**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| *In Re Abbott Laboratories, et al., Preterm Infant Nutrition Products Liability Litigation* | MDL No. 3026<br><br>Master Docket No. 1:22-cv-00071<br><br>Hon. Rebecca R. Pallmeyer |
| **This Document Relates to:**<br>*Inman v. Mead Johnson & Company, LLC et al.* | Cause No. 1:22-cv-03737 |

**MEAD JOHNSON & COMPANY LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 4

LEGAL STANDARD.................................................................................................................. 9

ARGUMENT ............................................................................................................................... 9

I. Mead Johnson Is Entitled to Summary Judgment on Plaintiff's Failure to Warn Claim Because There Is No Evidence a Different Warning Would Have Changed Daniel's Clinical Course. ........................................................................................ 9

A. Daniel's Doctors Did Not Rely on Mead Johnson's Labels, and a Different Warning Would Not Have Changed Their Feeding Decisions............................ 10

B. Plaintiff Cannot Show that a Warning Would Have Mattered Because She Was Not Aware Daniel Was Receiving Formula. ............................................... 16

II. Mead Johnson Owed No Duty to Warn Ms. Inman Directly Because North Carolina's Learned Intermediary Doctrine Applies, and the Association Between Formula and NEC is Well-Known Within the Relevant Community. ............................ 18

III. Mead Johnson Is Entitled to Summary Judgment on Plaintiff's Defective Design Claim.......................................................................................................................... 21

A. Plaintiff's Design Defect Claim Fails as a Matter of Law Because She Cannot Show an Existing, Feasible, Alternative Design. .................................... 22

B. Plaintiff's Design Defect Claim Fails as a Matter of Law Because It Is an Impermissible Categorical Challenge. ............................................................... 24

IV. All of Plaintiff's Claims Fail Because She Cannot Prove Medical Causation. ................ 26

V. Mead Johnson Is Entitled to Partial Summary Judgment on Plaintiff's Request for Punitive Damages and Other Non-Specific Damages. .................................................... 27

CONCLUSION .......................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*,
No. 2 C 05356, 2025 WL 2377686 (N.D. Ill. Aug. 14, 2025) (*Diggs*)....................1, 14, 15, 20

*In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*,
No. 22 C 00232, 2025 WL 1282749 (N.D. Ill. May 2, 2025) (*Mar*).............................. *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................................9

*Asby v. Medtronic, Inc.*,
673 F. Supp. 3d 797 (E.D.N.C. 2023).............................................................................22, 25

*Bachtel v. TASER Int'l, Inc.*,
747 F.3d 965 (8th Cir. 2014) ............................................................................................25

*Baraukas v. Danek Med., Inc.*,
No. 6:97CV00613, 2000 WL 223508 (M.D.N.C. Jan. 13, 2000)..............................18, 19, 21

*Beck v. DePaolo*,
901 S.E.2d 462, 2024 WL 2828182 (N.C. Ct. App. June 4, 2024) .......................................27

*Brown v. Johnson & Johnson*,
64 F. Supp. 3d 717 (E.D. Pa. 2014) ....................................................................................24

*Carlson v. Bos. Sci. Corp.*,
Nos. 5:15CV57-RLV, 3:15CV211-RLV, 2015 WL 5732107 (W.D.N.C. Sep. 30, 2015), *aff'd*, 856 F.3d 320 (4th Cir. 2017)........................................................9, 10, 12, 18

*Carlton v. Goodyear Tire & Rubber Co.*,
413 F. Supp. 2d 583 (M.D.N.C. 2005) ...............................................................................26

*Christopher v. Cutter Lab'ys*,
53 F.3d 1184 (11th Cir. 1995) ............................................................................................20

*Click v. Pilot Freight Carriers, Inc.*,
265 S.E.2d 389 (N.C. 1980)................................................................................................26

*DeWitt v. Eveready Battery Co.*,
550 S.E.2d 511 (N.C. Ct. App. 2001) ..................................................................................10

*Doe v. Alpha Therapeutic Corp.*,
3 S.W.3d 404 (Mo. Ct. App. 1999)......................................................................................20

*Dunderdale v. United Airlines, Inc.*,
807 F.3d 849 (7th Cir. 2015) ....................................................................................9

*Edwards v. ATRO SpA*,
891 F. Supp. 1074 (E.D.N.C. 1995)...........................................................................12, 14

*Evers v. Hologic, Inc.*,
Nos. 22-cv-11895-ADB, 22-cv-12194-ADB, 2024 WL 4309413 (D. Mass. Sep. 26, 2024) .........................................................................................................18

*Friedl v. Airsource, Inc.*,
753 N.E.2d 1085 (Ill. App. Ct. 2001) ........................................................................21

*Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*,
2009 WI 78, 768 N.W.2d 674 (Wis. 2009)...................................................................25

*Lightfoot v. Georgia-Pacific Wood Prods., LLC*,
441 F. Supp. 3d 159 (E.D.N.C. 2020)........................................................................9, 14

*Estate of Long v. Fowler*,
861 S.E.2d 686 (N.C. 2021)........................................................................................28

*Odom v. G.D. Searle & Co.*,
979 F.2d 1001 (4th Cir. 1992) ....................................................................................21

*Rhyne v. U.S. Steel Corp.*,
474 F. Supp. 3d 733 (W.D.N.C. 2020) .......................................................................27

*Richardson v. Holland*,
741 S.W.2d 751 (Mo. Ct. App. 1987)..........................................................................25

*Smith v. Am. Honda Motor Co., Inc.*,
No. 1:14-CV-943, 2016 WL 1312541 (M.D.N.C. Apr. 4, 2016) ...............................27

*Sparks v. Oxy-Health, LLC*,
134 F. Supp. 3d 961 (E.D.N.C. 2015)............................................................... *passim*

*Taylor v. R.D. Morgan & Assocs., Ltd.*,
563 N.E.2d 1186 (Ill. App. Ct. 1990) ........................................................................29

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
No. 14 C 1748, 2017 WL 2574057 (N.D. Ill. May 22, 2017) .......................................9

*Town of Lexington v. Pharmacia Corp.*,
133 F. Supp. 3d 258 (D. Mass. 2015) ........................................................................25

*Walls v. Ford Motor Co.*,
No. 1:20-CV-98, 2022 WL 588901 (M.D.N.C. Feb. 25, 2022) ...............................28

**Statutes**

N.C. Gen. Stat § 1D-15(a) ....................4, 27

N.C. Gen. Stat. § 1D-15(c) ....................29

N.C. Gen. Stat. § 99B-1.1 ....................9

N.C. Gen. Stat. § 99B-3 ....................26

N.C. Gen. Stat. § 99B-5(a)....................10, 14, 16

N.C. Gen. Stat. § 99B-5(b) ....................2, 18, 19, 21

N.C. Gen. Stat. § 99B-5(c)....................2, 18

N.C. Gen. Stat. § 99B-6 ....................21, 22, 24

**Other Authorities**

21 C.F.R. § 107.50(c)....................2, 3, 19

Restatement (Third) of Torts: Prod. Liab. § 2 ....................21

Fed. R. Evid. 702 ....................3, 27

## INTRODUCTION

Plaintiff Alexis Inman seeks to hold Mead Johnson & Company, LLC[1] ("Mead Johnson") liable for manufacturing and distributing a product that doctors and nurses in the NICU have relied on for nearly a half century. Like most Plaintiffs in this MDL, she brings claims for failure to warn and defective design. Those claims rest on two faulty assumptions: that neonatologists are unaware of the difference in NEC rates among breastmilk-versus formula-fed infants, and that cow's milk-based formula, a longstanding staple of NICU nutrition, is "unreasonably dangerous."

This Court is familiar with the defects in Plaintiff's evidentiary presentation. Twice, plaintiffs in this MDL have advanced design defect and failure to warn claims against formula manufacturers. And twice this Court has rejected those claims and granted summary judgment in favor of defendants because plaintiffs could not prove causation. As the Court recently noted, the deficiencies in plaintiffs' causation theories in these cases "have recurred in this MDL." *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 2 C 05356, 2025 WL 2377686, at *7 (N.D. Ill. Aug. 14, 2025) (*Diggs*).

