# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION    MDL NO. 3026

---

This Document Relates to:
Mar v. Abbott Laboratories, Case No. 1:22-cv-00232;
Diggs v. Abbott Laboratories, Case No. 1:22-cv-05356;
Etienne v. Abbott Laboratories, Case No. 1:22-cv-02001
Inman v. Mead Johnson & Company, LLC et al, Case No. 1:22-cv-03737

Master Docket No. 1:22-cv-00071

---

The Videotape Deposition of DR. LOGAN SPECTOR, taken pursuant to Notice of Taking Deposition, taken before Deb Beauvais, RPR, CRR, and a Notary Public in and for the County of Ramsey, State of Minnesota, taken on December 23, 2024 at St. Paul, Minnesota, commencing at approximately 8:00 a.m.

* * *

Covington & Burling for Mead Johnson.

MR. SAXON: Ed Saxon from Winston & Strawn for Abbott.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Witness sworn.)

EXAMINATION

BY MR. SCHMIDT:

Q. Good morning, Dr. Spector. How are you doing today?

A. Very well.

Q. Good. Good. My understanding is you've been deposed before?

A. Once.

Q. Do you need me to run through how a deposition works?

A. No.

Q. Okay. Are you able to testify completely, truthfully, and accurately today?

A. Yes.

MR. SCHMIDT: Go ahead and mark as Exhibit 1. I'll note for the record some of the exhibits will be out of numeric order.

(Deposition Exhibit 1 was marked for identification.)

BY MR. SCHMIDT:

* * *

that correct?
A. Dr. Betensky did the meta-analysis.
Q. Fair. You looked at the results of different meta-analyses of them, correct?
A. Yes.
Q. None of the analyses that Dr. Betensky conducted or you conducted focused specifically on specific weight groups; is that correct?
A. We did not stratify any of the meta-analyses based on weight group.
Q. None of the analyses you or Dr. Betensky conducted focused on specific age groups, correct?
A. No.
Q. Then that's a fault of my question, so I'm going to ask it again because I don't know if you are agreeing with me or not.
A. Okay.
Q. Did any of your analyses that you or Dr. Betensky conducted focus on specific age groups?
A. No, they did not.
Q. Thank you.
Do you know if you have a study

that shows a two-fold increased risk of NEC with cow's milk formula versus human milk in infants, let's say, 1,250 grams and below? Do you know if you can expect to see that same two-fold difference in risk if you're looking at infants 1,500 grams and above?

MS. JUNG: Objection.

THE WITNESS: Without spending a lot of time looking at the studies again, I don't think that I could give you that answer on the spot.

BY MR. SCHMIDT:

Q. Okay. Do you know the percentage of preterm infants who receive donor milk?

A. I don't, and it's likely to vary depending on setting.

Q. Do you know the percentage of preterm infants receiving human milk?

A. I do not.

Q. Do you know how long it takes NEC to develop upon exposure to something that causes NEC?

A. It's thought to occur fairly quickly. In a matter of hours to days.

Q. Would you give the same answer for preterm formula?

A. Insofar as preterm formula is contained in the universe of things that cause NEC, which is what you seem to imply.
Q. I'm not trying to imply anything, so let me ask the question differently.
Do you know how long after exposure to preterm formula it causes NEC?
A. Again, it's thought that triggers of NEC take days to -- hours to days to become fulminant.
Q. And that would include preterm formula?
A. It would.
Q. Is there a length of time between exposure to preterm formula and development of NEC that would cause you to rule out preterm formula as a cause for a given infant?
MS. JUNG: Objection.
THE WITNESS: Seconds.
BY MR. SCHMIDT:
Q. Okay. What about on the other end? If you have a preterm infant that receives formula on day one, mother's milk the rest of the time, on day 30 gets NEC, would you rule out the formula?
A. Can you please tell me that scenario again?
Q. Yeah, of course. Of course.

A preterm infant is born. On day one they're given some preterm formula. Then the rest of their feeds are mother's milk, until day 30 when they develop NEC.

In that case, given that it's not days or hours, would you rule out the preterm formula?

