## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| | MDL No. 3026 |
| *In Re Abbott Laboratories, et al., Preterm Infant Nutrition Products Liability Litigation* | Master Docket No. 1:22-cv-00071 |
| | Hon. Rebecca R. Pallmeyer |
| **This Document Relates to:** *Inman v. Mead Johnson & Company, LLC et al.* | Cause No. 1:22-cv-03737 |

## PLAINTIFF'S RESPONSE TO MEAD JOHNSON & COMPANY LLC AND MEAD JOHNSON
## NUTRITION COMPANY'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Northern District of Illinois Local Rule 56.1(A)(2), Defendant Mead Johnson & Company LLC ("Mead Johnson") hereby submits this Statement of Uncontroverted Material Facts, which is being filed contemporaneously with its summary judgment motion.

1.      Preterm infants face significant risks of health complications, including necrotizing enterocolitis ("NEC"). *See generally* Ex. 20, E. Claud Report (Nov. 1, 2024) (hereinafter "Claud Report"); Ex. 10, Report to Sec'y of Dep't of Health & Hum. Servs., Necrotizing Enterocolitis (NEC) in Preterm Infants Working Grp. of the Nat'l Advisory Council of Child Health & Hum. Dev. (NACHHD) at 2-3 (Sep. 16, 2024) ("NIH NEC Working Group Report").

**OBJECTION:** The Working Group Report is inadmissible under FRE 602, 702, 802, and 901. *See also Drew v. Ramos*, No. 11-CV-2938, 2013 WL 5212343, at * 1 (N.D. Ill. Sept. 17, 2013) ("Any statements or responses that . . . contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on

Defendants' motion for summary judgment."). **ADMIT** Preterm infants face significant risks of health complications, including necrotizing enterocolitis ("NEC").

2.      A "full term" pregnancy lasts approximately 37 to 40 weeks. See First Am. Compl. ¶ 9 (defining prematurity as birth prior to completion of 37 weeks of pregnancy.

**RESPONSE: ADMIT.**

3.      The earlier—and smaller—an infant is born, the higher risk of serious adverse health outcomes.  Ex. 20, E. Claud Report at 4–18; Ex. 21, Dhirendra K. Singh et al., *Necrotizing enterocolitis: Bench to bedside approaches and advancing our understanding of disease pathogenesis*, 10 Front. Pediatr. 1, 2 (2023) ("[T]he most prominent risk factor [for NEC] is infant prematurity.").

**RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that lower gestational age and birthweight results in a greater risk of serious adverse health outcomes. Plaintiff **DENIES** that the most prominent risk factor for NEC is prematurity. Prematurity is not a risk factor for NEC— it is a requirement for NEC. *See* Case No. 1:22-cv-00071, ECF No. 614-9 (Deposition Transcript of Dr. Jennifer Sucre) at 348:3–8 ("Q. Do you agree that prematurity is the primary risk factor for NEC in premature infants? A. That is like asking if being born female is a risk factor for ovarian cancer. It's requisite.").

4.      An infant can develop NEC regardless of what he or she is fed.  *See, e.g.*, Ex. 14, DeZure Tr. 27:4-7 (Dec. 16, 2024) ("Q.  I think we discussed on Friday that [of the infants with NEC] you had personally dealt with at Stanford, none of those had had formula?  A. Correct, yes.") (hereinafter 12/16/2024 DeZure Tr.); Ex. 22, Spector 12/23/2024 Dep. Tr. 28:2-5, 12-14; Ex. 18, Sucre Dep. Tr. 92:22-93:2, 347:12-16; Ex. 23, Lars Bode, *Human Milk Oligosaccharides in the Prevention of Necrotizing Enterocolitis: A Journey From in vitro and in vivo Models to Mother Infant Cohort Studies*, 6 Front. Pediatr. 1, 2 (2018) ("A significant number of infants still develop NEC although they

exclusively receive human milk and are not exposed to infant formula."); Ex. 24, Press Release, NEC Society, Statement on Lawsuits, https://necsociety.org/press-release/necsociety-statement-on-lawsuits/ [https://perma.cc/7QJ7-NCA2] (last accessed Aug. 25, 2025) (hereinafter "NEC Society, Statement on Lawsuits") ("It is important to note that some infants still develop NEC even when they receive an exclusive human milk diet."); Ex. 10, NIH NEC Working Group Report ("[a]vailable evidence supports the hypothesis that it is the absence of human milk – rather than the exposure to formula – that is associated with an increase in the risk of NEC.").

**OBJECTION:** Exhibit 24 (the press release) is inadmissible under FRE 602 and 802 because the evidence is hearsay, speculative, and lacks foundation. See also *Drew*, 2013 WL 5212343, at * 1 ("Any statements or responses that . . . contain hearsay or are not based on personal knowledge . . . will not be considered by the Court in ruling on Defendants' motion for summary judgment."). A press release by a third-party carries no reliability, and has not been subjected to any rigor, scrutiny or cross examination. Exhibit 10 (the working group report) is also inadmissible under FRE 602, 702, 802, and 901 because the evidence is hearsay, speculative, and lacks foundation. The Report specifically noted that it was not undertaking a causation analysis. Subject to and without waiving the foregoing objection, Plaintiff responds as follows:

**RESPONSE: ADMIT IN PART AND DENY IN PART.** Plaintiff **ADMITS** that a preterm infant may develop NEC even if he is only fed human milk. Plaintiff **DENIES** the implication that NEC is equally likely to occur in preterm infants fed human milk as it is to occur in preterm infants fed cow's-milk-based formula, to the extent Defendant argues as such. *See* Case No. 1:22-cv-00071, ECF No. 616-3 (Deposition Transcript of Dr. Jennifer Sucre) at 467:17-22 ("when comparing pasteurized donor milk versus formula, that pasteurized donor milk has half as much risk of NEC or, conversely, that formula has twice as much risk of developing NEC as pasteurized donor milk"); Case

No. 1:22-cv-00071, ECF No. 616-3 (Deposition Transcript of Dr. Logan Spector) at 124:10–17 ("I conclude to a reasonable degree of scientific certainty that feeding preterm infants bovine-based nutrition products causes NEC compared to feeding human milk. MR. SCHMIDT: So what is your probability? A. More likely than not."); Case No. 1:22-cv-00071, ECF No. 616-39 (Amended Report of Dr. Spector) at 25–26 ("Based on the results of the systematic literature review interpreted in the light of the Bradford Hill guidelines for assessing causality commonly used in Epidemiology, as well as the meta-analyses of the studies identified through my SLR, I conclude to a reasonable degree of scientific certainty that feeding preterm infants [bovine-based nutrition products] causes NEC compared to feeding [human milk].").  *See also* Pl.'s Aff. SOF ¶ 2.

5.      While the cause of NEC is unknown, scientists have concluded that the most prominent risk factor for NEC is prematurity.  *See* Ex. 25, DeZure Tr. 91:20-92:1 (Dec. 13, 2024) ("Q. Okay.  And the next sentence in this article says, 'The most important risk factor for NEC is prematurity, and the earliest infants are at the greatest risk . . . You agree with that, right?  A.  Yes, I do."); Ex. 1, Press Release, Am. Acad. of Pediatrics, AAP Statement in Response to NEC Lawsuit Verdicts (July 27, 2024), https://www.aap.org/en/news-room/news-releases/aap/2024/aapstatement-in-response-to-nec-lawsuit-verdicts/ [https://perma.cc/K9WM-MC2E] ("Part of what is so challenging about NEC is that the causes are multifaceted and not completely understood.  Our science does not tell us exactly how to prevent it."); Ex. 22, Spector 12/23/2024 Dep. 41:9-14 ("Prematurity is the major cause of NEC."); Ex. 13, FDA, CDC, NIH, *Consensus Statement on Recent Advisory Council Report on Premature Infants and Necrotizing Enterocolitis* at 2 (October 3, 2024) ("Consensus Statement") ("[P]reterm birth is the primary risk factor for developing NEC"). *See also* Pl.'s Aff. SOF ¶ 2.

**OBJECTION:** The Working Group Report is inadmissible under FRE 602, 702, 802, and 901. *See also Drew v. Ramos*, No. 11-CV-2938, 2013 WL 5212343, at * 1 (N.D. Ill. Sept. 17, 2013) ("Any statements or responses that . . . contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendants' motion for summary judgment.").

**RESPONSE: ADMIT in part AND DENY in part. Deny** because formula does cause NEC. *See* Case No. 1:22-cv-00071, ECF No. 614-9 (Deposition Transcript of Dr. Jennifer Sucre) at 109:7-9 "I think that to a reasonable degree of medical certainty, that preterm infant formula does cause NEC."; *Id.* at 576:25-577:4 ("My testimony is that they – carbohydrates, proteins, and fats contained in cow's milk-based formula cause or substantially contribute to NEC.")**.**

Plaintiff **DENIES** that the most prominent risk factor for NEC is prematurity. Prematurity is not a risk factor for NEC—it is a requirement for NEC. *See* Case No. 1:22-cv-00071, ECF No. 614-9 (Deposition Transcript of Dr. Jennifer Sucre) at 348:3–8 ("Q. Do you agree that prematurity is the primary risk factor for NEC in premature infants? A. That is like asking if being born female is a risk factor for ovarian cancer. It's requisite."). Premature infants are incredibly fragile and require specialized medical intervention. ECF No. 63-7 at 179:23–180:5. (Deposition Transcript of Dr. Rachana Singh) ("Q. So a baby with anemia, low birthweight, small for gestational age, you'd agree that that baby comes to the table as – as a vulnerable baby, true? A. Yeah.") (objection omitted); Deposition Transcript of Dr. Timothy Cooper, Ex. HHH, at 215:5–8 ("Q. Are – are – are very low birth weight or extremely low birth weight infants medically vulnerable? A. Absolutely. Yes."); Deposition Transcript of Dr. Teresa Murguia, Ex. III, at 324:25–325:12 ("Q. Are very low birthweight and extremely low birthweight infants medically vulnerable? A. Very, very vulnerable. Q. Why is that? A. Because they have immaturity of everything. They have immaturity of the brain, of the eyes, of the

lungs, of the immune system, that's terrible infections of NEC, of kidneys, and – and also it's a period in which they have to grow a lot. For example, the brain increases in volume three times from 26 to 40 weeks, so it's a period of growing that they need a lot of nutrition[.]"). Because they are born before the final trimester of gestation is complete, premature infants are at higher risk for a variety of serious medical complications, such as hemorrhage, respiratory distress syndrome and bronchopulmonary dysplasia, and necrotizing enterocolitis. *Id.* Premature infant care, therefore, differs significantly from care for a healthy term infant.

