UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION <br><br> This Document Relates to: <br><br> *Alexis Inman v. Mead Johnson & Company, LLC, et al.* <br><br> Case No. 22 C 3737 | MDL NO. 3026 <br><br> Master Docket No. 22 C 00071 <br><br> Hon. Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

One month after his premature birth, Plaintiff Alexis Inman's infant son, Daniel Windley, was fed a preterm infant formula product manufactured by Defendant Mead Johnson & Company ("MJC"). Daniel developed necrotizing enterocolitis ("NEC") and died shortly thereafter. Ms. Inman sued MJC, arguing that the formula caused Daniel to develop NEC. This case, and hundreds of others, have been consolidated by the Judicial Panel on Multidistrict Litigation for pretrial proceedings, and the parties selected it as part of an initial wave of four "bellwether" trials. Mead Johnson has moved to exclude the testimony of Dr. Chandani DeZure, Plaintiff's specific causation expert witness, pursuant to FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As explained below, this motion is denied.

## BACKGROUND

The court assumes the parties' familiarity with the factual and procedural background of this MDL and the prior three bellwether cases.[1]

---

[1] *See* General Causation Order, No. 22 C 00071, 2025 WL 1283927 (N.D. Ill. May 2, 2025); Omnibus *Daubert* Order, No. 22 C 00071, 2025 WL 2381699 (N.D. Ill. Aug. 15, 2025); *see also Mar v. Abbott Lab'ys, Inc.*, No. 22 C 00232, 2025 WL 1282749 (N.D. Ill. May 2, 2025); *Diggs v. Abbott Lab'ys, Inc.*, No. 22 C 05356, 2025 WL 2377686 (N.D. Ill. Aug. 14, 2025); *Brown v. Abbott Lab'ys, Inc.*, No. 22 C 2001, 2025 WL 2987083 (N.D. Ill. Oct. 23, 2025).

Dr. Chandani DeZure is a board-certified attending physician at Stanford University's Lucile Packard Children's Hospital in the neonatal intensive care unit ("NICU"). (DeZure Rep. [52-5] at 4, 19.) She is also Associate Professor of Pediatrics at Stanford Medical School, and supervises medical students, residents, and fellows in her practice. (*Id.*; Hearing Tr. [111] at 7:23–24.) Prior to joining Stanford, she completed residency at the University of Chicago Comer Children's Hospital, and practiced at Children's National Medical Center in Washington, D.C. (DeZure Rep. [52-5] at 4–5.)

In total, Dr. DeZure has almost 15 years of experience as a physician both on the pediatric floor and in the NICU. (Hearing Tr. [111] at 7:6–17.) Since 2019, she has practiced exclusively in the NICU. (*Id.* at 8:8–11.) In her care for premature infants, Dr. DeZure makes feeding decisions on a daily basis. (DeZure Rep. [52-5] at 4–5.) She has cared for tens of thousands of premature infants over the course of her career, and has assessed and treated between 50–100 babies suspected of or diagnosed with NEC. (Hearing Tr. [111] at 7:15–17, 11:18–19; DeZure Dep. [52-3] at 64:14–20.)

Plaintiff retained Dr. DeZure to conduct a specific causation analysis. (DeZure Dep. [52-3] at 35:7–8.) Dr. DeZure was tasked with examining infant Daniel Windley's medical records to determine whether Mead Johnson's Enfamil Premature Formula, which he was fed during his course in the NICU, caused him to develop NEC. (Hearing Tr. [111] 30:5–15.) Dr. DeZure conducted a differential diagnosis, or differential etiology, to "evaluate[] and rule[] out several potential causes and contributing factors of Daniel's NEC." (DeZure Rep. [52-5] at 13.) As Dr. DeZure explained, a differential etiology is "a systematic standard [method] that clinicians use in the hospital to determine the diagnosis or the cause of a condition." (Hearing Tr. [111] 23:14–20.) Physicians evaluate the clinical course of a patient," including "risk factors, physical exam findings, [and] labs." (*Id.*) The physician then applies "clinical judgment and experience and knowledge, to get [] a cause or etiology by ruling things in or out to a reasonable degree of medical certainty." (*Id.*) This methodology is precisely what Dr. DeZure uses in her clinical practice on a

daily basis. (*Id.*) Indeed, differential diagnosis/etiology is, in her words, "the bedrock of clinical decisionmaking." (Hearing Tr. [111] 24:10–11.)

Mead Johnson moved to exclude Dr. DeZure's testimony [52], challenging her methodology as unreliable. (Defs. Mot. [52] at 6.) MJC does not question Dr. DeZure's qualifications. Instead, MJC takes issue with Dr. DeZure's references to a Bradford Hill analysis and argues that her failure to cite the medical literature in parts of her analysis renders her methodology suspect. (*Id.*) The parties submitted briefing and Dr. DeZure testified live at an in-person *Daubert* hearing conducted on February 12, 2026.

## DISCUSSION

### I. Legal Standard

Under FED. R. EVID. 702, an expert witness must be qualified by specialized knowledge or skill, their testimony must be relevant and assist the trier of fact, and their methods must "demonstrate sufficient reliability" in both the underlying data and its application to the facts of the case. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citing FED. R. EVID. 702). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that the Federal Rules of Evidence requires the trial judge to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). The court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

Although the court must assess whether the expert's methodology is reliable, "this obligation "does not ordinarily extend to the reliability of the conclusions those methods produce— that is, whether the conclusions are unimpeachable." *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025) (citations and quotations omitted). So long as the expert's testimony is "based on a valid and properly applied methodology," it is admissible even if the expert reaches "a

3

conclusion that is subject to doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–66 (7th Cir. 2013). "[T]he accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596).