The record here is no different. The undisputed facts show that neonatologists in general—and the specific neonatologists in this case—***are*** aware of the difference in NEC rates and nevertheless routinely make informed decisions to prescribe Mead Johnson's preterm formulas to preterm infants in their care. The record here further shows that the hospital at issue in Plaintiff's claims, like virtually every hospital in the country, uses formula only when it is medically necessary, prioritizing mother's milk whenever it is available and not contraindicated. And as has

[1] Mead Johnson Nutrition Company, also named as a defendant, is a holding company that does not design, manufacture, or sell Enfamil products and therefore cannot be liable for any of the allegations in Plaintiff's complaint. Mead Johnson Nutrition Company has filed a separate motion for summary judgment on those grounds and also joins the arguments made herein.

been true in every single bellwether case, far from being defectively designed, cow's milk-based formula remains a critical, irreplaceable, tool for NICU doctors across the country and the world. Plaintiff cannot prevail on either claim, and Mead Johnson is entitled to summary judgment.

***First***, Plaintiff cannot prove that a warning to either her or her son Daniel's physicians would have changed the course of his care. There is no dispute that any nutrition Daniel Windley received could come (and did come) only via a doctor's order. And other than telling Daniel's doctors that she wanted to prioritize breastfeeding—a desire everyone agrees hospital staff encouraged—Plaintiff testified that she had no role in selecting the nutrition products that Daniel received. The only evidence in the record from the medical professionals involved in selecting the nutrition that Daniel received is that they (1) prioritized mother's milk whenever it was available; (2) knew about the difference in the incidence of NEC between infants fed mother's own milk, donor milk, or formula; (3) administered formula only when it was medically necessary; and (4) would not have changed their practice based on a warning label from Mead Johnson. Mead Johnson is thus entitled to summary judgment on Plaintiff's failure to warn claim (Count II).

***Second***, Plaintiff's failure to warn claim fails because North Carolina law[2] dictates that a manufacturer's duty to warn runs only to the physician where products are "prescribe[d]" and "dispense[d]" by physicians. N.C. Gen. Stat. § 99B-5(c). And no duty exists when the alleged risks are a "matter of common knowledge." N.C. Gen. Stat. § 99B-5(b). Specialty preterm formulas, like those Daniel received, are "typically prescribed by a physician . . . [and] distributed directly to . . . hospitals . . . ." 21 C.F.R. § 107.50(c). That was certainly true in this case, where each of Daniel's feeding decisions were made by physicians exercising their medical judgment.

[2] The Court has previously ruled that "North Carolina substantive law applies to this case." *See* ECF No. 25, at 4.

And those physicians were well-aware of any alleged risks, making any would-be warning to them moot. Because Mead Johnson owed no duty to warn of such a risk that was indisputably "common knowledge" among neonatologists, Mead Johnson is entitled to summary judgment on Plaintiff's failure to warn claim for this separate reason.

***Third***, Plaintiff's design defect claim fails because, like the plaintiff in the *Mar* case, Plaintiff cannot point to any feasible alternative design, which North Carolina law expressly requires. Moreover, Plaintiff has not identified any particular defect in ***Mead Johnson***'s formula. Instead, she claims that cow's milk-based formulas are defective ***in general***. But specialty formulas have been a "routine and necessary part" of caring for preterm infants for decades. SOF ¶ 16. They provide preterm infants with an "essential source of nutrition" when their mother's breastmilk is unavailable or where, as here, the child is not able to tolerate it. *Id.*; Ex. 1, Press Release, Am. Acad. of Pediatrics, *Statement in Response to NEC Lawsuit Verdicts* (July 27, 2024), https://www.aap.org/en/news-room/news-releases/aap/2024/aap-statement-in-response-to-nec-lawsuit-verdicts/ [https://perma.cc/K9WM-MC2E] ("AAP Statement"); Ex. 2, American Academy of Pediatrics ("AAP") Amicus Br. at 7 ("[P]reterm formula is an essential option in the NICU for preterm infant health."). And more fundamentally, North Carolina—like every other state—does not permit such categorical challenges to products.

***Fourth***, both of Plaintiff's claims fail because she cannot prove causation. In a complex case like this one, Plaintiff must prove causation through expert testimony. But as explained in Mead Johnson's contemporaneously filed motions to exclude Dr. DeZure and Dr. Spector, Plaintiff's sole specific causation and one of her general causation experts respectively, Rule 702 precludes their testimony.

***Finally***, in the alternative, Mead Johnson is entitled to partial summary judgment on Plaintiff's request for punitive and economic damages. Plaintiff has no evidence that Mead Johnson concealed or otherwise misrepresented the scientific literature related to formula and NEC. N.C. Gen. Stat § 1D-15(a) (requiring claimant to show fraud, malice, or willful or wanton conduct). To the contrary, the evidence shows that Mead Johnson promoted maternal breast milk as the first choice for preterm infants, followed by donor human milk, consistent with the guidance from the American Academy of Pediatrics. In addition, Plaintiff lacks evidence to support a claim for economic damages.

## BACKGROUND

After a pregnancy lasting a little more than 29-weeks that included multiple medical complications, Alexis Inman delivered Daniel Windley and his twin brother, Deyvon, via an emergency C-section on May 12, 2020 at Vidant Medical Center in North Carolina. SOF ¶ 20.[3] Because they were more than ten weeks early, both boys were considered "very preterm." SOF ¶¶ 2, 21. Deyvon weighed 1278g—almost three pounds—at birth. SOF ¶ 22. Daniel weighed 670g, barely half his brother's weight, placing him in the third percentile for his gestational age and in the "extremely low birthweight" category. *Id.*; Ex. 4, Singh Report at 13.

Daniel's care was further complicated due to a number of comorbidities and chronic issues. *See* SOF ¶ 1; Ex. 5, Bear Tr. at 105:12-17. As one of his doctors said, Daniel had "lots of medical problems through[out] his [NICU] course." Ex. 5, Bear Tr. at 15:15-17; *see also* SOF ¶ 1. In the days and weeks after his birth, Daniel had nine blood transfusions due to acute anemia. *See* SOF

[3] Ms. Inman's pregnancy was complicated by multiple challenges. SOF ¶ 19; Ex. 3, Miller Dep. Tr. 317:21-318:17 (Jan. 8, 2025) ("Ms. Inman's pregnancy was complicated by multiple, very rare conditions: the mono-di twins, the selective fetal growth restriction, rare; HDFN causing severe fetal anemia, rare.").

¶ 23. He received antibiotics for at least nine days—more than quadruple the standard 48-hour course typical for preterm infants. SOF ¶ 24. Daniel's physicians noted significant concerns about his health—and his gut health in particular—long before he received any formula. SOF ¶¶ 33, 38, 40, 44. In short, even among preterm infants—a population that is already at risk for a host of complications simply by being born early—Daniel's challenges were particularly complex. *See* SOF ¶¶ 1, 3; Ex. 6, Singh Dep. Tr. 291:3-4 (Jan. 22, 2025) (referring to Daniel's case as "a very, very complicated case").

Everyone involved in Daniel's care agreed that mother's own milk was the best nutrition to provide Daniel and his brother. *See* SOF ¶¶ 25-28; Ex. 7, Inman Tr. at 129:12-13 ("[T]hey agreed with me about breastfeeding both twins."). Ms. Inman believed this, in part because she had breastfed each of her three prior children. SOF ¶ 25; Ex. 7, Inman Tr. at 22:4-11 ("I was always informed that breastfeeding was the best way to go."); *id.* at 21:19-20 (Alianna breastfed); *id.* at 30:14-16 (Alayna breastfed); *id.* at 33:20-22 (Amaya breastfed). Indeed, at the time of the twins' birth, Ms. Inman was still breastfeeding her 15-month-old daughter. SOF ¶ 25. As she had done with her prior children, Ms. Inman intended to breastfeed the twins, and she told virtually every doctor she met with that was her intent. SOF ¶ 25. Although medical staff wondered how she could do that while continuing to breastfeed her daughter at home, Daniel's doctors honored that decision, agreeing that his mother's own milk would "always be the first thing he would be fed, if it were available." SOF ¶ 25. Indeed, Dr. Kelly Bear, the only treating neonatologist who was deposed in this case, repeatedly described herself as a "big advocate for breastfeeding." SOF ¶ 26; Ex. 5, Bear Tr. at 75:5-6; *see also id.* at 11:5-12 ("I'm an advocate for breastfeeding and breast milk.").