MS. JUNG: Objection.

THE WITNESS: So they received preterm formula after a period of mother's own milk?

BY MR. SCHMIDT:

Q. It was actually the other way around. So day 1 they receive their only preterm formula, never again. For the next 30 days they receive only mother's milk, and at the end of that 31 days they receive -- they develop NEC. In that instance, would you rule out preterm formula?

MS. JUNG: Objection.

THE WITNESS: That sounds like specific causation and not general causation, so I don't have an opinion.

BY MR. SCHMIDT:

Q. Is formula capable of causing NEC under those

circumstances?
A. I don't recall seeing any study that looked at that fairly exotic and arbitrary example, so I can't answer that.
Q. Okay. Had you ever tried to identify the causes of NEC before becoming involved in this case, before being hired by the lawyers in this case?
A. No.
Q. Did you have an opinion before being hired in this case that formula causes NEC?
A. I had a general principle that mother's own milk is better for infant health.
Q. What about my question? Did you have an opinion that formula is capable of causing NEC before being hired in this case?
A. I had the vague knowledge of that.
Q. If I would have said to you, the moment before plaintiffs' lawyers called, does preterm formula cause NEC, what would your answer have been?
A. I would say I vaguely think that's the case.
Q. Okay. And what was your vague knowledge based on?
A. Again, my work in NICU concerns.

Q. When you're reaching epidemiological conclusions, it's important to control for alternate risk factors?
A. Correct.
Q. Is it important to be able to rule out alternate risk factors?
A. Are you talking about when conducting epidemiologic work or making a determination of specific causation?
Q. Not specific cause.
A. Okay.
Q. When conducting epidemiological work on causation, is it important to be able to rule out alternate risk factors?
A. I think you are talking about confounding and, yes, that's at the heart of epidemiology.
Q. I'm going to come to cow's milk products in a minute. Can you tell me any causes or risk factors for NEC beyond cow's milk products?
A. The major one is prematurity, as we've already gone over. I understand that the rates may be different according to demographics. It's more common in black infants, for reasons unknown. There may be

* * *

right there.
Q. Anything else?
A. I am sure there are, but nothing is coming to mind.
Q. Next paragraph says, "There are two key points about feeding practices and NEC." Do you see that?
A. I do.
Q. Point number one, "There is no conclusion" -- do you see this is in boldfaced language?
A. I do see it.
Q. Boldfaced, "There is no conclusive evidence that preterm infant formula causes NEC." Did I read that correctly?
A. You did.
Q. Do you agree with that?
A. I think that I cannot say whether I agree with this sentence without digging into the report more, but I think a lot of it hinges on the word "conclusive."
Q. If I say that, is that a true or a false statement in your view, there is no conclusive evidence that preterm infant formula causes NEC?
A. I do not agree with that statement as made.

Q. Next sentence says, "There is strong evidence that human milk is protective against NEC."
Do you see that?
A. I do.
Q. Do you agree with that?
A. I agree that there is an inverse association between human milk consumption and NEC.
Q. Well, do you remember telling me a few minutes ago that there are things in human milk that are absent from formula?
A. Yes.
Q. Are those factors you were telling me about, like DSLNT, protective against NEC?
A. They are inverse, so I think that we probably reached the point where I need to understand your understanding of what you consider protective versus a cause.
Q. Okay. Well, when this statement that you read last week says, "There is strong evidence that human milk is protective against NEC," do you understand what that means?
MS. JUNG: Objection.
THE WITNESS: I understand that they think that there is strong evidence.

BY MR. SCHMIDT:
Q. Do you understand what "protective" means in that statement?
A. It means that there is an inverse association between an exposure and disease.
Q. Did you see in the studies you looked at repeated reference to mother's milk being protective against NEC?
A. I certainly saw some language to that regard, but I didn't quantitate it.
Q. Okay. And what do you understand the scientific literature to be talking about when it says mother's milk is protective against NEC?
A. They mean that there is an inverse association between mother's own milk and the incidence of NEC, but conversely that means there is higher risk of NEC in children fed preterm formula.
Q. Okay.
A. And this report confirms that.
Q. Do you know if there is any difference in NEC rates with preterm formula versus elemental formula versus TPN feeding?
A. I don't know specifically.