6. "NEC is a multifactorial condition without one specific cause. There are many risk factors for NEC." Ex. 24, NEC Society, Statement on Lawsuits; Ex. 14, 12/16/2024 DeZure Tr. 25:22-26:2 ("Q. . . .The risk for any particular infant is a feeding formula rather than human milk is highly variable, difficult to isolate for any given infant? A. Correct, yeah, and it depends on a multitude of factors."); Ex. 26, Press Release, NEC Society, Statement on *Watson v. Mead Johnson* Verdict, https://necsociety.org/press-release/statement-on-the-watson-vs-mead-johnson-verdict/ [https://perma.cc/X57Z-KA2K] (last accessed Aug. 25, 2025) ("There is no single cause, no clear etiology, no cure, and no known way to eliminate the risks of NEC for medically fragile infants.").

**OBJECTION:** A Press Release from the NEC Society, which is outside the record, is inadmissible under FRE 602, 702, 802, and 901. *See also Drew v. Ramos*, No. 11-CV-2938, 2013 WL 5212343, at * 1 (N.D. Ill. Sept. 17, 2013) ("Any statements or responses that . . . contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendants' motion for summary judgment."). Moreover, the use of this statement which provides unsubstantiated, unverified opinions about this litigation is highly inappropriate and prejudicial.

**RESPONSE: ADMIT** in part and **DENY** in part. There are three main risk factors for NEC repeatedly identified among experts in the field, including formula feeding. Plaintiff **ADMITS** that NEC is a multifactorial condition and that multiple risk factors for NEC exist. Plaintiff **DENIES** that a specific cause of NEC cannot be determined. Dr. Chandani DeZure, Plaintiff's specific-causation expert, did just that by conducting a differential diagnosis. She began by ruling out potential causes for Daniel Windley's death, determining that breastmilk feeds, hyperbilirubinemia, hypoglycemia, neurologic factors, cardiac factors, hypothyroidism, hyperinsulinemia, minimal bilateral pelviectasis, and penile hypospadias were not the cause of his NEC. Case No. 1:22-cv-03737, ECF No. 57-21 (DeZure Rep.) at 10–11. Next, she ruled out causes such as anemia, other infections, exposure to antibiotics, respiratory status, caffeine administration, low cortisol levels, alloimmunization, twin-to-twin transfusion syndrome, intrauterine growth restriction, prematurity, mother's prenatal history, birth/delivery course, and immediate postnatal care. *Id.* at 11–12. Having ruled out those potential causes, Dr. DeZure determined to a reasonable degree of medical certainty that "the transition to full volume EPF HP formula and the increase in caloric density was a substantial factor in causing Daniel's NEC and subsequent death." *Id.* at 12. *See also.* Pl.'s Aff. SOF ¶ 2.

7.      Neonatologists are aware of the risk of NEC to preterm infants in the Neonatal Intensive Care Unit ("NICU"). Neonatologists are taught about the risks and benefits of each nutrition option—mother's own milk, donor human milk, and preterm formula—as part of their medical education and training, in medical school, residency, and fellowship. Ex. 5, Bear Dep. Tr. 14:2-6, 63:11-64:21 (May 22, 2024) (hereinafter "Bear Tr."). It is so fundamental to neonatology that it even appears on the board exam. Ex. 27, Am. Board of Pediatrics, Content Outline: Neonatal-Perinatal Medicine, Subspecialty In-Training, Certification, and Maintenance of Certification (MOC) Examinations, § 6.C (at 19–20).

**OBJECTION:** Exhibit 27 is hearsay and is not part of the record in this case.

**RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that neonatologists are aware that NEC is a risk for preterm infants and that neonatologists are educated about the benefits of different nutritional sources in many contexts (e.g., growth and neurological benefits).

Plaintiff **DENIES,** to the extent Mead Johnson implies as such, that neonatologists are generally aware that formula can cause NEC. *See* Case No. 1:22-cv-03737, ECF No. 57-4 (Bear Tr.) (treating neonatologist in *Inman*) at 17:13-18:12 ("Q. In June of 2020, would you be able to give me a percentage risk for preemies fed formula versus preemies fed human milk? A. Not off the top of my head. **Q. Would it be fair to say that you felt there was a slight increase risk by feeding formula? A. Yes. Q. Do you understand what 'slight risk' means? A. An increased risk that is not significant.** Q. Right. And would you categorize it as a slight risk when you feed formula versus human milk to preemies of NEC? A. Yes."); *Id.* at 148:3-8 ("Q. Okay. And you didn't think that by continuing to feed [formula] at that point in time, there was a significant risk that the infant formula would cause NEC, correct? A. Correct.") (objection omitted); *Id.* (on re-direct) ("Q. And you told me under oath – and if you want, I can go back and – I'm sure the court reporter doesn't want to find it, but she can to it – if we need to, we can go back. But would you agree with me that when I asked you whether – what your believe the increased risk is between feeding formula versus human milk, you said you believe there was a slight increased risk? A. Yes.") (objection omitted); Case No. 1:22-cv-00232, ECF No. 52-2 (Deposition Transcript of Dr. Stefan Maxwell (treating neonatologist in *Mar*)) at 122:7–20 ("Q. You did not believe in 2014 that formula causes necrotizing enterocolitis? A. I did not believe that. Q. Would it surprise you to learn that since at least 2010 Abbott Laboratories has believed that bovine formulas and fortifiers are a primary risk factor for NEC? THE WITNESS: It would surprise me, yes. Q. That would have been information if it were true that you would have

wanted to know; true? THE WITNESS: Yes.") (objections omitted); Case No. 1:22-cv-05356, ECF No. 86-21 (Deposition Transcript of Dr. Elias Abebe (treating neonatologist in *Diggs*)) at 41:6–42:2 ("Q. My question was: If in 2010, five years before Kamari was born, Abbott knew that [cow's-milk-based formula] was believed to be the primary risk factor for NEC, is that information you would have liked to have known? THE WITNESS: I mean, if it's coming from them saying that this is going to cause NEC, yes, of course I would take that information. Q. And did anyone from Abbott ever communicate that to you? A. No. Q. Is that information, if you had known it, something you would include in your risk-benefit analysis? THE WITNESS: If that information was available, I would have, yes. I would take into account, yes.") (objections omitted).

Plaintiff also **DENIES** that nutrition is included on the neonatology board examination as it relates to NEC. The only mention of NEC in the Content Outline for the Neonatal-Perinatal Medicine certification exam reads as follows:

> 2. Necrotizing Enterocolitis (NEC)/GI perforations
>
>> a. Recognize the clinical manifestations, diagnosis, and management of infants with perforations of the gastrointestinal tract (including gastric and intestinal)
>>
>> b. Know the pathophysiology of NEC
>>
>> c. Know the clinical and diagnostic features, evaluation, management, and complications of NEC
>>
>> d. Know the clinical features, complications, and management of short bowel syndrome

Case No. 1:22-cv-03737, ECF No. 56-13 (Content Outline: Neonatal-Perinatal Medicine) at § 11.B.2. The "Nutrition" section of the Content Outline mandates knowing "the differences in the nutritional composition of human milk and infant formula[,]" "the differences in the nutritional composition of

human milk and infant formula[,]" and "the advantages and disadvantages of the use of donor milk[.]" *Id.* at § 6.C. But it does not address the dangers of formula as it relates to NEC or the comparative risk of NEC from feeding cow's-milk-based formula as opposed to human milk.

8.      Mother's own milk ("MOM") is widely recognized as the first choice for preterm infant nutrition, including because it is uniquely protective against NEC. *See, e.g.*, Ex. 5, Bear Tr. 64:10-14 ("Mom's milk has the lowest associated risk of NEC.").

**RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that mother's own milk is widely recognized as the first choice for preterm infant nutrition. Plaintiff also **ADMITS** that many believe that mother's own milk is uniquely protective against NEC. Plaintiff **DENIES**, to the extent Mead Johnson implies as such, that the absence of the protective facets of mother's own milk causes NEC as opposed to the harmful facets of cow's-milk-based formula. Case No. 1:22-cv-00071, ECF No. 614-9 (Sucre Tr.) at 322:1–9 ("Q. Do you agree with David Hackam that it's possible that it's the absence of breast milk rather than the presence of formula that is most important in NEC pathogenesis, just yes or no? A. Not as that statement – Q. Okay. A. – is worded. Q. That's fine. A. No.").

9.      If mother's own milk is not available in sufficient supply, donor milk is typically the next choice in the NICU. Ex. 5, Bear Tr. 16:1-4 ("Q. What is your opinion about donor milk? A. I think it is a great alternative when we don't have mom's milk. Mom's milk is still the best, but it is a great alternative."); *id.* 64:19-21 ("Donor milk . . . also has a decreased risk of NEC compared to formulas, but probably not as good as mom's own milk."); *see also* Ex. 28, Policy Statement, Am. Acad. of Pediatrics, Breastfeeding and the Use of Human Milk, 129 Pediatrics 2 (2012).

**RESPONSE: DENY.** NICUs' lacked an appreciation of the disparity in risk between formula and donor milk as a result of Mead Johnson's war on donor milk which pushed the message to doctors that donor milk is insufficient for growth and development and that it should not be used "too long." Pl. Aff. Stmt. ¶ 12. Mead Johnson peddled a false equivalency between donor milk and formula relative to NEC. *See* Pl.'s Aff. Stmt. ¶¶ 9-16

NICU's often did not use donor milk due to budget reasons and a lack of appreciation of the gravity of the risk associated with formula. Rojas Decl. Ex. G (MJ_Jupiter_ 0385524) (Talley Dep., 11/20/23, Ex. 8). ("Perceived shortage by NICU's . . . Perceived image of shortage. But, current demand is fulfilled . . . All hospital's needing DHM get enough volume. 'Hospitals are rationing and prioritizing their supply of VLBW ≤1,5kg infants due to **lack of budget**, not lack of supply (emphasis in original)"

Knowing these budgetary constraints, Mead Johnson gave its formula to NICUs for free or nearly free, in exchange for a contract with the hospital requiring a commitment to use 80% to 90% Mead Johnson products. Rojas Decl., Ex. I, Deposition of Robert Cleveland, 5/17/24, Tr. 65:3-7; *Id.* at 67:10-15. ("Q. Now, you understand, Mr. Cleveland, that hospitals operate under tremendous cost pressure because the revenue's not easy to earn, and as a result, they have incentive to reduce cost of treatment so they can treat as many patients as possible. Correct? A. That's a general statement, yes."); *Id.* at 68:3-9 ("I just mean it can be significant to the hospital from a financial standpoint to get – to get something for free as opposed to pay for it. A. Yes, I agree. Q. It's hard to say not to free stuff, in other words. Can we agree to that? A. We can."). Vidant itself received formula at a reduced cost. Pl. Aff. SOF ¶ 9. A false perception of the unavailability of donor milk, budget concerns, a lack of appreciation of the risk calculus, and Mead Johnson's provision of formula for free, resulted in donor

milk not being the "next choice." As urged by Dr. Valentine, NICUs such Vidant believed it was prudent to get babies of donor milk "sooner." *See* Pl.'s Aff. SOF ¶ 10.