## II. Analysis

It is well-established in the Seventh Circuit that a differential etiology is an acceptable, reliable method for establishing legal cause, *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013), so long as the expert follows a reliable method in ruling in and ruling out various potential causes. *See In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, No. 14 C 1748, 2017 WL 1833173, at *17 (N.D. Ill. May 8, 2017*).* The court believes that Dr. DeZure did so in this case. In her expert report, deposition testimony, and live testimony, Dr. DeZure explained that she considered numerous factors that could have caused the infant Daniel to develop NEC, and ruled various factors out based on a combination of her extensive clinical experience, study of the relevant medical literature, and review of Daniel's medical records. She clearly articulates a basis for doing so, and the court is satisfied that her opinion would be helpful to a jury.

MJC believes otherwise; it argues, primarily, that Dr. DeZure did not apply a differential etiology, but instead applied a Bradford Hill test. The Bradford Hill test is a set of nine factors that are ordinarily used to determine general causation—that is, in this case, whether as a general matter there is a causative connection between consumption of cow's-milk-based infant formula and the infant's development of NEC.[2] It is undisputed that Dr. DeZure has not offered a general causation opinion. But MJC argues that Dr. DeZure's opinion should be excluded because in

---

[2] The nine Bradford Hill factors are consistency, specificity, strength, analogy, experiment, coherence, plausibility, dose-response relationship, and temporality.

4

rendering her specific causation opinion, (1) she improperly used the Bradford Hill factors, and (2) she failed to apply the Bradford Hill test correctly.

The court does not agree. Dr. DeZure's expert report, deposition testimony, and live testimony each explicitly stated that she was applying a differential etiology. Mead Johnson contends that Dr. DeZure's statements do not accurately characterize her methodology, and they accuse her of effectively utilizing the Bradford Hill test because she referenced several of the nine criteria during her deposition. (Defs. Mot. [52] at 11–13.) But saying something does not make it so. Dr. DeZure indeed referenced several factors from Bradford Hill—including temporality, biological plausibility, and dose-response—in conducting her differential etiology, but that is not remarkable. The two tests have substantial overlap; certain of the Bradford Hill factors (like temporality) are clearly also relevant to establishing specific causation. And, because "ruling in" certain risk factors requires understanding whether those risk factors could potentially have caused NEC, an understanding of Bradford Hill and other general causation principles is intertwined with a specific causation analysis. Dr. DeZure's discussion of Bradford Hill factors does not render her opinions inadmissible, given that the opinions are otherwise methodologically sound.

Mead Johnson also attacks Dr. DeZure's overreliance on her clinical expertise. (*See, e.g.*, Hearing Tr. [111] at 106:24–112:6.) It notes that she did not cite medical literature for many of her conclusions but instead relied on her expertise practicing in the NICU and other clinical settings. This also does not trouble the court. Citations to medical literature are useful and are, in some contexts necessary—for example, with respect to diseases (like cancer) that generate a substantial amount of academic commentary. *Cf. Engilis v. Monsanto Co.*, 151 F.4th 1040, 1054 (9th Cir. 2025) ("[R]eliance on extensive clinical experience might be particularly informative—and perhaps necessary—in the context of a rare disease. But it might be less probative in the context of a more common disease for which there exists a substantial body of established literature."). NEC is a disease of prematurity and is relatively rare. Even so, a provider's reliance

5

on her training and extensive experience dealing with the relevant patient population does not render her methodology unreliable. Dr. DeZure's reliance on her clinical experience is not a mere "'talismanic invocation' of clinical experience," as Mead Johnson alleges. (Defs. Mot. [52] at 30 (quoting *Engilis*, 151 F.4th at 1054).) Rather, Dr. DeZure relied on her extensive clinical experience to fill gaps in the medical literature. As Defendant is aware, Plaintiff will offer the expert testimony of other witnesses, Drs. Sucre and Spector, who have studied the available literature and will offer a general causation opinion; Dr. DeZure did not err in relying on their conclusions in rendering her specific causation opinion. Defendant is free, of course, to cross-examine Dr. DeZure with evidence (from medical literature or otherwise) that conflicts with her opinions.

MJC notes that Dr. DeZure has treated no more than 100 infants with NEC and is not sure whether any of them had developed NEC as a result of exposure to formula. But this does not mean Dr. DeZure's experience is not relevant in this case. Dr. DeZure explained that she has actively practiced in the NICU for nearly fifteen years, and has treated tens of thousands of premature infants during that time. The hospital where she works rarely uses cow's-milk formula to feed premature infants, and, as noted, NEC Is a rare disease even within the population of preterm infants. Thus, Dr. DeZure's comparative lack of experience with babies who have developed NEC after consuming formula is not surprising. That lack of experience is a basis for cross-examination, not for exclusion of her testimony.

MJC also lodged a volley of other attacks, none of which are persuasive. In briefing and during cross-examination, MJC attacked the brevity of Dr. DeZure's report, the veracity of her medical conclusions, her past statements with respect to other infants, and her failure to consider certain publications. Many of these arguments also blur the line between general and specific causation; others go towards Dr. DeZure's credibility or the merits of her conclusions. As the court observed at oral argument, establishing general causation will be a significant challenge for all patients whose cases are part of this MDL. (Hearing Tr. [111] at 155:16–18.) With respect to

6

the infant at issue in this case, if the evidence establishes general causation, the court concludes that Dr. DeZure has rendered a specific causation opinion using a sound and reliable methodology, and her testimony will be helpful to the jury.

## **CONCLUSION**

The motion to exclude the testimony of Dr. Chandani DeZure [52] is denied.

ENTER:

Dated: February 17, 2026

_____
REBECCA R. PALLMEYER
United States District Judge