Daniel and Deyvon's feeding regimens followed the hospital's feeding roadmap, a set of guidelines the hospital's NICU staff developed to standardize feedings. SOF ¶ 27. After birth, Daniel and Deyvon's doctors, consistent with the hospital's guidelines, ordered mother's milk first and, if not available, donor milk. SOF ¶ 28. Although Ms. Inman began pumping after the twins' birth, her milk began coming in "by day three." SOF ¶ 34. From May 12 through May 15, until Ms. Inman's milk came in, the twins received donor milk. SOF ¶ 32. During this period, when Daniel was receiving donor breastmilk, his doctors were concerned that he was not tolerating that form of nutrition. SOF ¶ 33. He had various indications of feeding intolerance, including abdominal distention, during the first three days after his birth. SOF ¶¶ 35, 38. Accordingly, during this time, Daniel's doctors would occasionally withhold his feeds. SOF ¶ 33.

As Ms. Inman's milk supply increased, the twins' physicians began feeding them her breastmilk on May 16. SOF ¶ 34. In accordance with the hospital's feeding guidelines, the medical team slowly increased the twins' feeding, eventually adding cow's milk-based fortifier to both of their feeding orders on May 19th to supplement Ms. Inman's breast milk. SOF ¶ 36. From May 19 through May 25, Daniel received his own mother's milk, fortified with Enfamil human milk fortifier, consistent with the hospital's guidelines. SOF ¶ 37.

On May 25, Daniel's doctors, concerned about his growth and continued feeding intolerance on human milk, hypothesized that Daniel might have a genetic disorder called "galactosemia," a metabolic complication that prohibits the body from metabolizing galactose, a sugar found in human milk. SOF ¶ 39. This meant that he could not receive mother's own milk or donor milk. SOF ¶ 40. But Daniel, of course, still needed to eat. And so nearly two weeks after he was born, his doctors switched Daniel's feeds from fortified mother's milk to various hypoallergenic, but still cow's milk-based, formulas to ensure he could continue receiving

nutrition. SOF ¶ 41. From May 25 through June 3, Daniel received Nutramigen and Pregestimil—Mead Johnson hypoallergenic formulas—to meet his nutritional needs. SOF ¶ 41. After Daniel's galactosemia test came back negative, his doctors switched his feeds back to his mother's own milk fortified with a cow's milk-based fortifier—the same feeding regimen as his brother. SOF ¶ 44; *see, e.g.*, Ex. 8, Minor-DeyvonWindley-PPR-00957–58 (showing feeding of breast milk with added "Human Milk Fortifier – Enfamil"). From June 3 through June 5, Daniel again received his own mother's milk fortified with cow's milk-based fortifier. SOF ¶ 44.

On June 6, now nearly a month old, Daniel's care team was concerned that he had not gained adequate weight even though he was on fortified mother's milk. SOF ¶ 45. He weighed 868g, a little less than two pounds. SOF ¶ 46. His brother, Deyvon, weighed approximately 1700g—nearly four pounds. SOF ¶ 47. His physicians ordered that Daniel begin receiving a mix of mother's own milk (or donor breastmilk if Ms. Inman's milk was not available) and Enfamil Premature Formula ("EPF") for extra calories due to his poor growth. SOF ¶ 48.

Once Daniel reached 30 days old, his care team removed donor milk from his feeding order, which was consistent with the hospital's feeding protocol. SOF ¶ 50. From then on, Daniel continued to receive his own mother's milk or, if his mother's milk was insufficient, formula. *Id.* Daniel received exclusively EPF from June 12 onward.[4] SOF ¶ 51. On June 17, 2020, Dr. Bear ordered the combination of two different products—a 24 kcal and a 30 kcal product—to create a

[4] There is disagreement in the record as to why Daniel received exclusively formula at this point. Dr. Bear testifies that he would have done so only if his mother's own milk was insufficient, Ex. 5, Bear Tr. at 134:20-135:6, while Ms. Inman claims that she was pumping sufficient milk to feed both twins. Ex. 7, Inman Tr. at 117:19-118:6. SOF ¶ 52. There is no evidence in the record, however, that Dr. Bear or the hospital was influenced in any way by Mead Johnson to avoid using any of Ms. Inman's own milk. To the contrary, the evidence is unanimous that Daniel's care team prioritized Ms. Inman's milk.

27 kcal formulation, which they fed Daniel due to his "poor growth curve." SOF ¶ 53. He remained on the 27 kcal mixture through the remainder of his time in the NICU. SOF ¶ 54.

While the hospital informed Ms. Inman of the transition to Nutramigen, SOF ¶ 42, she testified that no one at the hospital told her about any of the other changes to Daniel's nutrition course, including the transition to full feeds of EPF on June 12 or the increase in caloric density on June 17, 2020. SOF ¶ 56. Ms. Inman also testified that no one at the hospital spoke with her about NEC, and she did not see any formula bottles or labels during the time that Daniel was in the NICU. SOF ¶¶ 61–64.

On June 23, 2020, Daniel was diagnosed with NEC and passed away that same day. According to Plaintiff, Daniel's physicians never told Plaintiff that Daniel had NEC. SOF ¶ 60. Daniel's doctors had phoned Plaintiff and told her that they believed he had an infection and was getting sick. *Id.* Plaintiff testified that she first learned Daniel died from NEC from her attorneys. SOF ¶ 59 (citing Ex. 7, Inman Tr. at 145:14-20 ("[I]s it your testimony that you did not understand that Daniel had passed away as a result of NEC until a conversation with your attorneys? **A. From my knowledge, yes.**") (emphasis added)). No doctor has ever told Plaintiff that infant formula products—of any kind—caused or contributed to Daniel's NEC. SOF ¶ 65.

Plaintiff filed her complaint in the Southern District of Indiana on June 22, 2022 alleging claims for strict liability, negligence, failure to warn, and punitive damages. ECF No. 1. The JPML transferred the case to this Court, and Mead Johnson timely moved to dismiss. ECF Nos. 7-10, 17. Plaintiff filed an amended complaint alleging negligent design defect, negligent failure to warn, and punitive damages under the North Carolina product liability statute, which does not recognize strict liability claims. ECF No. 20. On July 17, 2023, the Court granted in part Mead Johnson's motion to dismiss, holding that Plaintiff was not permitted to recover damages for future

economic benefits or pain and suffering. ECF No. 25. The parties and the Court selected this as a bellwether case for the purpose of "provid[ing] significant information regarding the entire pool of cases that are part of the MDL." *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2017 WL 2574057, at *1 (N.D. Ill. May 22, 2017).

## LEGAL STANDARD

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

North Carolina law does not permit strict liability in product liability actions. N.C. Gen. Stat. § 99B-1.1 ("There shall be no strict liability in tort in product liability actions."). "[W]here a product liability claim sounds in tort . . . the plaintiff must prove duty, breach, causation, and damages" as with any other negligence claim. *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 986 (E.D.N.C. 2015) (citing *Bryant v. Adams,* 116 N.C. App. 448, 465, 448 S.E.2d 832 (1994)).

## ARGUMENT

### I. Mead Johnson Is Entitled to Summary Judgment on Plaintiff's Failure to Warn Claim Because There Is No Evidence a Different Warning Would Have Changed Daniel's Clinical Course.