* * *

studies support health benefits for its use in infants with a birth weight less than 1,500 grams, especially in decreasing rates of necrotizing enterocolitis."
A. I see that.
Q. Okay. Do you agree with that statement?
A. Yes.
Q. Have you seen any data that let's you conclude -- well, let me strike that.
Do you know if the available studies show an increase in NEC rates with preterm formula versus human milk in infants with a birth weight of above 1,500 grams?
A. I don't know specifically.
Q. Do you see on the first page at the bottom there is a carryover sentence that begins, "However"? Do you see that?
A. Yes.
Q. It reads, "However, accessibility to donor milk in the United States continues to be substantially limited in terms of supply, cost, and distribution." Do you see that?
A. Yes.
Q. Do you know whether that was a true statement in 2017?

A. I don't know specifically, but I have no reason to doubt it.
Q. Is it a true statement today?
A. I have no idea.
MR. SCHMIDT: Let's go to Exhibit 12, please.
(Deposition Exhibit 12 was marked for identification.)
BY MR. SCHMIDT:
Q. Exhibit 12 is a news release from the AAP dated July 2024. Do you see that?
A. Yes.
Q. Have you seen this before?
A. No.
Q. You have never seen this before today?
A. I have not.
Q. Okay. It says, "AAP's statement in response to NEC lawsuit verdicts." Do you see that?
A. Yes.
Q. Do you know what that's referencing?
A. I'm going to assume that it's referencing lawsuits that we're -- the reason we're here today.
Q. Let's look at the second paragraph. It says, "Part of what is so challenging about NEC is that the causes are multi-faceted and not

completely understood." Do you see that?
A. Yes.
Q. Do you agree with that?
A. Yes.
Q. Do you agree that our science does not tell us exactly how to prevent NEC?
A. I do not agree.
Q. How do we prevent NEC?
A. Preventing prematurity, which was the statement that the AAP made in the other document that you handed me.
Q. Then it says, "Special formulas designed for preterm infants provide an essential source of nutrition." Do you see that?
A. Yes.
Q. Do you agree with that?
A. I agree that we do not starve infants and that they need to be fed.
Q. Do you agree that special formulas, like cow's milk preterm formula, provide an essential source of nutrition for preterm infants?
MS. JUNG: Objection.
THE WITNESS: I agree that if there is not human milk available, that children

need to be fed to get nutrition.
BY MR. SCHMIDT:
Q. Including with cow's milk preterm formula?
A. I agree that we do not starve children and that it's better to feed them something rather than nothing.
Q. Including cow's milk preterm formula?
A. Yes.
Q. The next sentence says, "Using human breast milk to feed preterm infants may reduce the NEC, but it does not eliminate this risk." Is that true as you understand it?
A. Yes.
Q. Let's go to the next page, second paragraph. "Courtrooms are not the best place to determine clinical recommendations for the care of infants." Do you see that?
A. Yes.
Q. Do you agree with that?
MS. JUNG: Objection.
THE WITNESS: I agree that courtrooms are not the best place to decide on science in general.
BY MR. SCHMIDT:
Q. Skip a sentence. Well, actually, don't skip

* * *

STATE OF MINNESOTA )

COUNTY OF RAMSEY )

Be it known that I took the deposition of Dr. Logan Spector, on December 23, 2024;

That I was then and there a notary public in and for the County of Ramsey, State of Minnesota, and that by virtue thereof I was duly authorized to administer an oath;

That the witness before testifying was by me first duly sworn to testify the whole truth and nothing but the truth relative to said cause;

That the testimony of said witness was recorded in stenotype by myself and transcribed into typewriting under my direction, and that the deposition is a true record of the testimony given by the witness to the best of my ability;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

Witness my hand and seal this 24th day of December, 2024.

Debra Beauvais

DEBRA BEAUVAIS
COURT REPORTER