10.     Mead Johnson supports the use of human milk. The company trained its sales representatives that "MOM is associated with lower rates of NEC and death." Ex. 29, Hasseberg Dep. Tr. 333:1-4 (Aug. 1, 2023).

**RESPONSE: DENY** Mead Johnson manipulated the science, deceived the medical community, gave formula for free with the explicit purpose of "competing" with donor milk to ensure formula (instead of donor milk) was consumed in NICUs S*ee Pl.'s Aff. SOF* ¶ 6-19. The company viewed donor milk as a competitive threat and took actions to defeat that threat. *Id.*

11.     Mead Johnson handed out brochures telling hospitals that "[u]se of mother's own milk is preferred" and that "Mom's own milk is associated with lower risk of NEC and death in ELBW infants in an amount-dependent manner." Ex. 30, MJ_Jupiter_6258828 at 8.

**OBJECTION:** Plaintiff **OBJECTS** to the use of this document as it does not appear to be in the record. There is no foundation. Mead Johnson offers no evidence showing that this document was distributed, or when it was distributed.

**RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that this document contains these quotes. Because Defendant offers no foundation evidence regarding this document, plaintiff is unable to admit or deny whether this brochure was "handed out" hospitals or ever received by hospitals.

12.     Mead Johnson produced summary booklets telling physicians that "Mother's Own Milk (MOM) is the gold standard in preterm infants feeding. Donor human milk (DHM) is the next-best choice when MOM is unavailable or insufficient." Ex. 31, MJ_Jupiter_6257958 at 20.

**OBJECTION:** Plaintiff **OBJECTS** to the use of this document as Mead Johnson offers no evidence show that this document was ever provided to physicians. Defendant states that it "produced" the summary booklets but notably does not say that it distributed the summary booklets, to whom or when. Specifically, Mead Johnson offers no evidence that this document was provided to any members of Daniel's care team. A review of the document further suggest that it post-dates Daniel's death, given that some of the references the documents cites are after Daniel died. For instance, at page 10, the document cites a 2022 study. Koletzko B, Cheah F-C, Domelldf M, Poindexter BB, Vain N, van Goudoever JB (eds): *Nutritional Care of Preterm Infants. Scientific Bass and Practcal Guidelines, 2nd edition*, World Rev Nutr Diet. Basel, Karger, 2021, vol 122. This document is objectionable on the basis of foundation and relevance.

  **RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that Mead Johnson produced summary booklets. **DENY** that Mead Johnson supports the use of donor human milk as the next best choice with mother's own milk is unavailable. *See* Pl. Aff. SOF ¶ 6-19.

  13.  Still, although NICU clinicians prioritize the use of human milk, the American Academy of Pediatrics has recognized that "there is not enough donated human milk to be used as the only source of nutrition for these infants." Ex. 1, Press Release, Am. Acad. of Pediatrics, AAP Statement in Response to NEC Lawsuit Verdicts, (July 27, 2024), https://www.aap.org/en/newsroom/news-releases/aap/2024/aap-statement-in-response-to-nec-lawsuit-verdicts/ [https://perma.cc/K9WM-MC2E].

  **OBJECTION: Plaintiff objects to the use of Ex. 1 as it is inadmissible FRE 802.**

  **RESPONSE: ADMIT** in part and **DENY** in part. Plaintiff **ADMITS** that the press release Defendant cites includes the quoted statement. Plaintiff denies that there is "not enough donated human milk." Mead Johnson has known since at least 2017 that there is an adequate supply of donor

milk. Rojas Decl., Ex. G (Advancy PowerPoint) ("Perceived shortage by NICUs . . . Perceived image of shortage. But, current demand is fulfilled . . . All hospital's needing DHM get enough volume. 'Hospitals are rationing and prioritizing their supply of VLBW ≤1,5kg infants due to **lack of budget**, not lack of supply." (emphasis in original).

Plaintiff **DENIES** that clinicians categorically prioritize the use of human milk, and notes that defendant offers no authority for that categorical statement. Rather, due in part to Mead Johnson's misinformation campaign, many clinicians, including Jennifer Fowler, get babies off donor milk "sooner", while failing to appreciate the risk of doing so. S*ee Pl.'s Aff. SOF* ¶ 6-20.

Plaintiff **DENIES** any suggestion that Daniel could not have been fed donor human milk or Prolacta formula. Bear Tr. At 29:22-30:5. (Q. Okay. And was donor milk available at this time? A. We did use donor milk. Q. Do you know why donor milk was not used? A. I don't recall. We have a roadmap that we follow, in terms of who gets donor breast milk and who doesn't and how long they get it and when we transition them off. I'm sure we followed that, but I don't recall.").

14.     Preterm formula is therefore the third option, behind mother's own milk and donor human milk, and is normally used when human breast milk is not available.  *See* Ex. 9, Vidant Medical Center, NICU Feeding Roadmap (version 5 Dec. 1, 2019) ("NICU Feeding Roadmap"); Ex.5, Bear Tr. 92:5-10 (testifying that the feeding guidelines "provide[] a framework for how to increase a baby's feeding safely and to improve their growth").

**RESPONSE: ADMIT in part and DENY in part.** Plaintiff **ADMITS** that preterm formula *should* be the last option and ADMITS that formula *should* only be used when human milk is not available. However, the "NICU Feeding Roadmap" defendant cites to, *supra* Ex. 9, Vidant Medical Center, NICU Feeding Roadmap (version 5 Dec. 1, 2019) ("NICU Feeding Roadmap"), tells a very different story. Under that Roadmap, preterm infants were required to be transitioned off formula at

14

28 days of life. S*ee* Pl.'s Aff. SOF ¶ 6-20. See also Rojas Decl. Ex. X Bear Tr. 29:12 – 30:5 ("Q. When you started on June 17 -- we can go back to lookat your note, but I don't think it said -- but do you know why Daniel had been put on Enfamil? A. I believe that -- we would have fed mom's milk if we had it Q. Okay. A. So I don't remember exactly, but I can only assume that we didn't have mom's milk. Q. Okay. And was donor milk available at this time? A. We did use donor milk. Q. Do you know why donor milk was not used? A. I don't recall. **We have a roadmap that we follow, in terms of who gets donor breast milk and who doesn't and how long they get it and when we transition them off. I'm sure we followed that, but I don't recall**."). This is the Roadmap that Fowler wrote in "large part," that mimics what Dr. Valentine taught Fowler, and that Dr. Valentine endorsed and promoted on behalf of Mead Johnson. S*ee* Pl. Aff. SOF ¶ 6-19.

Plaintiff **DENIES** that Mead Johnson communicates that donor milk is a superior option to formula. To the contrary, Mead Johnson trains its speakers regarding all the limitations of donor milk as compared to formula, warns that failure to switch from donor milk to formula could have a number of deadly and tragic outcomes. S*ee* Pl.'s Aff. SOF ¶ 12.

Although plaintiff ADMITS that Formula should be the last option, plaintiff denies that it is the third option. Prolacta, Medolac, and NiQ are all better options than Formula. S*ee* Pl.'s Aff. SOF. ¶ 21-26.

15.    Infants may need preterm formula because they otherwise cannot achieve sufficient growth.  Ex. 5, Bear Tr. 66:9-12 ("[W]hen a baby is not . . . growing appropriately," the physicians need to "make decisions to . . . , like in this case, increase calories . . . .").

**OBJECTION:** This statement misstates the record by removing it from context. A more fulsome account of this deposition testimony is included below.

15

**RESPONSE**: **ADMIT in part and DENY in part.** Plaintiff **ADMITS** that in a select rare cases it may be necessary to feed a preterm infant cow's-milk-based formula. Plaintiff **DENIES** that these cases are frequent enough to warrant any regular use. Dr. DeZure specifically testified fortifying milk is always preferable to feeding formula. DeZure Tr. 93:19-23 (Q. But you would nonetheless always fortify milk for an infant who is struggling wiht growth in preference to using a preterm formula of equivalent density. A. Correct.")

Plaintiff also **DENIES** that Dr. Bear's deposition testimony supports Defendant's assertion:

Q.     And when you are feeding a preterm infant in the NICU, is there a structured plan in place to make sure that that infant is meeting the nutritional goals?
A.     Yes.
Q.     And is that called, "A feeding plan"?
A.     Yes.
Q.     Are those tailored to each infant?
A.     Yes, they are.
Q.     Why is – is tailoring necessary?
A.     It is. So we have sort of our guideline that we follow for all of our preterm babies, but when a baby is not following – growing appropriately on those guidelines, then we have to make decisions to perhaps, like in this case, increase calories because the baby wasn't growing.
Q.     Is it important to be able to make those deviations based on the needs of the particular infant?
A.     Yes.

Case No. 1:22-cv-03737, ECF No. 57-4 (Bear Tr.) at 65:22–66:16. If anything, this goes to show that infants have different nutritional needs and must be fed accordingly. This includes feeding preterm infants who are especially prone to NEC with the safest possible food source: human milk.

16.     Preterm formula is a critically important part of the standard of care in the NICU. Ex. 1, Press Release, Am. Acad. of Pediatrics, AAP Statement in Response to NEC Lawsuit Verdicts (July 27, 2024), https://www.aap.org/en/news-room/news-releases/aap/2024/aapstatement-in-response-to-nec-lawsuit-verdicts/ [https://perma.cc/K9WM-MC2E] ("Special formulas designed for preterm infants provide an essential source of nutrition."); Ex. 24, NEC Society, Statement on

Lawsuits ("Sometimes, formula is necessary and chosen by the baby's care team as the best available plan of care."); Ex. 13, Consensus Statement ("For infants where the supply of human milk is insufficient, these formulas are part of the standard of care for premature infants."); Ex. 14, 12/16/2024 DeZure Tr. 148:4-15 ("Q. In addition, Dr. Hoffman, the president of the AAP also notes, that special formula is designed for source of nutrition; do you see that? A. Yes. Q. Do you agree with that statement? . . . A. I think it – Sorry. I think it provides an essential source of nutrition in very specific babies, yes , in cases – for specific cases. So if a mom declines donor milk in that case, yes, it's essential." (objection omitted))

**OBJECTION:** Plaintiff objects to the use of "standard of care" which is a legal concept applicable to medical malpractice cases, not product liability cases. Under North Carolina law, the question is whether Mead Johnson's design of the product was unreasonable. N.C. Gen. Stat. § 99B-6(a). Whether or not its use is generally withing the standard of care is irrelevant. Plaintiff further objects to the use of press releases and consensus statement as inadmissible hearsay and undisclosed expert opinion.