"In the context of a failure to warn, a plaintiff must establish both that plaintiff or [another decision maker] would have read a warning, and that they would have changed their behavior as a result of it." *Lightfoot v. Georgia-Pacific Wood Prods., LLC*, 441 F. Supp. 3d 159, 177 (E.D.N.C. 2020). Where no decision maker read or relied on a warning, ***or*** when the decision maker would not have altered their behavior even if they ***had*** read a warning, there can be no liability. *Carlson v. Bos. Sci. Corp.*, Nos. 5:15CV57-RLV, 3:15CV211-RLV, 2015 WL 5732107, at *2 (W.D.N.C.

Sep. 30, 2015), *aff'd*, 856 F.3d 320 (4th Cir. 2017). *See also* N.C. Gen. Stat. § 99B-5(a) ("No manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves . . . that the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought[.]").

Here, as in *Mar*, "there is simply no testimony or evidence on which a jury could find that a different warning would have resulted in different actions taken by Plaintiff or the physicians." *In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00232, 2025 WL 1282749, at *9 (N.D. Ill. May 2, 2025) (*Mar*). "[W]hen the necessary inference is so tenuous that it rests merely upon speculation and conjecture," "it is the duty of the court to withdraw the case from the jury." *Sparks*, 134 F. Supp. 3d at 978 (citation omitted).

### A. Daniel's Doctors Did Not Rely on Mead Johnson's Labels, and a Different Warning Would Not Have Changed Their Feeding Decisions.

"A manufacturer . . . may not be held liable for a claim based on inadequate warnings unless the failure to provide adequate warnings was a proximate cause of the plaintiff's injuries." *DeWitt v. Eveready Battery Co.*, 550 S.E.2d 511, 517 (N.C. Ct. App. 2001) (citation omitted). To prove warnings causation, Plaintiff must first produce evidence "demonstrating . . . reliance on the [product's warnings]." *Carlson*, 2015 WL 5732107, at *2.

There is no evidence in the record that Daniel's doctors made their feeding decisions based on any Mead Johnson-produced material. Daniel's physicians, who ordered and administered EPF, relied on "evidence-based science"—not Mead Johnson material—to make their feeding decisions. SOF ¶ 66. And the only evidence in the record from a physician who actually ordered formula for Daniel, Dr. Bear, was that no warning from Mead Johnson would have changed her decision. SOF ¶ 74.

Rather, the record regarding Daniel's physicians' decisions to feed him formula is that they did so according to the hospital's established feeding guidelines and the physicians' medical judgment, free from any Mead Johnson material. SOF ¶¶ 14, 68 (citing Ex. 5, Bear Tr. at 92:5-10 (testifying that the feeding guidelines "provide[] a framework for how to increase a baby's feeding safely and to improve their growth.")); Ex. 9, NICU Feeding Roadmap.

Under the hospital's feeding guidelines, whenever Ms. Inman's milk was available and not contraindicated Daniel always received that first.[5] SOF ¶¶ 25–28. Daniel was eligible for—and often received—donor milk. SOF ¶ 28. He was not eligible for, and therefore did not receive, Prolacta fortifier.[6] SOF ¶ 29. And while the neonatologists follow the feeding guidelines "very closely," it is important that physicians be able to deviate based on the needs of any particular infant. SOF ¶ 31. Specifically, "when a baby is not . . . growing appropriately," the physicians need to "make decisions to . . . like in this case, increase calories." SOF ¶ 31 (citing Ex. 5, Bear Tr. at 65:22-66:12). Consistent with the feeding roadmap, which incorporated concerns like the risk of NEC and lack of growth, Daniel's doctors began ordering formula. SOF ¶ 67.

The transition to formula was consistent with the hospital's feeding guidelines, and, in Dr. Bear's judgment, was an entirely "medically appropriate choice." SOF ¶¶ 67, 76. There is no evidence that Dr. Bear—or any other medical professional—relied on representations from Mead Johnson when making decisions about what to feed preterm infants. Dr. Bear testified that she does not "look to formula companies" to tell her what decisions to make about the care of preterm infants. SOF ¶ 68. Indeed, "marketing or labeling by Mead Johnson" has ***never*** influenced Dr.

---

[5] During the brief period where Daniel's care team was concerned that he might have had a metabolic disorder, they provided him with various specialty formulas.

[6] The hospital did not have Prolacta formula available to order for patients, and Dr. Bear was unaware Prolacta had a formula product. SOF ¶ 30.

Bear's decision to order preterm formula. SOF ¶ 68. Dr. Bear has ***never*** read the label on an EPF bottle, does not rely on sales representatives as a source of information about products she orders, and has never visited the Enfamil website. SOF ¶¶ 69–71.

Therefore, Plaintiff cannot demonstrate, based on evidence in the record, that a warning on the label of various Mead Johnson products would have made a difference where none of the physicians making decisions about Daniel's nutrition read the label. *See Mar*, 2025 WL 1282749, at *9 ("There is simply no testimony or evidence on which a jury could find that a different warning would have resulted in different actions taken by Plaintiff or the physicians."); *Carlson*, 2015 WL 5732107, at *2 ("[Plaintiff] cannot establish that an alleged inadequate warning for the Uphold was the proximate cause of her injuries without demonstrating Dr. Kennelly's reliance on the Uphold DFU (Directions For Use).").

***Second***, even if Daniel's physicians had relied on representations or information from Mead Johnson to make their feeding decisions, summary judgment is warranted because a warning would not have made a difference in what those physicians chose to feed Daniel. *Edwards v. ATRO SpA*, 891 F. Supp. 1074, 1078 (E.D.N.C. 1995) (summary judgment proper where "the best crafted manual, warning, or instruction imaginable would have been a futile measure, because [the product users] would have done nothing differently upon its receipt"). At a population level, many studies show a difference in the incidence of NEC between infants receiving human milk and infants receiving some other form of nutrition.[7] Physicians learn that basic principle in medical

[7] A recent report from a panel of experts to the Secretary of Health & Human Services concluded that "[a]vailable evidence supports the hypothesis that it is the absence of human milk – rather than the exposure to formula – that is associated with an increase in the risk of NEC." SOF ¶ 4, Ex. 10, Report to Sec'y of Dep't of Health & Hum. Servs., Necrotizing Enterocolitis (NEC) in Preterm Infants Working Grp. of the Nat'l Advisory Council of Child Health & Hum. Dev. (NACHHD) (Sep. 16, 2024).

school, residency, and fellowship. SOF ¶ 7. It is so fundamental to neonatology that it even appears on the board exam. SOF ¶ 7.

Daniel Windley's treating physicians knew this difference. Dr. Bear, Daniel's treating neonatologist who ordered formula that allegedly caused Daniel's NEC, testified that "Mom's milk has the lowest associated risk of NEC." SOF ¶ 8; Ex. 5, Bear Tr. at 64:10-14. "Donor milk," she added, "also has a decreased risk of NEC compared to formulas, but probably not as good as mom's own milk." SOF ¶ 9; Ex. 5, Bear Tr. at 64:19-21. Indeed, Dr. Bear knew this information years before Daniel was born. SOF ¶ 72. She was aware of AAP's 2012 guidance on breastfeeding and testified that she would "keep up to date" with AAP guidelines on breastfeeding and donor milk. SOF ¶ 73. And the decision she made to continue administering Enfamil Premature Formula, which Plaintiff alleges caused Daniel to develop NEC, was "with the understanding that formula is less protective against NEC than mom's milk or donor milk" and based on her belief that it was the "medically-appropriate choice." SOF ¶ 76. Jennifer Fowler, the dietitian who advised on Daniel's nutrition regimen, testified that she too "kn[ew] that breastmilk decreases the risk of NEC." SOF ¶ 75. Even Dr. Livingston, a pediatric hospitalist with no authority to select feedings who cared for Daniel, knew that "[t]here's just substantial evidence that breast milk is superior." SOF ¶ 75.