**RESPONSE:** Plaintiff **DENIES** that formula is a safe product, or that it is safer than human milk or human-milk-based formulas. Plaintiff further **DENIES** any implication that this means Daniel and other preterm infants could not have been fed human milk or Prolacta, or that cow's-milk-based formula is safe or as safe as human milk. In 2017, Mead Johnson itself was aware that formula would likely be gone from the NICU by 2021. Rojas Decl., Ex. G (Advancy Document) ("DHM expected to fully replace Pre-term IF [infant formula] by 2021). The document further notes that by 2016, donor milk had gone from 40% to 70%, with mom's own milk occupying 30%. *Id.* In other words, according to Mead Johnson itself, in 2016, formula was only being used in 10% of the cases. The *Colaizy* study proves the same trend. *See* Tarah T Colaizy, *Neurodevelopmental Outcomes of Extremely Preterm Infants Fed*

*Donor Milk or Preterm Infant Formula: A Randomized Clinical Trial*, 331(7) JAMA 582 (2024). There, "[i]nfants were enrolled from September 7, 2012, to March 13, 2019." *Id.* During this period, NEC rates were found to be significantly higher in the formula fed group (9%), compared to the donor milk fed group (4.2%). *Id.* The authors explained that

> [T]he study closed early due to slow enrollment related to increasing donor milk use at participating centers and **associated loss of equipoise**. At study initiation in 2012, less than 25% of Neonatal Research Network centers used donor milk; at study cessation, more than 75% of participating centers were widely using donor milk. Within 1 year of study initiation, the American Academy of Pediatrics and the European Society for Pediatric Gastroenterology, Hepatology, and Nutrition published policy statements recommending donor milk for preterm infants for the first time. The supply of donor milk available from the Human Milk Banking Association of North America increased exponentially during the current study, as did reported use in US neonatal intensive care units.

*Id.*; *See also* Pl.'s Aff. SOF. ¶ 4.

17.     Absent a healthcare professional's order, a preterm infant in the NICU cannot receive preterm infant formula.  *See* 21 C.F.R. § 105.70(c) (explaining that specialty preterm formulas, like those at issue in this case, are "typically . . . prescribed by a physician . . . [and] distributed directly to . . . hospitals.").  In the case of Daniel Windley, while other members of Daniel's care team could have consulted or advised Daniel's neonatologists on his nutrition, any order placed for his nutrition was required to be directed by a neonatologist.  Ex. 32, Fowler Tr. 226:10-20; Ex. 5, Bear Tr. 130:19-22.

**RESPONSE**: Plaintiff **DENIES** that the Code of Federal Regulations imposes any such limitation because the section Defendant cites—21 C.F.R. § 105.70(c)—does not exist. Nearby regulations likewise do not support Defendant's assertion. There is no 21 C.F.R. 105.70. And 21 C.F.R. § 106.70(c) provides "Any rejected infant formula shall be clearly identified as having been rejected for use and shall be controlled under a quarantine system designed to prevent its release or

distribution." To the extent Defendant intended to cite 21 C.F.R. § 107.50(c)(1), that section provides (in full):

> (c) Infant formulas not generally available at the retail level. (1) These exempt infant formulas are not generally found on retail shelves for general consumer purchase. Such formulas typically are prescribed by a physician, and must be requested from a pharmacist or are distributed directly to institutions such as hospitals, clinics, and State or Federal agencies. Such formulas are also generally represented and labeled solely to provide dietary management for specific diseases or conditions that are clinically serious or life-threatening and generally are required for prolonged periods of time. Exempt infant formulas distributed directly to institutions such as hospitals, clinics, and State or Federal agencies that are of the same formulation as those generally available at the retail level are subject to the requirements of paragraph (b) of this section rather than to the requirements of this paragraph.

In other words, § 107.50(c), referring to what is "generally" or "typically" the case, does not prohibit the use of cow's-milk-based formula without the involvement of a neonatologist, let alone Daniel's neonatologist.

18.    If Dr. Bear, the prescribing neonatologist in Daniel's case, disagreed with any feeding recommendation, she would have overridden it.  Ex. 5, Bear Tr. 130:11-18.

**RESPONSE: ADMIT** that Dr. Bear could have theoretically overridden Jennifer Fowler's recommendation. In practice, and in Daniel's case, Dr. Bear followed Jennifer Fowler's recommendations. Jennifer Fowler was the subject matter expert on nutrition.  S*ee* Pl.'s Aff. SOF ¶ 11. See also Bear Tr. 33:19-23 ("Q. Who is Jennifer Fowler? A. She is our nutritionist. Q. Okay. And does she provide advice and recommendations to the neonatologist on feeding? A. Yes."); Bear Tr. 34:12-15 ("Q. So you would have listened to Jennifer Fowler's idea and recommendations and used that to help you make a decision, correct? A. Yes."); Bear Tr. 129:13-130:7 ("Q. Can you remind me who Ms. Fowler is? A. She's an RN nutritionist. Q. And what does a nutritionist do? A. She monitors the growth of all our babies in the unit. And thgen she's - has specialized training in nutrition and gives us

recommendations on how to improve our babies nutrition. Q. And does that require significant expertise? A. Yes. Q. And Training? A. Yes. Q. And keeping up-to-date with the literature? Yes. Q. And so do you take her recommendations into consideration when making decisions. A. Yes."); Bear Tr. 143:17-144:2 (Q. And that idea of using increased calories of Enfamil Premature formula, that, according to the records, came from the recommendation of Jennifer Fowler, correct? A. Yes. Q. And were you aware that Jennifer Fowler does work for – occasionally does work for Mead Johnson. A. No.")

19.     Alexis Inman had a high-risk pregnancy. Ex. 33, Mother-AlexisInman-CHP00003. Her pregnancy was complicated by several factors, including monochorionic-diamniotic twins, severe selective fetal growth restriction, potential twin-to-twin transfusion syndrome (TTTS), and maternal Rh alloimmunization.  Ex. 34, DeZure Report at 5 (Daniel was "Twin A and the donor twin of a monochorionic, diamniotic twin gestation complicated by twin-to-twin transfusion syndrome."); Ex. 14, 12/16/2024 DeZure Tr. 251:10-12 ("Mom had two separate diagnoses, but alum – the presumed alloimmunization, which – and the twin to twin transfusion."); Ex. 3, Miller Dep. Tr. 317:21-318:17 (Jan. 8, 2025) ("Ms. Inman's pregnancy was complicated by multiple, very rare conditions: the mono-di twins, the selective fetal growth restriction, rare; HDFN causing severe fetal anemia, rare.").

**RESPONSE: ADMIT.**

20.     Daniel Windley and his twin brother, Deyvon, were born via emergency C-section on May 12, 2020 at Vidant Medical Center in North Carolina.  *See* First Am. Compl. ¶ 1; Ex. 35, Minor-DanielWindley-PPR-00832 ("This 29 w 4d African American Male infant was delivered by Cesarean Section for pre-term labor and breech presentation."); Ex. 8, Minor-DeyvonWindleyPPR-00001 (noting "DOB: 5/12/2020").

**RESPONSE: ADMIT.**

21.     Daniel and Deyvon Windley were born "very preterm" at 29 weeks.  *See* First Am. Compl. ¶¶ 1, 10; Ex. 35, Minor-DanielWindley-PPR-00832.

**RESPONSE: ADMIT.**

22.     Weighing 670g—about 1 ½ pounds—at birth, Daniel was only half the size of his brother Deyvon, who weighed 1278 g, and in the third percentile for his gestational age. Ex. 35, Minor-DanielWindley-PPR-00832; Ex. 35, Minor-DanielWindley-PPR-00002; Ex. 34, DeZure Report at 5 ("He had a birth weight of 670 grams, making him extremely low birth weight (ELBW); Ex. 4, R. Singh Report at 10, 13 (hereinafter "Singh Report").

**RESPONSE: ADMIT.**

23.     Daniel was anemic both before and after birth and required approximately six intrauterine blood transfusions while he was in utero, as well as nine blood transfusions after delivery. Ex. 4, Singh Report at 12, 14–16; Ex. 34, DeZure Report at 11.

**RESPONSE: ADMIT.**

24.     Daniel was subject to at least nine days of antibiotics total, including two 48-hour rounds of ampicillin and gentamicin, one round between May 12 and May 13, and one round between May 15 and May 16.  Ex. 4, Singh Report at 16.

**RESPONSE: ADMIT** that was administered antibiotics. It is unclear how many days.

25.     Ms. Inman decided to breastfeed her twins because she believed that breastfeeding was the "best way to go" having breastfed her prior children, though she knew donor milk was a "good alternative."  Ex. 7, Inman Tr. 22:4-11, 21:4-11, 21:19-20, 30:14-16, 33:20-22, 31:11-17, 62:23-63:2, 90:9-2, 96:24-97:13.  She made her intention clear to her medical providers, and although they wondered how Ms. Inman could breastfeed the twins while continuing to breastfeed her daughter at home, Daniel's doctors honored Ms. Inman's decision to breastfeed, agreeing that his mother's own

milk would "always be the first thing he would be fed, if it were available." Ex. 5, Bear Tr. 75:7-14

("Q. And so would Daniel have received any of his mom's breast milk if it were available? . . . A. Yes.

Q. Would that always be the first thing he would be fed, if it were available . . . A. Yes.") (objections

omitted); *see also* Ex. 7, Inman Tr. 90:13-21 ("Q. Did you have any discussions with anybody at Vidant

about how you planned to breastfeed your daughter and the twins? A. Yes. Q. And what did you

tell them that your plan was? A. They always asked me how was I going to be able to make that work,

and my goal was to start weaning my daughter off."); Ex. 7, Inman Tr. 63:1-2; *id.* at 63:12-14 (OB); *id.*

at 64: 16-22 (CHOP); *id.* at 87:2-5 (Vidant) (Sep. 15, 2023).

 **RESPONSE: ADMIT** in part and **DENY** in part. **ADMIT** that Ms. Inman thought

breastfeeding her children was "the best way to go" and that "donor milk was a good alternative."