There is no evidence anywhere in the record that Dr. Bear—or any of Daniel's physicians—would have done anything differently had Mead Johnson provided any kind of warning. As Dr. Bear testified:

> **Q.** If you had been told by Mead Johnson that there was a ***five times increased risk*** of NEC with formula compared to donor milk, again consistent with what we saw in the AAP 2012 guidelines, would you have changed your decision to order EPF 24 or 27 for Daniel?
>
> **A.** **No.**

SOF ¶ 74 (emphasis added). This is on all fours with the testimony this Court highlighted in *Diggs*. *Diggs*, 2025 WL 2377686, at *7. The reason a "five times increased risk of NEC with formula," as cited here, or a "77% reduced risk in NEC," which this Court cited in *Diggs*, does not matter to these doctors is because those numbers come from the AAP and have been well-known in the medical community for ***more than a decade***. Dr. Bear testified that she was familiar with the AAP's guidelines during the time she was treating Daniel. SOF ¶ 73. Indeed, throughout the entire deposition, Plaintiff's counsel presented Dr. Bear with ***no information*** about formula and NEC that she was not already aware of when she was making care decisions for Daniel:

> Q. Have you learned anything in this deposition today about the risk of NEC associated with cow's-milk-based preterm formula or fortifier that you didn't know in 2020?
>
> **A. No.**

SOF ¶ 79. Instead, Dr. Bear testified that, after her deposition, she would continue using preterm formula with her patients whenever it was medically indicated, as it was in Daniel's case. SOF ¶ 79. Indeed, even after Daniel passed away, Dr. Bear's team continued to feed his brother Deyvon with EPF. And while other members of Daniel's care team could have consulted or advised Dr. Bear and her neonatologist colleagues on Daniel's nutrition, any order for nutrition must be directed by a neonatologist. SOF ¶ 17. If Dr. Bear disagreed with any recommendation, she would have overridden it. SOF ¶ 18.

It is black letter law that warnings causation requires Plaintiff to show that a different warning would have affected the outcome. N.C. Gen. Stat. § 99B-5(a); *Sparks*, 134 F. Supp. 3d at 994 (summary judgment appropriate where different warning would not have affected outcome); *Lightfoot*, 441 F. Supp. 3d at 177 (same); *Edwards*, 891 F. Supp. at 1078 (same). Plaintiff offers

***zero*** evidence about what that warning might be.[8] But even taking an extreme potential warning—five times the risk, "a greater risk difference than even Dr. Spector [Plaintiff's epidemiologist] testifies to," *Diggs*, 2025 WL 2377686, at *7—Daniel's physicians would not have changed a thing about their formula prescriptions. SOF ¶¶ 74, 79. Because the medical professionals caring for Daniel testified that their decision to prescribe and continue prescribing EPF for Daniel would not have changed if Mead Johnson had provided them with the information that Plaintiff claims is so revelatory, Plaintiff cannot show warnings causation, and Mead Johnson is entitled to summary judgment. *Mar*, 2025 WL 1282749, at *9.

Moreover, this case, like the other bellwether cases in this MDL, reflects the reality that NICUs are complex environments in which doctors are making regular risk-benefit calculations about a host of interventions, including nutrition. Ex. 5, Bear Tr. at 72:3-9 (blood transfusions and "other medical interventions"); *id.* at 72:21-24 (antibiotics); *id.* at 73:7-11 (enteral feeding); *see also* Ex. 2, AAP Amicus Br. at 9. Here, Dr. Bear's priority for Daniel was ***not only*** avoiding NEC; it was ensuring he grew. Dr. Bear used her medical judgment to weigh both of those risks when deciding to prescribe Mead Johnson's formula and determined that "the risks of inadequate growth outweighed any risk of NEC." SOF ¶ 74 (citing Ex. 5, Bear Tr. at 137:21-138:7; *id.* at 153:10-19). Daniel began receiving exclusively preterm formula after his physicians had first tried donor milk, mother's milk, fortified mother's milk, three different hypoallergenic formulas, and a mix of donor milk and preterm formula. SOF ¶¶ 28, 29, 32, 34, 38–40, 43, 47–52; *see also* Ex. 4, Singh Report at 20–22. In Daniel's case, as in the other bellwether cases, formula was administered only

---

[8] As this Court noted in *Mar*, "the only testimony that has been provided as to what an adequate warning would have been is testimony from Plaintiff's regulatory and labeling expert, Dr. Scheer." *Mar*, 2025 WL 1282749, at *9. In the wake of this Court's order in *Diggs*, Plaintiffs have withdrawn Dr. Scheer from the litigation. Ex. 11, Email from T. Becker to E. Ullman (Aug. 11, 2025).

after a "thorough assessment and identification of medical need." SOF ¶ 49. There was no other option. Ex. 2, AAP Amicus Br. at 5 ("There are three possible sources of nutrition for a preterm infant….").

**B. Plaintiff Cannot Show that a Warning Would Have Mattered Because She Was Not Aware Daniel Was Receiving Formula.**

North Carolina law expressly imposes upon Plaintiff the obligation to prove, ***with evidence***, "that the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought." N.C. Gen. Stat. § 99B-5(a). But just as Plaintiff cannot show that Daniel's doctors would have acted differently, there is no evidence that a warning would have caused her to act any differently either.

***First***, there is no evidence Plaintiff would have done anything differently had she been warned because she never knew that Daniel was receiving Enfamil Premature Formula. SOF ¶ 55. She had already decided to feed her children breastmilk. SOF ¶ 25. She had already communicated that decision to the medical staff. *Id.* And she already knew that in the absence her own milk, donor milk was a "good alternative." *Id.* There was nothing more for her to do.

Even if Daniel's doctors had told Plaintiff that they believed EPF was the best way to meet Daniel's needs, the only evidence in the record is not that Plaintiff would have refused, but that she would have simply asked whether there were "other alternatives."[9] SOF ¶ 80. That testimony is entirely consistent with what she would have done had medical staff told her there was an increased risk of NEC with the various other treatments Daniel received. *E.g.*, Ex. 7, Inman Tr. at 134:1-9. ("Q. If doctors had told you that there was a potential risk for NEC, would you have gone against their recommendation to accept the blood transfusion? … **THE DEPONENT: I would**

[9] As explained in Section I.A., *supra*, there were no other alternatives.

**have probably reached out to other doctors or done more research to see what else was there[.]**" (emphasis added)).

***Second***, to the extent Plaintiff would have acted, that would not have been instigated by a label on an Enfamil bottle. Plaintiff ***never saw a label*** for an Enfamil product while Daniel was in the NICU. SOF ¶ 61. Nor did she read any "product pamphlets or inserts for any kind of formula" while in the hospital. SOF ¶ 62. And to the extent Ms. Inman points to various coupons she received from Mead Johnson, she has no idea whether they related to "preterm products or term products" because she "didn't pay much attention to them." SOF ¶ 63. Indeed, she never read them and instead "just g[a]ve them to somebody that [she] knew fed their baby formula." SOF ¶ 64. But in any event, Plaintiff did not select the formula that Daniel received. SOF ¶¶ 43, 66 The doctors did. SOF ¶ 17, 43. And Plaintiff did not rely on anyone or anything other than Daniel's doctors for Daniel's nutrition decision. SOF ¶ 43; Ex. 7, Inman Tr. at 125:3-10 ("Q. [D]id you believe that those providers were in a -- a better position to understand the risks and the benefits of the nutritional choices that were being administered to Daniel? . . . **THE DEPONENT: Yes, I did.**" (objection omitted) (emphasis added)). Indeed, when Daniel's doctors told Plaintiff they were going to administer Nutramigen to help Daniel gain weight, rather than push back or conduct independent research into the product, she agreed. SOF ¶ 42.