**ADMIT** that Dr. Bear testified that Daniel would have received Ms. Inman's breastmilk if it were

available. **DENY** to the extent this suggests Ms. Inman knew of the risks associated with Formula

feeding. **DENY** to the extent this suggests that Daniel's medical team understood the risk associated

with formula feeding. Rojas Decl. Ex. BBB (Aff. Alexis Inman). See Case No. 1:22-cv-03737, ECF

No. 57-4 (Bear Tr.) (treating neonatologist in *Inman*) at 17:13-18:12 ("Q. In June of 2020, would you

be able to give me a percentage risk for preemies fed formula versus preemies fed human milk? A.

Not off the top of my head. **Q. Would it be fair to say that you felt there was a slight increase**

**risk by feeding formula? A. Yes. Q. Do you understand what 'slight risk' means? A. An**

**increased risk that is not significant.** Q. Right. And would you categorize it as a slight risk when

you feed formula versus human milk to preemies of NEC? A. Yes."); *Id.* at 148:3-8 ("Q. Okay. And

you didn't think that by continuing to feed [formula] at that point in time, there was a significant risk

that the infant formula would cause NEC, correct? A. Correct.") (objection omitted); Id. (on re-direct)

("Q. And you told me under oath – and if you want, I can go back and – I'm sure the court reporter

doesn't want to find it, but she can to it – if we need to, we can go back. But would you agree with me that when I asked you whether – what your believe the increased risk is between feeding formula versus human milk, you said you believe there was a slight increased risk?  A. Yes.") *See* Pl.'s Aff. SOF ¶ 20.

26.     Indeed, Dr. Kelly Bear, the only treating neonatologist who was deposed in this case, repeatedly described herself as a "big advocate for breastfeeding."  Ex. 5, Bear Dep. 75:5-6; see also *id.* at 11:5-12 ("I'm an advocate for breastfeeding and breast milk.").

**RESPONSE: ADMIT** that Dr. Bear testified that she was an advocate for breastfeeding.

**DENY** to the extent this implies that she testified she was a big advocate for donor milk.

27.     Daniel and Deyvon's feeding regimens followed the hospital's feeding roadmap, a set of guidelines the hospital's NICU staff developed to standardize feedings.  Ex. 9, NICU Feeding Roadmap; Ex. 5, Bear Tr. 91:4-9, 92:5-10.

**RESPONSE**: **ADMIT**. The Roadmap mirrored Dr. Valentine's teachings that babies must be transitioned off donor milk. S*ee* Pl.'s Aff. SOF ¶ 10. Jennifer Fowler wrote the roadmap in "large part"; she based it on what she had been taught by Dr. Valentine and Mead Johnson. S*ee* Pl.'s Aff. SOF ¶ 17. Daniel and Deyvon were both transitioned off donor milk at 28 days in accordance with the Roadmap. Pl.'s Aff. SOF ¶ 20.

28.     Consistent with these guidelines, Daniel and Deyvon's doctors ordered mother's milk first and, if not available, donor milk.  Ex. 5, Bear Tr. 120:14-16, 121:2-7.  Formula was given when there was no mother's milk.  Ex. 5, Bear Tr. 149:9-14.

**RESPONSE: ADMIT** that Dr. Bear testified that mother's milk would be given first, and if not available, donor milk. **DENY** that Dr. Bear testified that formula was fed because there was no

mother's milk. Rather, Dr. Bear testified (in general terms) that formula would not be fed if mother's milk was available. Bear Tr. 149:9-14.

29.     Daniel was not eligible for Prolacta fortifier, and the hospital no longer uses Prolacta's products.  Ex. 5, Bear Tr. 96:1-6 ("In the time that we used it, they felt there was no change in the outcomes."); *id.* at 123:15-18.

**OBJECTION:** Plaintiff objects on relevance. It is irrelevant whether Prolacta was available at the particular hospital. The question is whether Prolacta existed as a feasible alternative design. Had Mead Johnson adopted a safer and feasible design, the question of whether the hospital had Prolacta would have no significance because Mead Johnson's product would be safe. Similarly irrelevant is whether the hospital guidelines made Daniel eligible for Prolacta. As has been noted multiple times herein, Defendant deceived this hospital into believing a false equivalence between human milk and formula. That they did not have Prolacta available, or that their policy would have rendered Daniel ineligible, is only relevant to the extent it demonstrates the impact of Mead Johnson's disinformation campaign on equivalence.

**RESPONSE:** Without waiving plaintiff's relevance objection, **ADMIT.**

30.     The hospital did not have Prolacta formula, and Dr. Bear was not aware Prolacta made a formula product.  Ex. 5, Bear Tr. 18:13-21, 19:4-8.

**OBJECTION:** Plaintiff objects on relevance. It is irrelevant whether Prolacta formula was available at the particular hospital. The question is whether Prolacta existed as a feasible alternative design. Had Mead Johnson adopted a safer and feasible design, the question of whether the hospital had Prolacta would have no significance because Mead Johnson's product would be safe. Similarly irrelevant is whether Dr. Bear knew whether Prolacta formula existed.

**RESPONSE: DENY.** It is clear from reading Dr. Bear's testimony that she was stating that Prolacta did not make a bovine based-formula. Bear Tr. 18:13-18. ("Q. There are two types of Prolacta. There is the human milk fortifier Prolacta and then there's the formula Prolacta. A. They don't have a formula. **It's all human based.**) It's clear from this answer she thought she was being asked whether Prolacta makes a bovine formula.

31.  Neonatologists sometimes deviate, based on the needs of any particular infant, from feeding guidelines "when a baby is not . . . growing appropriately," which can include adding formula or fortifiers to increase calories.  Ex. 5, Bear Tr. 66:13-16; 65:22-66:12.

**OBJECTION/RESPONSE:** What neonatologist "sometimes" do is irrelevant. What is relevant is what was done in Daniel's case. **ADMIT** that Daniel was switched off donor milk and onto formula per the Roadmap written in large part by Jennifer Fowler. S*ee* Pl.'s Aff. SOF ¶ 17. DENY that growth failure was the reason for the transition to formula as is evidenced by the fact that Daniel's much larger brother Deyvon was also switched off donor milk and onto formula on day 28. Def.'s L.R. 56.1(a)(3) ¶ 27. Dr. Bear testified that the transition to formula was in accordance with the Roadmap, not because of growth failure. Bear Tr. 29:25-30:5.

32.  Because mother's milk was not available, Daniel and Deyvon received donor milk for their first three days of life.  Ex. 34, DeZure Report at 7; Ex. 8, Minor-DeyvonWindley-PPR00998-1065.

**RESPONSE: ADMIT.**

33.  During his first three days of life, Daniel's doctors would occasionally withhold his feeds due to concerns about his clinical picture.  Ex. 34, DeZure Report at 7; Ex. 4, Singh Report at 20.

**RESPONSE: ADMIT**

34. Once Ms. Inman's milk supply increased, the twins' physicians began feeding them more of her breastmilk. Ex. 7, Inman Tr. 99:8-18; Ex. 34, DeZure Report at 7 (showing start of feeding of mother's own milk ("MOM") on May 16th).

**RESPONSE: ADMIT**

35. Daniel's gut showed signs of stress and immaturity several days before receiving any full volume Enfamil Premature Formula ("EPF") 24 cal./oz feeds, including noted "gaseous distention of bowel throughout the abdomen." Ex. 35, Minor-DanielWindley-PPR-00801-806.

**RESPONSE: ADMIT in part. DENY** to the extent this implies that Daniel was developing NEC prior to formula feeding.

36. The medical team slowly increased the twins' feeding, eventually adding cow's milk-based fortifier to both of their feeding orders on May 19th to supplement Ms. Inman's breast milk. Ex. 34, DeZure Report at 7.

**RESPONSE: ADMIT.**

37. From May 19 through May 25, Daniel received his own mother's milk, fortified with Enfamil human milk fortifier, consistent with the hospital's guidelines. Ex. 34, DeZure Report at 7; Ex. 9, NICU Feeding Roadmap.

**RESPONSE: ADMIT**

38. Daniel's abdominal distention was noted prior to the feeding of preterm fortifier, on May 13, Ex. 35, Minor-DanielWindley-PPR-00801, May 14, Ex. 35, Minor-DanielWindleyPPR-00802, and May 15, Ex. 35, Minor-DanielWindley-PPR-00806.

**RESPONSE: ADMIT.**

39. Concerned about his progress and continued feeding intolerance on human milk, Daniel's doctors hypothesized that Daniel might have a genetic disorder called "galactosemia," a

metabolic complication that prohibits the body from metabolizing galactose, a sugar found in human milk. Ex. 35, Minor-DanielWindley-PPR-00021; *see also* Ex. 5, Bear Tr. 124:17-19 ("Q. What is Galactosemia? A. It is a disorder where you can't tolerate certain types of feeds and protein. Q. And are those often found in types of milk? A. Yes.").

**RESPONSE: ADMIT** that Daniel was suspected of having Galactosemia, but this was ruled out through lab analysis. ECF No. 52-2 (DeZure Tr.); ECF No. 52-5 (DeZure Rep.).

40.    A potential "galactosemia" diagnosis meant that Daniel could not receive mother's own milk or donor milk. Ex. 5, Bear Tr. 124:23-25 (regarding galactosemia: "Q. So would that mean you can't receive even mother's own milk or donor milk? A. Correct.").

**RESPONSE: ADMIT** that Dr. Bear opined that a baby with galactosemia cannot receive mom's own milk or donor milk. However, galactosemia was ruled out and played no part in the decision to feed Enfamil 24 and Enfamil 30.

41.    Due to concerns about galactosemia, approximately two weeks after he was born, his doctors switched Daniel's feeds from fortified mother's milk to various hypoallergenic, but still cow's milk-based, formulas to ensure he could continue receiving nutrition. Ex. 4, Singh Report at 19 ("Due to Daniel's suspected galactosemia, Daniel was given Pregestimil and/or Nutramigen between May 25 and June 3. Pregestimil and Nutramigen are both lactose-free, hypoallergenic formulas.").

**RESPONSE: ADMIT.**

42.    The hospital informed Ms. Inman of the transition to Nutramigen, one of the hypoallergenic formulas that Daniel's medical team administered, and she agreed. Ex. 7, Inman Tr. 120:5-8 ("Q. Did you consent to that arrangement when they discussed that with you? A. Yes, because the discussion was to put him on the Nutramigen."); *id.* at 112:19-113:16.