"Proximate cause requires something more concrete than mere speculation or conjecture." *Sparks*, 134 F. Supp. 3d at 994. But that is precisely what Plaintiff' theory would require of a jury. The only evidence is that Plaintiff never saw a bottle of EPF while Daniel was in the NICU; that she would not have done anything other than look for other options and prioritize breastmilk, which she had already done; and that Daniel's treating physicians did what they believed was medically necessary. As was the case in *Mar* and in *Diggs*, there is simply no evidence that a warning would

have altered anyone's behavior. *Mar*, 2025 WL 1282749, at *9 ("There is simply no testimony or evidence on which a jury could find that a different warning would have resulted in different actions taken by Plaintiff or the physicians."). And like *Mar* and *Diggs*, there is no evidence that something else would have been available to Daniel.

**II. Mead Johnson Owed No Duty to Warn Ms. Inman Directly Because North Carolina's Learned Intermediary Doctrine Applies, and the Association Between Formula and NEC is Well-Known Within the Relevant Community.**

Under North Carolina law, "no manufacturer or seller of a prescription drug shall be liable in a products liability action for failing to provide a warning or instruction directly to a consumer if an adequate warning or instruction has been provided to the physician or other legally authorized person who prescribes or dispenses that prescription drug for the claimant[.]" N.C. Gen. Stat. § 99B-5(c). The same statute provides that there is no liability where the manufacturer fails to warn of a "risk that is a matter of common knowledge." N.C. Gen. Stat. § 99B-5(b). Mead Johnson had no duty to warn because Enfamil Premature Formula is a product "prescribe[d] or dispense[d]" by physicians and because the association between NEC and cow's milk-based formulas is "common knowledge" within the medical community.

Although the statute expressly applies to "prescription drug[s]," for decades, North Carolina courts have applied the learned intermediary doctrine to cases "where a defendant manufactures a product which is dispensed to patients by doctors, rather than directly." *Baraukas v. Danek Med., Inc.*, No. 6:97CV00613, 2000 WL 223508, at *4 (M.D.N.C. Jan. 13, 2000). In such an instance, "the defendant has a duty to warn only the doctor, rather than the patients of any risks associated with the product's use." *Id.*; *Carlson*, 2015 WL 5732107, at *2. *See also Evers v. Hologic, Inc.*, Nos. 22-cv-11895-ADB, 22-cv-12194-ADB, 2024 WL 4309413, at *13 (D. Mass. Sep. 26, 2024) (collecting cases applying North Carolina law and concluding that "North Carolina state courts have not addressed whether the [learned intermediary] doctrine also applies to medical

device manufacturers, but each federal court to confront the question has presumed that a North Carolina court would apply the doctrine to medical device manufactures as well"). But that duty to warn runs only to the extent the danger is not "open and obvious" or "common knowledge" to the relevant community. *See* N.C. Gen. Stat. §99B-5(b).

FDA regulates Enfamil Premature Formula products under 21 C.F.R. § 107.50(c)(1). That regulation requires those formulas be (1) "not generally available at the retail level," (2) "typically . . . prescribed by a physician, and must be requested from a pharmacist," and (3) "distributed directly to institutions such as hospitals, clinics, and State or Federal agencies." 21 C.F.R. § 107.50(c)(1). There is no dispute that this provision governs Enfamil Premature formulas. SOF ¶ 78, Ex. 16, Hadley Dep. Tr. 183:12–184:16 (Sep. 24, 2024) ("[Enfamil Premature Formula] would be used under significant, you know, physician supervision."). In short, Enfamil premature formula is, by regulation, a product "dispensed to patients by doctors." *Baraukas*, 2000 WL 223508, at *4; 21 C.F.R. § 107.50(c)(1).

A physician who was well-informed on the difference in incidence of NEC between infants fed human milk and infants fed something other than human milk (*i.e.*, a learned intermediary) needed to approve each feeding that Daniel had in the NICU. SOF ¶¶ 7, 17. Daniel Windley could not have received anything other than breast milk absent a physician's order. SOF ¶ 17. But even if it were possible for Daniel to receive nutrition absent a physician order, the management of a complex nutritional course for Daniel Windley, who lived his entire life in an intensive care setting, ***required*** the input of knowledgeable physicians to navigate the complexities of his feeding regimen. *See* Ex. 5, Bear Tr. at 105:12-17, 118:20-22. Ms. Inman recognized that complexity because she testified that she relied on his physicians when they were determining what nutrition products to administer. SOF ¶ 43. And Daniel's doctor testified that she had to weigh the many

different, potential risks and adverse outcomes when making decisions about his feeding options. SOF ¶ 74. Axiomatically, such decision making requires medical training.

Moreover, the association between NEC and formula is well-documented in the medical literature. Dr. Bear knew it. SOF ¶¶ 72-73. Dr. Livingston knew it. SOF ¶ 75. Ms. Fowler knew it. SOF ¶ 75. And every physician working in the NICU who approved the feeding guidelines knew it. *See* SOF ¶ 67 (deposition testimony discussing feeding roadmap). Since at least 1990, there have been studies looking at the purported risk of NEC and formula. And since 2012, the American Academy of Pediatrics has told neonatologists that there is a 77% reduction—a number that, as this Court notes, is even greater than the difference Dr. Spector purported to find, *Diggs*, 2025 WL 2377686, at *7—in the risk of NEC between infants fed human milk and infants fed formula. All of this is public, has long been "a matter of common knowledge" by the neonatology community, and was indisputably known by Daniel's doctors.[10]

Courts around the country recognize that there can be no liability where physicians are already aware of risks associated with a product. *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 420 (Mo. Ct. App. 1999) ("[T]he causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had substantially the same knowledge as an adequate warning from the manufacturer that should have been communicated to him." (citation omitted)); *Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1192 (11th Cir. 1995) ("[T]he failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a

[10] The AAP has since put forward additional guidance highlighting that "[a]lthough a mother's own milk is always preferred, donor human milk may be used for high-risk infants when the mother's milk is not available or the mother cannot provide milk. Priority should be given to providing donor human milk to infants <1500 g birth weight." Ex. 12, Policy Statement, Am. Acad. of Pediatrics, Donor Human Milk for the High-Risk Infant: Preparation, Safety, and Usage Options in the United States, 139 Pediatrics 4 (Jan. 2017).

prescription product is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warnings should have communicated."); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (affirming summary judgment where physician was aware of risks notwithstanding manufacturer's lack of a warning); *Friedl v. Airsource, Inc.*, 753 N.E.2d 1085, 1088 (Ill. App. Ct. 2001) ("no duty to warn physicians of a device's dangers if the medical community was already generally aware of those dangers"); *see also* N.C. Gen. Stat. § 99B-5(b) (no duty to warn where risks are "open and obvious").

Because the formulas are products "prescribe[d]" or "dispense[d]" by a physician and because any potential "risk" associated with formula feeding was "common knowledge" in the medical community and well-understood by Daniel's physicians, who were in the best position to adjust his feedings if necessary, and the associated practicalities of communicating complex information to parents already overwhelmed with information, applying the learned intermediary doctrine is the correct result here. *Baraukas*, 2000 WL 223508, at *4. The Court should grant summary judgment because Daniel's physicians were well-aware of any potential risks associated with NEC and formula.

## III. Mead Johnson Is Entitled to Summary Judgment on Plaintiff's Defective Design Claim.

To prevail on a design defect claim, the plaintiff must demonstrate that, among other things, "the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation." N.C. Gen. Stat. § 99B-6(a).[11]

---

[11] A plaintiff may also show that "the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." N.C. Gen. Stat. § 99B-6(a)(2). Mead Johnson is not aware of any North Carolina case applying this provision. *See* Restatement (Third) of Torts: Prod. Liab. § 2 reporter's note to cmt. d (1998) ("While the North Carolina courts have yet to reach the issue, it seems reasonable to assume that subsection (a)(2) of [N.C. Gen. Stat. § 99B-6] will serve as an acceptable basis for design-defect liability only in very rare instances[.]"). In any event, § 99B-6(a)(2) would not

***First***, Plaintiff's design claim fails as a matter of law because she, like every other bellwether plaintiff in this MDL to date, cannot offer proof of an alternative design. In *Mar*, this Court noted that "[o]ther plaintiffs pursuing similar claims in this MDL may be able to produce a more thorough record as to the basic facts and manufacturing process of Prolacta formula and procure expert testimony as to the feasibility of Prolacta as an alternative design for cow's-milk-based formula at the time of their child's birth." *Mar*, 2025 WL 1282749, at *10. No "more thorough record" exists here. ***Second***, even if Plaintiff could show an alternative design, her claim is not about something "wrong with the design" of Enfamil Premature Formula; it is instead a categorical challenge against cow's milk-based formulas. *Asby v. Medtronic, Inc.*, 673 F. Supp. 3d 797, 793 (E.D.N.C. 2023) ("Alleging negligent design requires alleging what was wrong with the design." (citation omitted)). Like many states, North Carolina does not permit such a claim.