**RESPONSE: ADMIT.**

43.     Ms. Inman relied on Daniel's physicians to select what nutrition products to administer to Daniel and believed Daniel's medical providers were in a better position to understand the risks and benefits of nutritional choices that were being administered to him.  Ex. 7, Inman Tr. 114:14-18, 116:8-12, 122:1-6, 122:7-10, 125:3-10.

**RESPONSE: ADMIT** that Ms. Inman trusted the medical team at a time when she did not know the degree of influence that Mead Johnson asserted over the clincians, feeding protocols and formula contracts.

44.     After Daniel's galactosemia test came back negative, his doctors switched his feeds back to his mother's own milk fortified with a cow's milk-based fortifier from June 3-5.  Ex. 5, Bear Tr. 126:9-14; Ex. 4, Singh Report at 24-25 (showing feeding switch to "Fortified MOM 24 kcal/oz w/ Enfamil HMF" on June 3).

**RESPONSE: ADMIT** that galactosemia came back negative and was completely ruled out. **ADMIT** that Daniel's doctros switched Daniel back to his mother's own milk fortified with a cow's milk-based fortifier from June 3-5.

45.     On June 6, approximately a month after his birth, Daniel's care team was concerned that he had not gained adequate weight even though he was on fortified mother's milk.  Ex. 5, Bear Tr. 131:11-20; *see also* Ex. 34, DeZure Report at 7 (showing weight of 868 grams on June 6, 2020).

**OBJECTION/RESPONSE: DENY** to the extent Defendant implies that Dr. Bear was concerned about weight gain. In the portion of Dr. Bear's depositon that Defendant cites to she is merely reading a record from a nutritionist and confirming that this is indeed what the nutritionist wrote. Defendant does not cite to any authority in the record that Dr. Bear determined that there was insufficient weight gain. To the contrary, and as noted in response to ¶ 13  above, the decision to switch Daniel to formula was simply due to the Roadmap. Bear Tr. 29:25-30:5.

28

46. On June 6, Daniel weighed 868g, a little less than two pounds. Ex. 35, Minor-DanielWindley-PPR-00238.

**RESPONSE: ADMIT**

47. On June 6, Deyvon weighed about 1700g—approximately four pounds. Ex. 8, Minor-DeyvonWindley-PPR-00332.

**RESPONSE: ADMIT**

48. On June 6, Daniel's physicians ordered that Daniel begin receiving a mix of mother's own milk (or donor breastmilk if Ms. Inman's milk was not available) and Enfamil premature formula due to his poor growth. Ex. 5, Bear Tr. 131:24-132:25; Ex. 34, DeZure Report at 7.

**RESPONSE: ADMIT** that Enfamil Premature formula was ordered. **DENY** that this was due to poor growth. Daniel was switched to formula in accordance with the Roadmap. Bear Tr. 29:25-30:5.

49. Formula was administered to Daniel only after a "thorough assessment and identification of medical need." Ex. 5, Bear Tr. 87:15-19.

**RESPONSE: DENY.** Daniel was switched to formula in accordance with the Roadmap. Bear Tr. 29:25-30:5.

50. On June 11, Daniel's care team, consistent with the hospital's feeding guidelines, removed donor milk and ordered either fortified mother's milk or, if not available, formula. Ex. 5, Bear Tr. 134:3-18; Ex. 34, DeZure Report at 8.

**RESPONSE: ADMIT** that Daniel was switched to formula in accordance with the Roadmap. Bear Tr. 29:25-30:5.

51.     Daniel received exclusively Enfamil Preterm Formula from June 12 onward.  Ex. 34, DeZure Report at 8; Ex. 5, Bear Tr. 134:20-135:6.

**RESPONSE: ADMIT**

52.     Dr. Bear testified that Daniel would have received exclusively formula only if his mother's own milk was insufficient, Ex. 5, Bear Tr. 134:20-135:6, while Ms. Inman testified that she was pumping sufficient milk to feed both twins.  Ex. 7, Inman Tr. 117:19-118:6.

**RESPONSE: ADMIT**

53.     On June 17, 2020, Dr. Bear ordered the combination of two different products—a 24 kcal and a 30 kcal product—to create a 27 kcal formulation, which they fed Daniel due to his "poor growth curve."  Ex. 35, Minor-DanielWindley-PPR-00344; Ex. 4, Singh Report at 30–32; Ex. 34, DeZure Report at 8 ("Recommendation to increase to 27 kcal/oz formula); Ex. 5, Bear Tr. 35:15-36:3.

**RESPONSE: ADMIT** that Dr. Bear ordered the mixture of 24kcal and 30kcal at Jennifer Fowler's recommendation. Bear Tr. 143:12-22. **ADMIT** Jennifer Fowler recommended this due to poor growth. **DENY** that Daniel's growth at that time was poor. DeZure Tr. 275:17-24 ("Daniel had regained his birthweight by two weeks of age, as is expected. Further, Daniel's weight on June 15 2020, one day prior to the recommendation to increase his caloric density was 1,070 grams. This is an excellent seven day average weight gain of 20 grams per day.").

54.     Daniel remained on the 27 kcal mixture through the remainder of his time in the NICU.  Ex. 34, DeZure Report at 8.

**RESPONSE: ADMIT**

55.     Besides the Nutramigen, Ms. Inman stated she was not aware Daniel received any formula.  Ex. 7, Inman Tr. 120:23-121:1 ("I was not aware.").

30

**RESPONSE: DENY.** Ms. Inman's testified that: (1) she did not know Daniel was switched to "*Enfamil*"; and (2) She did not know that Daniel was being switched to a diet of "<u>only</u> formula". Plaintiff DENIES that she never knew formula was being consumed. Ms. Inman became aware that Daniel was receiving formula 1-2 weeks before he passed away, and that he started having intolerance around that time. *See* Inman Affidavit, Para. 6. *See also*, Inman Tr. 125:12-126:

> Q. Were you ever – did you ever become aware that Daniel was not tolerating any of his feeds at any point during his hospitalization?
> A. Yes.
> Q. When did you become aware of that?
> A. From my knowledge it was when he started being put on formula.
> Q. And when you say he was being put on formula, at what time period after his birth are you referring to?
> A. I would say maybe a week or two before he passed away.
> Q. Okay. And what are you or on what are you basing your statement that you believe he stopped tolerating his feeds when he was put on formula?
> A. I feel like around that time is when they kept telling me that he – they had to hold his feeds. They weren't able to feed him. At that point I wasn't able to touch him. I wasn't able to move him. He just strictly was basically really just laying there, and I could only talk to him through the incubator.
> Q. And, to the best of your recollection, that would have occurred approximately a week after you became aware that Daniel had received a – a formula or fortifier product. Am I correct on that?
> A. Yes.

Ms. Inman was clearly aware that Daniel was being fed formula at some point prior to his death.

56.     Ms. Inman testified that no one at the hospital told her about any of the other changes to Daniel's nutrition course, including the transition to full feeds of EPF on June 12 or the increase in caloric density on June 17, 2020.  Ex. 7, Inman Tr. 121:2-8.

**RESPONSE: DENY.** As noted in response to ¶ 55, Ms. Inman was aware that Daniel had been switched to formula. *See* Inman Affidavit, ¶ 6; Inman Tr. 125:12-126.

57.     On June 23, 2020, Daniel was diagnosed with NEC.  Ex. 35, Minor-DanielWindley-PPR-00048; Ex. 36, Minor-DanielWindley-VMC-00074.

**RESPONSE: DENY.** On June 17, 2020. Daniel began having desaturations after and associated with feeds. Rojas Decl. Ex. HHH at 444, 340, 445, 357. On June 22, an xray of the abdomen noted "gaseous distention of multiple loops of bowel." *Id.* at 822. On June 22, 2020 at 4:37 am, Dr. Parish was informed by the charge nurse that Daniel's abdominal girth was increasing. *Id.* at 373. Dr. Bear noted on June 22, at 12:32 pm that there was concern of increasing abdominal girth overnight and that KUB showed "gaseous distention." *Id.* at 822. At 1:30 pm, Dr. Dalzell noted that "Daniel had more apnea/brady episodes past few days with increasing abdominal girth" and "increase[d] O2 need . . ." *Id.* at 383. Daniel received his last feed ever on June 22, at 3:23pm. *Id.* at 2420. At 7:50, Dr. Calamito was "called to bedside for increase work of breathing . . . marked abdominal distention and significant respiratory distress. Chest xrays with low lung volumes and KUB with portal venous gas." *Id.* at 391. At approximately 8:00 PM, Dr. Davenport was called to evaluate infant "for acute decompensation requiring increased respiratory support . . .with notable increased work of breathing," x-rays were obtained "reveal[ing] low lung volumes and . . . concerning for portal venous gas. The decision was made to intubate the infant while further work up initiated." *Id.* at 392. Surgery was consulted. *Id.* Daniel was "initially on the conventional ventilator however was requiring high pressure with difficult oxygenating." *Id.* The surgical team was at the bedside, but Daniel was experiencing" respiratory acidosis" and an adjustment was made on ventilator. *Id.* A surgeon was "en route with plans for ex lap [exploratory laparotomy]." *Id.* At 12:53 AM Daniel "underwent bedside laparotomy which revealed dilated small bowel with patchy necrotic colon." *Id.* His "[b]owel was placed in Silo with plans to re-evaluate 24-48 hours." *Id.* at 392. A note just after midnight (12:29 am on June 23) states "Daniel had acute decompensation overnight with protal venuous gas on KUB and abodminal compartment syndrome clinically. Bedside ex-lap performed by Dr. Longshore show NEC with much of the smal bowel showing likely NEC totalis." *Id.* at 392.

58.     Daniel passed away on June 23, 2020.  Ex. 35, Minor-DanielWindley-PPR-00002–3

**RESPONSE: ADMIT.**

59.     Ms. Inman testified that she first learned that Daniel died from NEC from her attorneys.  Ex. 7, Inman Tr. 145:14-20 (Q.  When did you find out that it was NEC?  A.  From my attorneys."  Q.  And I guess I'll take a step back.  So is it your testimony that you did not understand that Daniel had passed away as a result of NEC until a conversation with your attorneys?  A.  From my knowledge, yes.").

**OBJECTION:** When or how Ms. Inman learned that Daniel got NEC is not relevant to any of the issues in this case.

**RESPONSE: ADMIT** that defendant correctly quotes Ms. Inman's testimony.

60.     No one at the hospital spoke with Ms. Inman about NEC.  Ex. 7, Inman Tr. 98:14-17; Ex. 7, Inman Tr. 143:7-20.

**OBJECTION:** When or how Ms. Inman learned that Daniel got NEC is not relevant to any of the issues in this case.

**RESPONSE: ADMIT** that defendant correctly quotes Ms. Inman's testimony.

61.     Ms. Inman did not see any formula bottles or labels while Daniel in the NICU.  Ex. 7, Inman Tr. 124:11-15.

**RESPONSE: ADMIT**.

62.     Ms. Inman did not read any "product pamphlets or inserts for any kind of formula" while in the hospital.  Ex. 7, Inman Tr. 124:23-125:2.