### A. Plaintiff's Design Defect Claim Fails as a Matter of Law Because She Cannot Show an Existing, Feasible, Alternative Design.

North Carolina law is clear that Plaintiff must show that a "safer, practical, feasible, and otherwise reasonable alternative design or formulation" existed ***and*** that the defendant acted unreasonably in failing to adopt the alternative design. N.C. Gen. Stat. § 99B-6(a). "The technical, economic, and practical feasibility of using an alternative design or formulation at the time of manufacture" matters in terms of whether an alternative design could "have been reasonably adopted." N.C. Gen. Stat. §§ 99B-6(b)(6), 99B-6(a)(1).

---

apply to preterm formula, a product that has been widely used for fifty years and is, after human milk, the standard of care in NICUs around the country and the globe. *See id.* at cmt. d (noting that the category does not include "[c]ommon and widely distributed products such as alcoholic beverages, firearms, and above-ground swimming pools."). Indeed, less than one year ago, three leading public health agencies—FDA, CDC, NIH—jointly recognized preterm formula as "a crucial part of the standard of care" for preterm infants when mother's own milk is unavailable. Ex. 13, Press Release, U.S. Dep't of Health & Hum. Servs., FDA, CDC, NIH Consensus Statement on Recent Advisory Council Report on Premature Infants and Necrotizing Enterocolitis (Oct. 3, 2024) [https://perma.cc/BK33-BM7B].

Plaintiff points to Prolacta's products as a potential alternative design.[12] *See* Ex. 14, DeZure Tr. at 103:3-21 ("I think [Prolacta] would have been protective against the NEC, yes."); Ex. 15, J. Sucre Report at 16 (amended Dec. 16, 2024). As this Court held in the *Mar* case, "[t]here is no evidence in the record, however, as to the scale at which Prolacta was manufactured during the relevant period of Plaintiff's claims." *Mar*, 2025 WL 1282749, at *5. There is no evidence here either. Indeed, the only evidence in the record is that Prolacta's products are ***not*** able to be produced at scale. SOF ¶ 77.

Moreover, Plaintiff cannot meet her burden of demonstrating that Prolacta's fortifier or formula would have made any difference for Daniel here. The evidence in the record is that they would not have. Daniel's doctor testified that the hospital no longer uses Prolacta products ***at all*** because it did not find the product effective at reducing NEC. SOF ¶ 29. Moreover, under the Hospital's feeding policy, Daniel would not have qualified for Prolacta's fortifier. *Id.* Under the hospital's feeding guidelines, the infant needed to be less than 26 weeks, under 1,000 grams, ***and*** meet additional criteria to receive Prolacta fortifier. Ex. 9, NICU Feeding Roadmap at 3. Daniel was neither less than 26 weeks nor did he meet any of the hospital's additional criteria. SOF ¶ 29. As such, the fortifier was available, but the hospital made an informed decision not to offer it to patients like Daniel. As for the formula product, the hospital did not have it, and Dr. Bear had never even heard of it. SOF ¶ 30.

To the extent Plaintiff alleges Prolacta's ***formula*** is an alternative design, that argument fails, too. As this Court acknowledged in *Mar*, "it is a basic matter of tort principles that an

[12] As in *Mar*, Plaintiff's experts are not clear on whether they are alleging Prolacta's fortifier or formula would have been protective. As this Court noted in *Mar*, "fortifier is a different *class* of product from formula" and so cannot be an alternative design to formula. *Mar*, 2025 WL 1282749, at *6.

alternative design must not be an altogether essentially different product." *Mar*, 2025 WL 1281749, at *6 (citation omitted). The Court went on to accept the *Mar* plaintiff's contention that the "primary purpose of formula" is to be "a stand-alone food source—not as supplementation." *Id.* (citing Resp. to DSOF ¶ 56); *see also* SOF ¶ 78.

Taking Plaintiff's and the Court's logic, Prolacta's formula ***cannot*** be an adequate substitute. It is not designed, nor does it claim to be, a "stand-alone food source." Indeed, Prolacta tells doctors that its products are "***not suitable*** for use as a sole source of nourishment." SOF ¶ 77; Ex. 17, Guide, Feeding Transition From an Exclusive Human Milk Diet, Prolacta Bioscience (2021) (emphasis added). The product itself contains a caution statement warning physicians that it is "[n]utritionally incomplete." *Id.* Cow's milk based-preterm formula, on the other hand, provides a sole source of nutrition. SOF ¶ 78. Just as "acetaminophen is not an alternative to ibuprofen but an entirely different product," Prolacta's formula product is wholly different from cow's milk-based preterm formulas. *Brown v. Johnson & Johnson*, 64 F. Supp. 3d 717, 722 (E.D. Pa. 2014) (citation omitted).

Absent a feasible alternative design, Plaintiff cannot prevail on her design defect claim, and Mead Johnson is entitled to summary judgment. N.C. Gen. Stat. § 99B-6(a); *Mar*, 2025 WL 1281749, at *6 (awarding summary judgment for Plaintiff's lack of alternative design).

### B. Plaintiff's Design Defect Claim Fails as a Matter of Law Because It Is an Impermissible Categorical Challenge.

North Carolina requires that Plaintiff prove there is something ***beyond*** an "inherent characteristic of the product" that is allegedly defective. N.C. Gen. Stat. § 99B-6(c) (prohibiting liability when claim is "based upon an inherent characteristic of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and that is recognized by the ordinary person with the ordinary knowledge common to the community"). But

other than point to the fact that Enfamil Premature Formula is partially derived from cow's milk, Plaintiff alleges no specific design flaw. Absent a challenge to something "wrong with the design," *Asby*, 673 F. Supp. 3d at 793, Plaintiff's claim is simply an impermissible categorical challenge. "A plaintiff does not meet [her] burden of demonstrating a design defect by alleging that an entire class of products is inherently dangerous." *Town of Lexington v. Pharmacia Corp.*, 133 F. Supp. 3d 258, 270 (D. Mass. 2015) (citation omitted).

Dr. Sucre, Plaintiff's mechanism expert, speculates that there are ingredients in formula that, in isolation or in combination, could cause NEC. Those might be "the protein, the carbohydrate, the fact, or some combination of them." Ex. 18, Sucre Dep. Tr. 133:4-17 (Dec. 20, 2024); *see also* Ex. 15, J. Sucre Report at 37-38 (amended Dec. 16, 2024). But these are not unique to Enfamil Premature formula. Indeed, Dr. Sucre concedes that her opinions do not relate to any particular Mead Johnson product but are instead about "cow's milk-based formula in general." Ex. 18, Sucre Dep. Tr. at 405:9-406:1. This is dispositive. For a design defect claim, the question is not whether cow's milk-based formula generally is harmful. The question is whether there is a defect in ***Enfamil Premature Formula's design*** that is harmful. *Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 973–74 (8th Cir. 2014) (plaintiff failed to show that defendant's taser was defective when purported defect was common to all tasers); *Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.*, 2009 WI 78, ¶ 37, 768 N.W.2d 674, 685 (Wis. 2009) ("A claim for defective design cannot be maintained here where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself."); *Richardson v. Holland*, 741 S.W.2d 751, 756–57 (Mo. Ct. App. 1987) (rejecting plaintiff's contention that defendant's gun was defective because plaintiff did not identify anything that made it more dangerous than other guns).