**RESPONSE: ADMIT** in part and **DENY** in part. Prior to Daniel's birth Ms. Inman received many communications through the years from Mead Johnson in the form of "coupons and little booklets" through the mail and email. Tr. 165-169. She specifically recalls seeing an advertisement for

Enfamil that "said something about help your baby grow or something like that or something of that nature . . ." Tr. 169:21-25.

63.     Ms. Inman does not know whether any formula-related coupons she may have received related to "preterm products or term products" because she "didn't pay much attention to them." Ex. 7, Inman Tr. 166:12-16.

**RESPONSE: DENY.** Prior to Daniel's birth Ms. Inman received many communications through the years from Mead Johnson in the form of "coupons and little booklets" through the mail and email. Tr. 165-169. She specifically recalls seeing an advertisement for Enfamil that "said something about help your baby grow or something like that or something of that nature . . ." Tr. 169:21-25.

64.     Ms. Inman never read any coupons from formula companies and instead "just g[a]ve them to somebody that [she] knew fed their baby formula." Ex. 7, Inman Tr. 166:21-24.

**RESPONSE: DENY.** Prior to Daniel's birth Ms. Inman received many communications through the years from Mead Johnson in the form of "coupons and little booklets" through the mail and email. Tr. 165-169. She specifically recalls seeing an advertisement for Enfamil that "said something about help your baby grow or something like that or something of that nature . . ." Tr. 169:21-25.

65.     No doctor has ever told Ms. Inman that infant formula products—of any kind— caused or contributed to Daniel's NEC. Ex. 7, Inman Tr. 162:9-19.

**RESPONSE: ADMIT**

66.     Daniel's neonatologist Dr. Kelly Bear, who ordered and administered Enfamil formula, relied on "evidence-based science"—not Mead Johnson material—to make her feeding decisions. Ex. 5, Bear Tr. 19:25-20:5, 154:14-21.

**RESPONSE: DENY**. Dr. Bear relied on Jennifer Fowler for feeding recommendations. See Pl.'s Resp. to Def.'s L.R. 56.1(a)(3) ¶18. Jennifer Fowler was the nutrition expert at Vidant. ECF No. 63-5. (Fowler Tr. at 10:18-21). *See also*, Pl.'s Aff. SOF ¶ 13. Residents and attending physicians relied upon her for nutrition expertise and advice. ECF No. 63-5. (Fowler Tr. 10:22-25). Fowler educated and trained physicians relative to nutrition at Vidant. ECF No. 63-5. (Fowler Tr. 11:1-12 and 11:19-23). This training and education included the use of formula products. ECF No. 63-5. (Fowler Tr. 11:24-12:1). Mead Johnson orchestrated a campaign to convince clinicians, and Jennifer Fowler specifically, that babies needed to be switched off donor milk "sooner" because they falsely claimed, growth and developmental failures were associated with donor milk falsely claimed equivalence with respect to NEC. S*ee* Pl.'s Aff. SOF ¶ 9-12. Jennifer Fowler's understanding about the advantages of Enfamil bovine formula were taught to her by Mead Johnson. S*ee* Pl.'s Aff. SOF ¶ 1. She was taught this lie by Mead Johnson to whom she was loyal (Pl.'s Aff. SOF ¶ 14), and specifically by Dr. Valentine who was her hero. Pl.'s Aff. SOF ¶ 11, 12, 14 and 16. Jennifer Fowler was not aware the Formula increases the risk of NEC. S*ee* Pl.'s Aff. SOF ¶ 17. Baby Daniel was transitioned off donor milk and onto Enfamil formula at 28 days, consistent with the roadmap that Jennifer Fowler had written "in large part" based on what she had learned from Mead Johnson. S*ee* Pl.'s Aff. SOF ¶ 19 and Pl.'s Aff. SOF ¶ 11.

67.     Dr. Bear's decisions were consistent with the hospital's evidence-based feeding roadmap, which the staff approved after reviewing the existing literature.  Ex. 5, Bear Tr. , 92:293:21, 132:21-133:16 (Q. "[T]hat transition [to formula] would have been consistent with the evidence-based feeding roadmap? A. Yes.").

**RESPONSE: ADMIT** that Dr. Bear's decisions were consistent with the hospital's roadmap. **DENY** that the roadmap was evidence-based. The Roadmap, written in "big part" by Jennifer Fowler

(Fowler Tr. 11:13-18) clearly reflects Mead Johnson's false propaganda that babies should be taken off donor milk "sooner" and false science that donor milk is inferior to formula with respect to growth and development. Pl.'s Aff. SOF ¶ 11, 12, 16.

68.     "[M]arketing or labeling by Mead Johnson" has never influenced Dr. Bear's decision to order preterm formula, and she does not look to formula companies to dictate her clinical decisions. Ex. 5, Bear. Tr. 67:11-14; 103:22-25.

**RESPONSE: ADMIT** that Dr. Bear claims to have not been influenced by marketing. **DENY** that she was not influenced by Mead Johnson's false propaganda. A jury in this case, given the record, could reasonably conclude that Mead Johnson had a significant impact on the feeding decisions in the Vidant NICU, and particularly on Jennifer Fowler, who in turn influenced the roadmap and influenced Dr. Bear. See generally, Pl.'s Aff. SOF

69.     Dr. Bear has never read the label on an Enfamil bottle.  Ex. 5, Bear Tr. 102:24-103:3.

**RESPONSE: ADMIT**.

70.     Dr. Bear does not rely on sales representatives as a source of information about products she orders.  Ex. 5, Bear Tr. 103:4-7.

**RESPONSE: ADMIT** that Dr. Bear claims to have not relied on sales representatives. **DENY** that she was not influenced by Mead Johnson's false propaganda and marketing scheme. A jury in this case, given the record, could reasonably conclude that Mead Johnson had a significant impact on the feeding decisions in the Vidant NICU, and particularly on Jennifer Fowler, who in turn influenced the roadmap and influenced Dr. Bear. See generally, Pl.'s Aff. SOF Moreover, a jury could reasonably conclude that Mead Johnson's scheme of giving formula for free, compared with the high cost of donor milk influenced feeding decisions in Daniel's case. Pl.'s Aff. SOF ¶ 10. See also Mead Johnson internal document stating that there is a "***perceived*** image of shortage [of donor milk] . . . but,

current demand is fulfilled . . . All hospitals needing DHM get enough volume. **Hospitals are rationing and prioritizing their supply for VLBW <1,5kg infants due to lack of budget, not lack of supply.**" *See* Rojas Decl. Ex. G at slide 13 (MJ_Jupiter_ 0385524) (Talley Dep., 11/20/23, Ex. 8) (emphasis added).

71.     Dr. Bear has never visited the Enfamil website.  Ex. 5, Bear Tr. 102:21-23.

**RESPONSE: ADMIT** that Dr. Bear said she has never visited the Enfamil website.

72.     Dr. Bear knew about the risk of NEC associated with formula years before Daniel was born.  Ex. 5, Bear Tr. 101:1-102:8.

**RESPONSE: DENY.** *See* Case No. 1:22-cv-03737, ECF No. 57-4 (Bear Tr.) (treating neonatologist in *Inman*) at 17:13-18:12 ("Q. In June of 2020, would you be able to give me a percentage risk for preemies fed formula versus preemies fed human milk? A. Not off the top of my head. **Q. Would it be fair to say that you felt there was a slight increase risk by feeding formula? A. Yes. Q. Do you understand what 'slight risk' means? A. An increased risk that is not significant.** Q. Right. And would you categorize it as a slight risk when you feed formula versus human milk to preemies of NEC? A. Yes."); *Id.* At 148:3-8 ("Q. Okay. And you didn't think that by continuing to feed [formula] at that point in time, there was a significant risk that the infant formula would cause NEC, correct? A. Correct.") (objection omitted).

73.     Dr. Bear was aware of the American Academy of Pediatrics ("AAP") guidance on breastfeeding and testified that she would "keep up to date" with AAP guidelines on breastfeeding and donor milk.  Ex. 5, Bear Tr. 78:7-18.

**RESPONSE: DENY**. Paintiff repeats and re-asserts its response to Def.'s L.R. 56.1(a)(3) ¶71.

74.     Dr. Bear stated that no warning from Mead Johnson would have changed her feeding decisions for Daniel. Ex. 5, Bear Tr. 137:12-138:7 (testifying she would have continued feeding Enfamil "because the risks of inadequate growth outweighed any risk of NEC"); *id.* 153:10-19.

**RESPONSE:** ADMIT that Dr. Bear testified that "the risks of inadequate growth outweighed any risk of NEC." But this highlights the how Mead Johnson's misinformation campaign had made its way into Dr. Bear's understanding of the science. She wrongly believed that there was a "slight risk" (Resp to. Def.'s L.R. 56.1(a)(3) ¶71) while believing Dr. Valentine's propaganda that babies need to be switched off donor milk. This is diminished understanding of the risk combined with an exaggerated and false understanding of the benefits of formula is precisely identical to the message Dr. Valentine was "teaching" clinicians in her webinar. Pl.'s Aff. SOF ¶ 12.75. Daniel's care team was aware of that human milk decreases the risk of NEC. *See* Ex. 32, Fowler Tr. 87:14-19 (Jennifer Fowler, the dietitian who advised on Daniel's nutrition regimen, testifying that she "kn[ew] that breast milk decreases the risk of NEC"); Ex. 37, Livingston Tr. 37:1-14 (Dr. Livingston, a pediatric hospitalist with no authority to select feedings, testifying that he knew that "[t]here's just substantial evidence that breast milk is superior").

**OBJECTION:** Relevance. This case does not implicate a choice between mom's breastmilk and formula. It implicates a choice between donor milk and/or donor milk products versus formula. Defendant conflates "breast milk" with "donor milk".

**RESPONSE**: **ADMIT** that Jennifer Fowler and Dr. Livingston understood the benefits of *mom's own breastmilk*. Daniel's physicians may have recognized the benefits of his mother's own milk, but they did not appreciate the comparative advantages of donor human milk over formula, the magnitude of the risk associated with formula feeding, or the false belief—cultivated by Mead

Johnson—that formula was superior to donor milk with respect to growth and development. *See* Pl.'s Aff. SOF ¶ 17 and 18 (re: Fowler) and 32 (re: Livingston).