Dr. DeZure instead claims that a combination of Enfamil Premature Formula 24 kcal and the subsequent decision to mix multiple formulas to achieve a 27 kcal version was a substantial factor in causing Daniel's NEC. Ex. 14, DeZure Tr. at 59:6-9 ("But it's not until they increased the – to the higher caloric density of 27 kcal that it shortly thereafter starts the cascade for his development of NEC."). Mead Johnson does not make—and has never made—a 27 kcal product. Instead, the 27 kcal version was a bespoke formulation that ***Daniel's treaters*** made for him. SOF ¶ 53. Not only is this not a design of Enfamil, North Carolina does not hold manufacturers liable when there is "an alteration or modification of the product by a party other than the manufacturer or seller." N.C. Gen. Stat. § 99B-3.

A product is defective when it "malfunction[s] after [being] put to its ordinary use." *Sparks*, 134 F. Supp. 3d at 986. There is nothing in the record suggesting Enfamil Premature Formula malfunctioned. The product is not given to prevent NEC, and no one thinks it does. Rather, it is given to provide nutrition. *See, e.g.*, Ex. 1, AAP Statement ("Special formulas designed for preterm infants provide an essential source of nutrition"). Even Plaintiff's expert acknowledges that preterm formula is designed to provide a "essential source of nutrition." Ex. 14, DeZure Tr. at 148:4-15. And even if Plaintiff were granted that inference, she would still not be entitled to the further inference that ***Mead Johnson*** was negligent in designing Enfamil Premature formula. *Carlton v. Goodyear Tire & Rubber Co.*, 413 F. Supp. 2d 583, 588 (M.D.N.C. 2005) ("[A] plaintiff may not prove negligence by stacking inference upon inference."). Accordingly, Plaintiff's design defect claim fails.

## IV. All of Plaintiff's Claims Fail Because She Cannot Prove Medical Causation.

In any complex tort case, a plaintiff must prove specific causation through expert testimony. *See Click v. Pilot Freight Carriers, Inc.*, 265 S.E.2d 389, 391 (N.C. 1980) ("[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical

questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." (citing *Gillikin v. Burbage*, 139 S.E.2d 753, 760 (N.C. 1965)). Reliable causation testimony is critical here where infants develop NEC regardless of what they are fed, where earlier and smaller infants have a higher risk of NEC. SOF ¶¶ 3, 4.

Mead Johnson has separately moved to exclude Dr. DeZure, Plaintiff's only specific causation expert, and Dr. Spector, Plaintiff's general causation expert. If ***either*** of their opinions are inadmissible, Mead Johnson is entitled to summary judgment. *Rhyne v. U.S. Steel Corp.*, 474 F. Supp. 3d 733, 743 (W.D.N.C. 2020). Because both of their opinions are inadmissible under Rule 702, Plaintiff is unable to meet her causation burden, and Mead Johnson is entitled to summary judgment on all counts. *See Beck v. DePaolo*, 901 S.E.2d 462, 2024 WL 2828182, at *7 (N.C. Ct. App. June 4, 2024) ("Plaintiffs are required to meet their evidentiary burden at the summary judgment stage through the testimony of an expert witness[.]").

## V. Mead Johnson Is Entitled to Partial Summary Judgment on Plaintiff's Request for Punitive Damages and Other Non-Specific Damages.

North Carolina applies an "extremely high standard . . . for punitive damages." *Smith v. Am. Honda Motor Co., Inc.*, No. 1:14-CV-943, 2016 WL 1312541, at *3 (M.D.N.C. Apr. 4, 2016). Under North Carolina law, a Plaintiff can recover punitive damages "only if the claimant proves" that the defendant committed "fraud," "malice," or "willful or wanton conduct." N.C. Gen. Stat. § 1D-15(a). Plaintiff must prove those factors by "clear and convincing evidence." *Id.* § 1D-15(b).

Plaintiff offers no evidence that Mead Johnson had any secret knowledge. There is no evidence that Mead Johnson actively concealed or misrepresented any facts about the association between NEC and formula. *See Smith*, 2016 WL 1312541, at *3 (no punitive damages where

internal memoranda did not show "an active concealment or misrepresentation of facts regarding the dangers of asbestos in the [product]" (citation and internal quotations marks omitted)). Nor does she offer any testimony about the effect of Mead Johnson's marketing on any NICU or hospital.[13] She offers no evidence that Mead Johnson ever lied or misled doctors about the appropriate use of formula. To the contrary, Mead Johnson trained its sales reps that "MOM is associated with lower rates of NEC and death." SOF ¶ 10. It handed out brochures telling hospitals that "[u]se of mother's own milk is preferred" and that "Mom's own milk is associated with lower risk of NEC and death in ELBW infants in an amount-dependent manner." SOF ¶ 11. Mead Johnson produced summary booklets telling physicians that "Mother's Own Milk (MOM) is the gold standard in preterm infants feeding. Donor human milk (DHM) is the next-best choice when MOM is unavailable or insufficient." SOF ¶ 12. There is nothing "wilful or wanton" about any of that (defining "willful or wanton conduct" as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm").

This is hardly a situation where Plaintiff can allege that Mead Johnson acted in "conscious and intentional disregard of and indifference to the rights and safety of others" by not warning neonatologists of a risk they already know and framing it in a way that the medical community has consistently rejected. *Estate of Long v. Fowler*, 861 S.E.2d 686, 696 (N.C. 2021) (quoting N.C. Gen. Stat. § 1D-5 (2019)); *see also Walls v. Ford Motor Co.*, No. 1:20-CV-98, 2022 WL 588901, at *18 (M.D.N.C. Feb. 25, 2022) (no punitive damages where plaintiff could not show company

[13] Plaintiff initially proffered Dr. Jakki Mohr as a purported expert on Mead Johnson's internal knowledge. Plaintiff has now withdrawn Dr. Mohr's opinions after the Court excluded her analogous opinions in the *Diggs* case. *See* Ex. 19, Email from D. Debrosse to E. Ullman (Aug. 11, 2025).

employees had displayed indifference to a specific risk). On the contrary, Mead Johnson makes products that the American Academy of Pediatrics have recognized are necessary to the survival of preterm infants.

Moreover, North Carolina law provides that punitive damages "shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another." N.C. Gen. Stat. § 1D-15(c). Therefore, to the extent Plaintiff's causation theory relies on Dr. DeZure's opinion regarding the EPF 27 kcal feedings—a product Mead Johnson neither manufactures nor sells—punitive damages are unavailable.

Mead Johnson is also entitled to summary judgment on Plaintiff's economic damages claims for lack of record evidence. There is no record evidence providing any expert testimony on which, if any, part of the care Daniel received in the NICU were "incurred as a result of" Mead Johnson's alleged negligence as opposed to being incurred in the normal course of Daniel's stay in the NICU. *E.g.*, *Taylor v. R.D. Morgan & Assocs., Ltd.*, 563 N.E.2d 1186, 1189 (Ill. App. Ct. 1990) (directed verdict where "there is no delineation in the record between the amount of the bills incurred as a result of the original injury and the amount of the bills incurred as a result of the defendant's alleged misconduct").

## CONCLUSION

For the foregoing reasons, Mead Johnson is entitled to summary judgment on all of Plaintiff's claims.

Dated: August 25, 2025

Respectfully submitted,

/s/ *Emily S. Ullman*

Paul W. Schmidt
Phyllis A. Jones
Emily S. Ullman

Elizabeth T. Fouhey
Sumner T. Truax
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-6000
pschmidt@cov.com
pajones@cov.com
eullman@cov.com
efouhey@cov.com
struax@cov.com

Rachel M. Cannon
Anthony J. Anscombe
**STEPTOE LLP**
227 West Monroe, Suite 4700
Chicago, IL 60606
312.577.1270
rcannon@steptoe.com
aanscombe@steptoe.com

*Counsel for Defendant Mead Johnson & Company, LLC*