76.     The decision Dr. Bear made to continue administering Enfamil Premature Formula, which Plaintiff alleges caused Daniel to develop NEC, was "with the understanding that formula is less protective against NEC than mom's milk or donor milk" and was the "medically-appropriate choice." Ex. 5, Bear Tr. 132:16-133:20.

**RESPONSE: ADMIT** that Dr. Bear stated this. **DENY**, to the extent this statement states or implies that Dr. Bear understood the magnitude of the risk with using formula. She also was operating in an informational vacuum because she wrongly perceived that formula provided a substantial benefit over fortified donor milk with respect to growth and development. Pl.'s Aff. SOF ¶ 17. See also Bear Tr. 74:14-22; Id. 153:10-19.

77.     Prolacta's formula was not available as an alternate feeding option for Daniel in part because its products are not made at scale. Ex. 38, Cleveland Dep. Tr. 375:13-376:11. Even if they were, Prolacta tells doctors that its products are "not suitable for use as a sole source of nourishment" and that they are "[n]utritionally incomplete. Ex. 17, Guide, Feeding Transition From an Exclusive Human Milk Diet, Prolacta Bioscience (2021) (emphasis added); Ex. 39, Prolacta Bioscience, Nutrition Information: 100% Human Milk-Based Neonatal Nutritional Products From Prolacta Bioscience, at 2–11; Ex. 40, Product Information Sheets for Prolact RTF 24™, Prolact RTF 26™ & Prolact RTF 28™, Prolacta Bioscience (2020).

**OBJECTION:** Plaintiff objects on relevance, because plaintiff is not required to prove scale. Defendant points to nothing in North Carolina law requiring proof of "scale." Plaintiff objects to Defendant's characterization of the citations above given that Defendants have repeatedly delayed the depositions of Prolacta witnesses (originally scheduled for July and August and cross-noticed in the

MDL, No. 1:22-cv-00071, ECF Nos. 659, 660, and 661) that would better position Plaintiff to counter Defendant's threadbare assertions. Plaintiff reserves the right to supplement this response when that testimony is finally taken. Subject to and without waiving this objection, Plaintiff responds as follows:

**RESPONSE: DENY**. Plaintiff **DENIES** that Prolacta was not an available alternative food source simply because it required supplementation. The warnings on the Prolacta label state that an infant fed Prolacta "may require additional vitamins and iron added separately from the product." Case No. 1:22-cv-03737, ECF No. 56-7 (Feeding Transition From an Exclusive Human Milk Diet) at 2. *See also* Case No. 1:22-cv-03737, ECF No. 56-15 (Nutrition Information: 100% Human Milk-Based Neonatal Nutritional Products From Prolacta Bioscience) at 3 ("An EHMD requires nutritional supplementation. Any required additional vitamins and iron must be administered separately from Prolacta's products."); Case No. 1:22-cv-03737, ECF No. 56-16 (Product Information Sheets for Prolacta RTF formulas) at 1–3 ("Nutritionally incomplete. Infant will require additional vitamins and iron added separately from the product."). But exclusively breastfed infants also require supplementation. *See* Wagner, CL, Greer, FR, and American Academy of Pediatrics Section of Breastfeeding and Committee on Nutrition, *Prevention of Rickets and Vitamin D Deficiency in Infants, Children, and Adolescents*, PEDIATRICS (2008) 122(5): 1142–52 ("Infants who are exclusively breastfed but who do not receive supplemental vitamin D or adequate sunlight exposure are at increased risk of developing vitamin D deficiency and/or rickets.") (recommending that exclusively breastfed infants be supplemented with 400 IU of vitamin D daily, up from prior recommendation of 200 IU daily). The need to add vitamin D does not render breastmilk nutritionally inadequate or make cow's-milk-based formula a better option. Adding vitamins and iron to a preterm infant's diet does not require adding cow's milk to that diet. Prolacta RTF formula combined with vitamins and iron (not derived from cow's milk) can be fed as a safer alternative for cow's-milk-based formula. Adopting Defendant's

40

characterization would require the Court to determine that breastmilk is nutritionally incomplete and cannot be administered as the sole source of nutrition. Additionally, Def. Ex. 40 (Product Information Sheets for Prolact RTF 24™, Prolact RTF 26™ & Prolact RTF 28™, Prolacta Bioscience (2020)) also that although an exclusive human milk diet "may require additional nutrients[,]" "no commercially-available human milk fortifier (HMF) or premature infant formula can be guaranteed to provide the full and necessary nutritional needs of every preterm infant." Stated more succinctly, Enfamil products themselves may require additional nutrients too.

Even if "scale" of a feasible alternative design was a requisite matter of proof in a product liability action in North Carolina (it is not), Mead Johnson does not point to anything in the record to suggest that the absence of "scale" played any role in the reason why Prolacta was not fed to Daniel. To the contrary, the record suggests scale had nothing to do with its absence at Vidant. The absence of the Prolacta is more plausibly explained by the economic moral hazards created by Mead Johnson's *downstream model* which gave formula to hospitals for free (or near free). One "container" of Enfamil 24 was "sold" to Vidant for a penny (1¢). Rojas Decl., Ex. K, Neuhoff Tr. 145:5-23. This penny charge was only to get around baby friendly guidelines, and Mead Johnson was willing to give the product completely free of charge. Rojas Decl., Ex. K, Neuhoff Tr. 144:19-23. In exchange for the nearly free product, Vidant was required to commit to 80% usage of Mead Johnson product. Rojas Decl., Ex. K, Neuhoff Tr. 101:1-17. See also, Rojas Decl., Ex. I, Deposition of Robert Cleveland, 5/17/24, Tr. 65:3-7 (Q. And the contracts with hospitals are typically that they'll use, like 80 to 90 percent of your product, then then they get everything at no charge. Is that typically how it works? A. Typically, Yes."); *Id.* at 67:10-15. ("Q. Now, you understand, Mr. Cleveland, that hospitals operate under tremendous cost pressure because the revenue's not easy to earn, and as a result, they have incentive to reduce cost of treatment so they can treat as many patients as possible. Correct? A. That's a general statement,

yes."). Id. at 68:3-9   ("I just mean it can be significant to the hospital from a financial standpoint to get – to get something for free as opposed to pay for it. A. Yes, I agree. Q. It's hard to say no to free stuff, in other words. Can we agree to that? A. We can.")

Mead Johnson put a key member of Vidant's NICU nutrition team on its payroll. Pl.'s Aff. SOF ¶ 13. Mead Johnson ensured it was the source of what Fowler knew about nutrition by paying her to attend Mead Johnson "educational" seminars. *Id.* Mead Johnson then cemented this indoctrination by paying Fowler to write about the subjects. Fowler Tr. 41:9-25 and 43:22-44:14 (Fowler's "article was being used as a promotional device" and to "add credibility to their product lines."). And Mead Johnson paid Fowler to speak about Enfamil products, including about the feeding roadmap she developed at Vidant, and how important it is.[1] Fowler Tr. 66:22-68:24.

Prolacta's absence is better explained by the fact that Mead Johnson managed to exert a tremendous level of influence over this particular NICU and its providers, including actual influence over the feeding protocol. See Rojas Decl., MJ_MDL_3026_Inman_0010678 (Sales representative Susan Neuhoff reporting on September 29, 2019 that one of her "top accomplishments": "established Enfacare D/C [discharge] protocol at Vidant Medical center despite baby friendly."); Rojas Decl., MJ_Jupiter_4385793 (Susan Neuhoff reporting "powerful tool" she employs to "battle baby friendly no-access rules).

Finally, Robert Cleveland testified that Prolacta is available to scale. Rojas Decl. Ex. EE, Cleveland Tr. 256:16-24 (12/15/23).

78.     Cow's milk based-preterm formula provides a sole source of nutrition, and is regulated pursuant to 21 C.F.R. § 107.50(c).   Ex. 16, Hadley Dep. Tr. 183:6–184:16 (Sep. 24, 2024); Ex. 41, Alvey Dep. Tr. 48:20-22 (Aug. 10, 2023) ("All our infant formulas have all the nutrition needed for

---

[1] This feeding roadmap required transition to formula, specifically Enfamil Premature. See Pl.'s Aff. SOF ¶ 19–20

healthy growth for – for any infant."); Ex. 42, MJ_Jupiter_ 0010754 at 4 ("Premature infant formulas have been designed as the sole source of nutrition specifically for the preterm low birthweight infant, with nutrients at levels to help achieve body growth and composition similar to that seen in a normal fetus of the same postconceptional age.").

**RESPONSE: ADMIT** that Cow's milk based-preterm formula is regulated pursuant to 21 C.F.R. § 107.50(c). DENY that it provides a sole source of nutrition. Bovine formula is an inadequate and dangerous source of nutrtion for preterm infants. *See* Pl.'s Aff. SOF ¶ 2-5.

79.     Dr. Bear continues to prescribe preterm formula and fortifier today, with the full understanding that the incidence of NEC is lower in infants fed human breast milk. *See, e.g.*, Ex. 5, Bear Tr. 138:8-21 ("Q. Have you learned anything in this deposition today about the risk of NEC associated with cow's-milk-based formula or fortifier that you didn't know in 2020? A. No. Q. And after you leave this deposition today, will you continue to use Enfamil preterm formulas with your preterm patients when it is medically indicated? A. Yes. Q. And will you continue to use Enfamil human milk fortifier with your preterm patients when it is medically indicated? A. Yes.").

**RESPONSE:** Plaintiff **ADMITS** that when her deposition was taken she said that she continues to prescribe preterm formula. However, that deposition was a year and a half ago (May 22, 2024), and the record is devoid of what she currently prescribes, and therefore, the statement is **DENIED** as stated. Plaintiff further denies that Dr. Bear was aware of the magnitude of risk associated with formula use. See Pl.'s Aff. SOF ¶ 17.

80.     Ms. Inman would have asked whether there were other alternatives had Daniel's physicians told her they believed Enfamil Premature Formula was the best way to meet Daniel's nutritional needs. Ex. 7, Inman Tr., 121:9-19.

**RESPONSE: DENY.** Ms. Inman testified that she would have done her own research. Id. However, under no circumstances would she have allowed Daniel to be fed formula if she knew the risk. See Affidavit, Alexis Inman, ¶ 3, 7 and 10.

October 24, 2025

Respectfully submitted,
/s/ *José M. Rojas*
José M. Rojas
LEVIN, ROJAS, CAMASSAR & RECK, LLC
PO Box 431
North Stonington, CT
(860)535-4040
jose@LRCR.law
*Counsel for Plaintiff Alexis Inman*