# EXHIBIT A

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT

LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| JAMIE SIMMONS | ) | |
| | ) | |
| INDIVIDUALLY AND AS | ) | |
| SPECIAL ADMINISTRATOR FOR THE | ) | |
| ESTATE OF DECEASED MINOR CHILD | ) | |
| AVA JAMES VILLARREAL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21L00000144 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion and Order**

This matter comes before the Court on Plaintiff's Motion for Leave to Amend Complaint pursuant to 735 ILCS 5/2-616 and Defendant's, Abbott Laboratories, Inc., Motion to Dismiss pursuant to 735 ILCS 5/2-619.1 and 5/2-615 with prejudice. Having heard arguments on this motion, and being fully advised in the premises, the Court now FINDS AS FOLLOWS:

**Background**

The deceased minor child, Ava James Villareal, was born prematurely weighing only 4 pounds on March 1, 2011, at Hamilton Medical Center in Dalton, Georgia. Beginning March 2, 2011, she received both Neosure, a brand of Similac manufactured by Defendant, and breast milk. On March 3, 2011, she received only Neosure infant formula. On March 4, she received Neosure throughout the morning and received breast milk around noon that same day. On or around March 4, 2011, Ava James Villareal began exhibiting signs of Necrotizing Enterocolitis ("NEC"). On March 6, 2011, she had blood in her stool and was officially diagnosed with NEC.

1

She died the following day, March 7, 2011, and her death certificate lists the cause of death as "Necrotizing Enterocolitis".

Plaintiff filed her Complaint against Defendant, Abbott Laboratories, Inc., on February 18, 2021, bringing four claims against Defendant: Strict Product Liability for Defective Product, Negligence, Failure to Warn, and Breach of Implied Warranty. Defendant brought its Motion to Dismiss on March 25, 2021, alleging the statute of limitations period expired long before Plaintiff's Complaint was filed pursuant to 5/2-619(a)(5). Defendant also requests dismissal pursuant to 5/2-615 for Plaintiff's failure to state any claim against Defendant.

On May 11, 2021, Plaintiff filed a Motion for Leave to Amend Complaint. In her motion, Plaintiff specifically moves the court for leave to amend for the purpose of adding Abbott Laboratories as a Defendant.

### Discussion

#### A. Plaintiff's Motion to Amend Complaint

Plaintiff's request to Amend seeks to add "Abbott Laboratories" as a defendant. Abbott Laboratories is a separate corporate entity which appears to be nearly identical in actual form to Abbott Laboratories, Inc., the originally named defendant. According to Plaintiff, the purpose of this amendment is to cure a possible technical defect in the original pleading by adding Abbott Laboratories, an Illinois Corporation.

Section 2-616 of the Code of Civil Procedure provides that a trial court may allow amendments to pleadings on just and reasonable terms at any time prior to final judgment. 735 ILCS 5/2-616(a) (West 2021). The Code of Civil Procedure begins with the statement, "[t]his Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties." 735 ILCS 5/1-106 (West 2021).

2

Despite this liberal policy, a plaintiff does not have an absolute and unlimited right to amend a complaint. *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶76; *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 6 (1st Dist. 2004); *Wilk v. 1951 W. Dickens, Ltd.*, 297 Ill. App. 3d 258, 265 (1st Dist. 1998). The decision to grant leave to amend a complaint rests within the sound discretion of the trial court, and the appellate court will not reverse such a decision absent a manifest abuse of discretion. *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273–74 (1992); *Wilk*, 297 Ill. App. 3d at 265. In determining whether a trial court has abused its discretion, the relevant factors are: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy*, 146 Ill. 2d at 273. The plaintiff must satisfy all four factors. *Id.* at 276.

Plaintiff asserts that amending the Complaint to add Abbott Laboratories cures its defective pleading by adding a proper party to the suit. As support, Plaintiff points out that in other litigation regarding similar allegations, Abbot Laboratories has asserted that it was improperly named as Abbott Laboratories, Inc., that Abbott Laboratories was the correct party, and that its state of incorporation and principal place of business is Illinois. Defendant argues none of the defects in the original complaint were the result of a missing defendant and adding a new defendant does not result in curing the fact that the case was filed eight years too late for the statute of limitations. However, Defendants statute of limitations argument relies in part on the fact that there is no party to the lawsuit who is an Illinois resident. Defendant's then utilize the borrowing statute to claim the Plaintiff's causes of action are beyond the statute of limitations. Under Georgia law, both parties concede Plaintiff's claims are barred by the statute of

3

limitations. Adding Abbott Laboratories to the Complaint would arguably negate the use of the borrowing statute to provide Plaintiffs with Illinois' possible exceptions to the two-year statute of limitations. It follows that the amendment does cure a possible defect in the Complaint by adding an Illinois resident as a proper party to the suit.

Plaintiffs are correct that there is no surprise or prejudice to the defendants demonstrated by the amendment because of the apparent parent-subsidiary relationship between Abbott Laboratories and Abbott Laboratories, Inc. The party added, Abbott Laboratories, had appropriate notice of this lawsuit, since they share a registered agent, a corporate secretary, and they appear to share a business address. Additionally, there is no valid reason to find that previous opportunities to amend the Complaint to add Abbott Laboratories could be identified. The Complaint was filed in February, with the Motion to Dismiss filed the next month in March. There appears to be no delay in Plaintiff's request to amend the pleading.

Defendant argues the request to amend is untimely, and cites 5/2-616(d), which "governs the amendment of a complaint to add a new defendant after the statute of limitations has expired." *Webb v. Ambulance Serv.*, 262 Ill.App.3d 1039, 1043 (1st Dist. 1994). Defendant maintains that the statute of limitations had already expired when the original action was filed. However, this argument puts the cart before the horse. The court has not yet determined if the statute of limitations has expired in this matter. Therefore, there is no basis to apply 5/2-616(d) to Plaintiff's request to amend the Complaint. Further, Defendant misconstrues the meaning of 2-616(d), which governs circumstances where a complaint is filed within the statute of limitations and that limitations period then expires before a request to add a new defendant. In such circumstances, the amended complaint must relate back to the original complaint. That is

4

not the situation in this case. No statute of limitations expired between Plaintiff's original Complaint being filed and their request to amend to add Abbott Laboratories.

In relation to the four factors discussed above, courts examine timeliness of the amendment by reviewing the length of time elapsed since originally filing the cause of action. See *Wingate v. Camelot Swim Club Inc.*, 193 Ill.App.3d 963, 967 (1990) (trial judge did not abuse his discretion in denying amendment where four years had elapsed since filing suit); *Evans v. United Bank of Illinois*, 226 Ill.App.3d 526 (1992) (motion to amend was not untimely when filed seven months after the motion for summary judgment). As noted earlier, this case was filed in February 2021, and Plaintiff's Motion comes in May 2021.

The Plaintiff has met the necessary factors and the Court grants her request.

## B. Statute of Limitations

Defendants request dismissal pursuant to 735 ILCS 5/2-619(a)(5) arguing the statute of limitations period expired long ago for Plaintiff's claims. In Plaintiff's response to the Motion, she "concedes that her claims would otherwise be barred by Georgia's statute of limitations law and, therefore, her claims can only survive in the event that the borrowing statute does not apply." (Pl. Opposition to Motion to Dismiss, pg. 4, note 1.) She further concedes that Illinois law will bar the application of the implied warranty claim but maintains that the product liability claims should survive. *Id.*

The borrowing statute does not apply and Illinois' laws with respect to the statute of limitations are applicable in this matter. The Illinois borrowing statute provides that an action cannot be maintained in the forum statute if it is barred either by the statute of limitations of the forum state or by a statute of limitations that the forum state has "borrowed" from another jurisdiction in accordance with the forum state's "borrowing statute." See 735 ILCS 5/13-210

(West 2021). The borrowing statute applies where (1) the cause of action accrued in another jurisdiction; (2) the limitations period of that jurisdiction has expired; and (3) all parties were non-Illinois residents at the time the action accrued and remained so until the foreign limitations period expired. *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 669 (2d Dist. 2001). The Court has granted Plaintiff's request to amend her Complaint to add Abbott Laboratories as a Defendant. Thus, one of the Defendants in this matter is an Illinois Corporation, making the borrowing statute inapplicable.

Dismissal of a case is allowed when "the action was not commenced within the time limited by law." 735 ILCS 5/2-619(a)(5) (West 2021). When considering a section 2–619 motion, all pleadings and supporting documents must be construed in a light most favorable to the nonmoving party, and the motion should be granted only when no material facts are disputed and defendant is entitled to dismissal as a matter of law. *Young v. McKiegue*, 303 Ill.App.3d 380, 386 (1st Dist. 1999).

Product liability claims asserting a personal injury are governed by a two-year statute of limitations. 735 ILCS 5/13-202; *Golla v. Gen. Motors*, 167 Ill.2d 353, 359 (1995). Under 5/13-202, actions for damages for an injury to the person, shall be commenced within 2 years after the cause of action accrued; or within two years after the date plaintiff knows or reasonably should have known both that an injury occurred and that it was wrongfully caused. *Witherell v. Weimer*, 85 Ill.2d 146, 156 (1981).

Generally, the application of the discovery rule to determine when a party knew or should have known that an injury was wrongfully caused is one of fact. *Witherell*, 85 Ill.2d at 156. The term "wrongfully caused" does not mean plaintiff must have knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action before the statute is

triggered. *Saunders v. Klungboonkrong*, 150 Ill.App.3d 56, 59 (5th Dist. 1986); *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 416 (1981). Instead, the phrase refers to that point in time when "the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox*, 88 Ill.2d at 416.

Courts often examine the nature of the injury itself in determining when a plaintiff knew or reasonably should have known that an injury was caused by wrongful conduct. *Saunders*, 150 Ill.App.3d at 60, citing *Kristina v. St. James Hospital*, 63 Ill.App.3d 810, 813 (1st Dist. 1978). If plaintiff's injury is caused by a "sudden traumatic" event, the statute of limitations begins to run on the date the injury occurs. *Pszenny v. General Electric Co.*, 132 Ill.App.3d 964, 966 (1st Dist. 1985). A traumatic injury has been defined as one where the damage is caused by external violence (*Roper v. Markle*, 59 Ill.App.3d 706, 711 (5th Dist. 1978)) or which is immediate and caused by an external force. See *Ikenn v. Northwestern Memorial Hospital*, 73 Ill.App.3d 694 (1st Dist. 1979) (blindness resulting from excessive amount oxygen given to premature infant); *Berry v. G.D. Searle & Co.*, 56 Ill.2d 548 (1974) ( stroke and paralysis due to ingestion of birth control pills); *Bates v. Little Co. of Mary Hospital*, 108 Ill.App.3d 137 (1st Dist. 1982) (injuries suffered when plaintiff was pinned underneath a forklift truck); *Urchel v. Holy Cross Hospital*, 82 Ill.App.3d 1050 (1st Dist. 1980) (paralysis caused by car accident and subsequent medical treatment).

By contrast, the nature and circumstances of the injury may be such that its cause is unknown or apparently innocent at the time it occurs. *Kristina*, 63 Ill.App.3d at 813. "If the injury is … an aggravation of a physical problem which may naturally develop, absent negligent causes, a plaintiff is not expected to immediately know of either its existence or potential

7

wrongful cause." *Saunders*, 150 Ill.App.3d at 60. In this latter situation, it would be "manifestly unrealistic and unfair to bar a negligently injured party's cause of action before he has had an opportunity to discover that it exists." *Kristina*, 63 Ill.App.3d at 813, quoting *Lipsey v. Michael Reese Hospital*, 46 Ill.2d 32, 41 (1970).

Defendants cite *Berry v. G.D. Searle*, 56 Ill. 2d 548, (1974), as an example of where plaintiff's injuries are caused by a sudden traumatic event and the plaintiff's cause of action accrues when the injury occurred. In *Berry*, plaintiff sought damages for injuries sustained after having taken a birth control pill called Enovid that was prescribed and sold to her on or before May 29, 1965. On May 30, 1965, plaintiff suffered a stroke and paralysis after ingesting the drug. Plaintiff filed her action more than two years after her injury, alleging that she did not learn that the drug caused her injury until June 1, 1967. *Berry*, 56 Ill.2d at 550.

The Illinois Supreme Court held that plaintiff's action in tort accrued on the date of the occurrence of the stroke. The court explained:

> From plaintiff's description of the severity of her condition in the complaint and her reply brief it is inconceivable that her injury was not occasioned by a traumatic event and that she knew of this injury more than two years prior to the filing of her complaint.

*Berry*, 56 Ill.2d at 559, 309 N.E.2d 550. *Berry* relied on the unusualness of plaintiff's condition and the obvious severity of her injury to classify the stroke as a "traumatic event." However, *Berry* provided no specific guidance relating to the interpretation of the term "traumatic event" or "traumatic injury". See *Kristina*, 63 Ill.App.3d at 813 ("nowhere in Berry does the court define the exact meaning of the term 'traumatic injury'").

This Court finds Plaintiff's cited case of *Watkins v. Health & Hosps. Governing Comm'n of Cook Cty.*, 78 Ill. App. 3d 468 (1st Dist. 1979), and the more recent First District case, *Clark v. Galen Hosp. Illinois, Inc.*, 322 Ill.App.3d 64 (1st Dist. 2001), more instructive and more factually

8

similar to the present case than *Berry*. *Watkins* involved a diabetic plaintiff who brought an action seeking damages for amputation of her leg, alleging that it was necessitated by a blood clot due to a negligent injection of dye. The complaint was filed more than two years after the amputation, but less than two years after the plaintiff was informed of the hospital's negligence. *Watkins*, 78 Ill.App.3d at 469.

The court rejected defendant's argument that plaintiff's leg amputation was a "traumatic event" which commenced the running of the limitations period. The court observed that "classification of an injury as traumatic or nontraumatic, alone, is of no significance. . .. Courts have been holding that the more obvious the injury the more easily a plaintiff should be able to determine its cause." *Watkins*, 78 Ill.App.3d at 471, citing *Berry*, 56 Ill.2d at 559. Instead, the court found the discovery rule to be controlling: the limitations period does not begin to run until the injured party discovers, or should have reasonably discovered, not only the nature of the injury but also the possibility that it was wrongfully caused. *Watkins*, 78 Ill.App.3d at 472, 33 Ill.Dec. 895, 397 N.E.2d 228. Since the plaintiff, a known diabetic, could have reasonably believed the amputation was caused by her diabetic condition, the court held that a triable issue of fact existed to determine whether she should have discovered the defendants' negligence more than two years before the action was filed. *Watkins*, 78 Ill.App.3d at 472–73.

Very similar to the case at bar is *Clark v. Galen Hosp. Illinois, Inc.*, 322 Ill.App.3d 64 (1st Dist. 2001). In *Clark*, plaintiff gave birth to a 23-week-old premature infant. *Id.* at 66. The baby died less than a month later at the University of Illinois Hospital at Chicago. *Id.* The medical certificate of death stated the infant died from septic shock due to disseminated intravascular coagulation. *Id.* At the time of death, plaintiff alleged that she was told "the baby died because of complications due to it being premature, having an infection and low birth

weight." *Id.* Plaintiff filed a complaint alleging medical malpractice after receiving medical records and hiring a medical expert. The defendants filed a motion to dismiss, claiming the plaintiff's complaint was untimely where she did not file it within two years of the date of the "sudden traumatic" event of her baby's death. *Id.* The Clark court concluded under the circumstances, it was reasonable for the plaintiff to believe her baby died from natural causes, and that a disputed question of fact remained as to when the statute of limitations began to run against the defendants. *Id.* at 75. The particular question for the trier of fact was whether the plaintiff should have discovered, prior to the neonatologist's report, that her baby's death might have resulted from negligent medical care. *Id.* The Clark court ultimately reversed the trial court's dismissal of the action as untimely and remanded the case.

Likewise, this case involves the death of a very premature infant with the cause of death listed as necrotizing interocolitis. This is a condition that Defendant's state, on the first page of their Memorandum of Law, "is a leading cause of death among all infants. The infection occurs naturally, including in premature infants who are fed only breast milk." The facts presently before the court suggest that Plaintiff was not possessed of enough information concerning Baby Ava's injury on the very date of her death to put a reasonable person on inquiry to determine whether actionable conduct was involved. *Clark,* 322 Ill.App.3d at 74 (explaining what the phrase "wrongfully caused" refers to and that it does not mean the plaintiff has knowledge of a specific defendant's negligent conduct or knows that a cause of action exists.). Because of Baby Ava's prematurity, it was possible for Plaintiff to believe that her baby's death resulted from an infection that occurs naturally in premature infants. This possibility was enough to prevent her from knowing or suspecting Defendant's product as the cause of Baby Ava's death. This Court does not find that the injuries alleged here were as a result of a sudden traumatic event. The

10

limitation period did not begin running immediately on the date of the death. Rather, the discovery rule would apply, and the limitations period would be within two years of when Plaintiff knew or reasonably should have known that an injury occurred and that it was wrongfully caused.

Defendants argue Plaintiff's allegations in the Complaint that "misleading marketing and lack of adequate warnings" fail to meet the requirement of pleading that they "detrimentally relied" on a false statement. However, detrimental reliance is a factor when tolling the statute of limitations pursuant to 735 ILCS 5/13-215, which provides that when a cause of action is fraudulently concealed, the plaintiff may bring an action within five years of the discovery of the cause of action. Defendants cite *Orlak v. Loyola Univ. Health Sys.*, 228 Ill.2d 1, 18 (2007), which discussed 735 ILCS 5/13-215 and applied it to toll the running of the statute of limitations/repose. Plaintiff makes clear in her response that she is not invoking section 13-215 to toll the statute of limitations. She cited to *Witherell*, 85 Ill.2d at 156, in which the Supreme Court stated the "discovery rule" postpones the starting of the two-year limitations period for personal injury claims until the injured party knows or should have known both of his injury and that it may have been negligently caused. Detrimental reliance is not a pleading requirement to toll the statute of limitations under the discovery rule.

Additionally, Defendant's cite *Butler v. BRG Sports*, 2019 IL App (1st) 180362, which also discussed and applied section 13-215 of the Code to toll the statute of limitations. In *Butler v. BRG Sports*, plaintiffs were advocating for the application of a five-year-statute of limitations for fraudulent concealment pursuant to section 5/13-215, which is an alternative basis to toll the statute of limitations separate from the "discovery rule" tolling of the statute of

11

limitations. As discussed, Plaintiff is not invoking 13-215 to toll the statute of limitations and the opinion in *Butler v. BRG Sports* is not applicable in this case.

Finally, Defendants assert the information relied upon by Plaintiff's to link NEC to cow's milk products has been well-known for decades. Plaintiff counters that the information was only known to the medical community and Plaintiff could not reasonably have known of the link between NEC and Defendants' products before filing their cause of action. When Plaintiff should have reasonably known that baby Ava's death could have been caused by Neosure is a question of fact. See *Watkins*, 78 Ill.App.3d at 472–73. The court cannot grant dismissal as a matter of law since material facts are in dispute. *Young v. McKiegue*, 303 Ill.App.3d at 386.

### C. Failure to State a Claim

Next, Defendants assert Plaintiff's design defect and failure to warn claims should be dismissed as they fail to state a claim against Abbott. Defendants argue the Infant Formula Act preempts all of Plaintiff's design defect claims because it would be "impossible for a private party to comply with both state and federal requirements." *Mut. Pharm. V. Bartlett*, 570 U.S. 472, 480 (2013). Additionally, they argue that the failure to warn claims should be dismissed because the learned intermediary doctrine under Georgia law operates to bar such claims.

#### 1. Federal law preemption

Federal preemption doctrine is based in the Supremacy Clause of Article VI of the United State Constitution, which states that the laws of the United States "shall be the supreme Law of the Land; . . . any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. "[I]t has long been settled that state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 479-80 (2013). All pre-

12

emption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Implied preemption has been found when federal regulations are so pervasive that they leave no room for state regulation and, therefore, Congress implicitly intended to occupy the field. See *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988). In this case, Defendants have asserted one type of implied preemption: impossibility preemption. Impossibility conflict has been described as a "demanding defense." *Wyeth*, 555 U.S. at 572. It arises when it is "impossible for a private party to comply with both state and federal requirements." *Bartlett*, 570 U.S. at 480.

The review process of exempt formulas provides the basis of Defendant's argument for preemption. The federal Infant Formula Act of 1980 was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359. The Act regulates how infant formula is made, its ingredients, and its labeling. 21 U.S.C. §350a; 21 C.F.R. §§106-07. It requires the ingredients to be "safe and suitable for use in infant formula." 21 C.F.R. §106.40(a). The Act also requires a manufacturer to submit a notice to the FDA that includes its "quantitative formulation", how much of each ingredient it contains, as well as how "each ingredient" meets the requirement of being safe and suitable. 21 C.F.R. §350a(d)(1)(A); 21 C.F.R. §§106.120(a), (b)(6)(ii). The manufacturer may not sell the formula until the FDA has had 90 days to review the notice. If the FDA finds any deficiency, the formula may not be sold. 21 C.F.R. §350a(c)(1)(B); 21 C.F.R. §106.120(e).

Defendant explains that the FDA has authorized Abbott to sell exempt formulas, including Neosure. The FDA conducts a special review of formulas "that are . . . labeled for

13

use by an infant who has . . . low birth weight." 21 C.F.R. §350a(h); 21 C.F.R. §§107.50(a). Such exempt formulas have additional requirements from the FDA that nonexempt infant formulas do not. Before an exempt formula is sold, its manufacturer must submit a notice to the FDA that includes "the label and other labeling of the infant formula, a complete quantitative formulation. . . and a detailed description of the medical conditions for which the infant formula is represented. 21 C.F.R. §107.50(b)(3). The FDA's Center for Food Safety and Applied Nutrition must review all of the information submitted about an exempt formula. *Id.* If, as a result of that review, the Center's Director "concludes that additional or modified. . . nutrient, or labeling requirements are needed, or that a product's exempt status is withdrawn," the Center must notify the manufacturer. 21 C.F.R. §107.50(d)(2)(i). Neosure also contains both warnings required by the FDA including a "warning. . . that cautions against improper. . . use of an infant formula" and a "statement indicating that parents should consult their physicians about the use of infant formulas." 21 C.F.R. §§107.20(e), (f)

Abbott submitted, and the FDA reviewed, detailed information such as ingredients (including cow milk), labeling (including warnings), and "a detailed description of the medical conditions for which the infant formulas is represented" (premature and low birth-weight). Mot. to Dismiss and Mem. Of Law, pg. 11. According to Defendants, the FDA concluded that Neosure could be sold as a formula specifically designed for premature infants with low birth weight, which would not have been done if the FDA "determined that a health hazard may exist." *Id.* Since Plaintiff's design defect claims assert that Abbott must remove cow milk and reformulate the product, this would result in a major change to Neosure. Under the Act, if a manufacturer makes a "major change, in processing or formulation, from a current or any previous formulation produced by such manufacturer," the result is a new infant formula that the

FDA must review. *Id.* at 12. As argued by Defendants, Abbott cannot make such a change on its own without violating the Act. Since it would be impossible for Abbott to comply with both state and federal requirements, the Act impliedly preempts state-law design defect claims.

There is no existing caselaw discussing whether the Infant Formula Act preempts a state law product liability claim. The most relevant precedent appears to be impossibility preemption of state law product liability claims against brand-name and generic drug manufacturers. Both parties base their arguments on these two lines of cases.

As support for their argument, Defendants cite *Mut. Pharm. v. Bartlett*, 570 U.S. 472 (2013). In *Bartlett*, the plaintiff developed an acute case of toxic epidermal necrolysis from the use of a generic form of Clinoril, named sulindac, which was a non-steroidal inflammatory used for shoulder pain. *Id.* Plaintiff sued Mutual Pharmaceuticals asserting both failure-to-warn and design defect claims. The Supreme Court reversed the First Circuit and found that federal law preempted the state law design defect claims. Defendants claim the Supreme Court held that federal law prevented a redesign because it would produce a new drug that would again need to go through FDA's approval process. Mot. to Dismiss and Mem. Of law, pg. 11. They quote the *Bartlett* Court, saying "[S]tate-law design-defect claims . . . that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufactures from unilaterally altering drug composition or labeling." *Bartlett*, 570 U.S. at 490. Defendants conclude that Plaintiff's design defect claims in this case would require Abbott to remove cow milk and reformulate its product, resulting in Abbott making a unilateral major change to the product, which is prohibited by the FDA.

However, Defendants misapprehend the reasoning and holding of *Bartlett*. It was not that the redesign of the drug would need to go through the FDA's approval process again that

15

was the basis for finding preemption in *Bartlett*. The Court found that redesign of the generic sulindac was not even possible. *Bartlett*, 570 U.S. at 483. "The FDCA requires a generic drug to have the same active ingredients, route, of administration, dosage form, strength, and labeling as the brand-name drug on which it is based." *Id.* at 484. Consequently, "Mutual cannot legally make sulindac in another composition." *Id.* Because it was impossible to re-design the drug, the Court found the plaintiff's design defect claim preempted. *Id.*

Defendants claim that a reformulation of the product removing cow milk would result in a new infant formula subject to FDA review, but there is no claim that a reformulation is not possible. They argue that by virtue of the fact that a reformulation of Abbott's product would require new FDA approval results in conflict preemption. The holding in *Bartlett* does not support that argument. The *Bartlett* court made a distinction between name brand and generic products. Generic products could not get FDA approval for a reformulation because of requirements that they contain the same ingredients and formulation as their name brand counterparts. This impossibility of receiving FDA approval resulted in the Court's finding of preemption. Defendants have made no claim nor shown any evidence that they would fail to get authorization from the FDA to sell their product with a change of ingredients.

Instead, the Supreme Court's reasoning in *Wyeth v. Levine*, 555 U.S. 555 (2009), is more instructive in regard to the claims and circumstances in this case. *Wyeth* involved a plaintiff seriously injured by the use of the anti-nausea drug Phenergan manufactured by Wyeth Pharmaceuticals. Plaintiff claimed that the defendant inadequately warned of the risk of developing gangrene from the IV-push method of administering the drug and alleged that the FDA-approved labeling was inadequate and that the defendant had an obligation to seek an improved warning from the FDA when it acquired additional information of the seriousness of

16

the risk post-approval. *Id.* at 559. The defendant responded that the FDA had ordered it to use the warning language in question and thus it would be impossible for it to satisfy both the state law warning obligation proposed by plaintiff and the FDA's command. *Id.* at 563-64. The Supreme Court found that neither implied impossibility conflict preemption nor implied obstacle conflict preemption were supported by the evidence. *Id.* at 581. The Court reasoned that the "central premise of federal drug regulation [is] that the manufacturer bears responsibility for the content of its label at all times." *Id.* at 570-71. Therefore, a drug manufacturer has the obligation to unilaterally change its drug labeling when evidence of a risk becomes apparent. Thus, "absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements." *Id.* at 571.

Reading *Wyeth* and *Bartlett* together leads this court to conclude that implied preemption depends upon whether the FDA has specifically prohibited the manufacturer from altering a product's ingredients and/or labeling. Clear evidence that a manufacturer is not permitted to alter ingredients, or a label may be sufficient to support impossibility preemption. Defendant has not produced any evidence that they are prohibited from altering their product's ingredients.

Defendants continue to misconstrue these cases arguing that if Abbott changes its ingredients, it must then submit the change for FDA review and wait to seek approval. Thus, Abbott cannot independently change Neosure's ingredients. They cite a 6th Circuit case stating, "[w]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Yates v. Ortho-McNeil-Janssen Pharms.*, 808 F.3d 281, 295 (6th Cir. 2015). However, the *Yates* case

17

involved a state law claim requiring a generic drug manufacturer to make changes to its label. The manufacturer was specifically prohibited from making this change unless the FDA provided special permission and assistance in changing the brand-name drug label as well. In those circumstances, it was found that the defendant could not independently satisfy state duties. Conversely, there is no prohibition by the FDA cited by Defendant which would prohibit it from changing its ingredients or label, and so no special permission or assistance is required by the FDA. Abbott must propose the change to the FDA and wait for approval.

The court was made aware of a case in the United States District Court for the District of Connecticut discussing the exact issue of whether impossibility preemption bars Plaintiff's design defect claim regarding the presence of cow milk in Defendants' formulas. *Ferry v. Mead Johnson & Co., LLD, et al.*, Case No. 3:20-cv-00099-SRU. That court stated it could not conclude as a matter of law that plaintiff's design defect claim was preempted. However, the *Ferry* court based its decision on whether replacing cow milk with another ingredient would be a "major change" under the IFA, which would necessitate re-notification to the FDA and subsequent approval. It seems the *Ferry* court followed the same reasoning as Defendants in this case-- that if a change of ingredients requires approval from the FDA, or in this case re-notification, it is impossible for Defendants to comply with both state and federal requirements. As discussed above, this Court construes the caselaw differently and whether the change of ingredients is a "major change" or not, Defendants still have made no claim or shown any evidence that they would fail to get authorization from the FDA to sell their product with a change of ingredients. Thus, Defendants cannot show that it is impossible to comply with both state and federal requirements and preemption is not found.

18

## 2. Learned Intermediary Doctrine

Defendants request dismissal claiming all failure-to-warn and breach of warranty claims are barred pursuant to the learned intermediary doctrine. Initially, they cite choice of law principles and argue Georgia law applies to the court's determination. However, the court disagrees for the following reasons.

The Illinois Supreme Court has stressed that "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007) (quoting *Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992)). Here, the only conflict of laws that appear are the application of the learned intermediary doctrine to breach of warranty claims -- applied in Georgia, but not Illinois – and the requirement of privity for breach of implied warranty claims in Georgia. Since Plaintiffs have conceded their breach of implied warranty claim is barred under Illinois law, the only consideration before the court is the application of the learned intermediary doctrine to Plaintiff's failure-to-warn claims. That said, there is no conflict between Illinois and Georgia laws with regard to the learned intermediary doctrine. Thus, the forum state's law (Illinois) will be applied. See *Univ. Underwriters Ins. V. LKQ Smart Parts*, 2011 IL App (1st) 101723, ¶¶46-47 (When states' laws are the same, this Court applies Illinois law.)

Count III of Plaintiff's Complaint alleges a failure to warn as to Abbott. Plaintiff states that Abbott owed a duty to Plaintiff to provide adequate warnings about the danger and risks associated with the use of Cow's Milk Products with preterm infants. Abbott breached those duties and, as a direct and proximate result of Abbott's failure to warn, Baby Ava suffered serious bodily injury. The essential elements of a cause of action based on common law

19

negligence are the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 525 (1987). The issue of the application of the learned intermediary doctrine involves the existence of a duty to Plaintiff.

The learned intermediary doctrine was adopted by our supreme court in *Kirk v. Michael Reese Hospital & Medical Center.* Under that doctrine, "manufacturers of prescription drugs have a duty to warn prescribing physicians of the drugs' known dangerous propensities, and the physicians, in turn, using their medical judgment, have a duty to convey the warnings to their patients." *Kirk,* 117 Ill.2d at 517. The doctrine's rationale is that a doctor is considered in the best position to prescribe drugs and monitor their use because he is knowledgeable of the propensities of the drugs he is prescribing and the susceptibilities of his patient. *Kirk,* 117 Ill.2d at 518. Consequently, in selling prescription drugs, the manufacturer is only required to warn the prescribing doctor, who then acts as a "learned intermediary" between the manufacturer and the consumer. *Kirk,* 117 Ill.2d at 518. Although Illinois' learned intermediary doctrine has its roots in prescription drugs, the Illinois courts have applied the rule to prescription medical devices. See *Hansen v. Baxter Healthcare Corp.,* 723 N.E.2d 302, 311 (Ill. App. 2000).

There is no caselaw cited by Defendants, nor found by this Court, extending the learned intermediary doctrine to nonprescription drugs or devices, or food products. There is no dispute that the Neosure formula given to baby Ava was nonprescription and could be purchased over the counter. Defendants argue the facts in this case warrant applying the doctrine because it would follow the rationale that a doctor is in the best position to warn the patient, and not the manufacturer. Particularly, they argue the use of Neosure was part of a medical regimen in the hospital NICU, where doctors make the feeding decisions and, when they judge it to be

20

appropriate, administer formula.   However, they fail to address the rationale for the doctrine's application to only prescription medication and devices.

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.' " *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill.2d 507, 525 (1987) quoting *Stone v. Smith, Kline & French Laboratories* (11th Cir.1984), 731 F.2d 1575, 1579.

Defendants cannot claim that infant formula, which can be bought by any person over the counter, is in the same category as a prescription drug.  No evidence is presented that formula is so "esoteric in formula" and "varied in effect" that physicians must "take into account the propensities of the drug as well as the susceptibilities of his patient" when recommending a formula to parents.

They also cannot bypass the fact that courts around the country have consistently refused to extend the intermediary doctrine to products available both directly to the intermediary and over the counter to ordinary consumers. *See, e.g., Hall v. Ashland Oil Co.*, 625 F. Supp. 1515, 1519 (D. Conn. 1986) (benzene sold both to large industrial purchaser and ordinary consumers); *Mitchell v. VLI Corp.*, 786 F. Supp. 966, 970 (M.D. Fla. 1992) (nonprescription contraceptive sponge given to patient by her physician); *Prager v. Allergan, Inc.*, 1990 WL 70875 (N.D. Ill. May 2, 1990) (contact lens solution recommended by physician but available over-the-counter without prescription); *Torsiello v. Whitehall Lab'ys, Div. of Home Prods. Corp.*, 398 A.2d 132 (N.J. Super. Ct. App. Div. 1979) (over-the-counter drug containing aspirin recommended by physician). The *Shanks* court specifically indicated that the

21

learned intermediary doctrine would not apply to "drugs typically administered in a clinical setting with little or no physician involvement, or drugs marketed under a strategy designed to appeal directly to the consuming public." *See Shanks*, 835 P.2d at 1195 n.7. Reading these authorities together, the basis for distinguishing ordinary consumer products is clear—the underlying rationale for the *intermediary* doctrine is lost where users could purchase and use the product *without* an *intermediary. See Hall*, 625 F. Supp. at 1519; *Mitchell*, 786 F. Supp. at 970 ("Considering that [plaintiff] could have obtained the [product] over-the-counter, it would be illogical to treat her differently based on the mere fortuity that she obtained a sample of the [product] from her physician."). No authority has been cited or found that would support a different conclusion. Accordingly, the learned intermediary doctrine does not apply to bar Plaintiff's failure to warn claim.

### 3. Failure to state a cause of action

A final argument put forth by Defendants is failure to state a cause of action pursuant to 735 ILCS 5/2-615 (West 2021). A section 2-615 motion to dismiss presents the question of whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, are sufficient to entitle the plaintiff to relief as a matter of law. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 348 (2003). When reviewing such a dismissal, we presume that the motion admits all well-pleaded facts and all reasonable inferences from those facts. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 320 (2008). A cause of action should be dismissed only when it is clearly apparent that no set of facts can be proved that will entitle a plaintiff to recovery. *Id.* at 305. Our supreme court has repeatedly stated "that Illinois is a fact-pleading jurisdiction." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). As such, notice to the defendants is not enough; instead, the plaintiff must allege facts "sufficient to bring a claim

22

within a legally recognized cause of action [citation], not simply conclusions." See *id.* at 429-30.

Defendants assert Plaintiff's failure to warn claim alleges no facts to show that an additional warning would have helped the infant. The Complaint does not allege the parents read or were even aware of what the product's labels and guides said. If there had been more warnings, the parents would never have known. The issue of whether a plaintiff can maintain a product liability action premised on a failure-to-adequately-warn theory when plaintiff never read the warnings that were given was first addressed in *Kane v. R.D. Werner Company, Inc.,*, 275 Ill.App.3d 1035 (1st Dist. 1995). The *Kane* court found plaintiff had not established the necessary element of proximate cause because the alleged inadequate content of those warnings could not have proximately caused the injuries. *Id.* at 1037.

The Complaint does allege that Abbott owed a duty to Plaintiff to properly warn and breached their duty by failing to provide proper warnings and/or instruction, including but not limited to the risks of NEC and death in premature infants. Plaintiffs allege many instances of Abbott marketing and promoting their preterm infant Cow's Milk Products to parents, physicians, hospitals, and medical providers as safe products that are specifically needed by preterm infants for adequate growth. Plaintiff then claims Abbott did not warn parents or medical providers of the risk of NEC, nor did Abbott provide any instructions or guidance on how to properly use its Cow's Milk Products so as to lower the risk or avoid NEC or death. Despite these claims, there are no specific factual allegations in the Complaint asserting that any of baby Ava's medical providers, or her parents, encountered or relied on any of the marketing or promotions. What is more, the Complaint provides no specific factual allegations that baby Ava's medical providers or parents ever read the alleged inadequate warnings contained on Neosure. Instead, the failure to warn claim (Count III) sets forth the conclusory statement that

23

"[a]s a direct and proximate result of Abbott's failure to warn, Ava James Villarreal suffered serious bodily injury, which resulted in her death." Bare legal conclusions are insufficient to state a legal claim. *Norabuena v. Medtronic, Inc.*, 86 N.E.3d 1198, 1209 (1st Dist. 2017), *case dismissed,* 111 N.E.3d 959 (Ill. 2018), citing *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Plaintiff's allegations are that the content of Neosure's warnings and instructions are inadequate. However, since there are no allegations that medical providers or baby Ava's parents read the warning labels, Plaintiff fails to make a claim that those warnings could have proximately caused baby Ava's injuries. See *Kane*, 275 Ill.App.3d at 1037. Accordingly, Plaintiff's failure to warn claim (Count III) should be dismissed.

A dismissal under section 2-615 of the Code should be made with prejudice only where it is clearly apparent that the plaintiffs can prove no set of facts entitling recovery. *Norabuena*, 86 N.E.3d at 1210. A court should typically "give a plaintiff at least one opportunity to cure the defects in his or her complaint." In this matter, although the pleadings are insufficient, it is not clearly apparent that Plaintiff can prove no set of facts entitling recovery. Accordingly, the dismissal should be without prejudice, and plaintiffs should be given the opportunity to amend their Complaint.

### Conclusion

Plaintiff's Request to Amend the Complaint is granted with respect to adding Defendant Abbott Laboratories. Defendants' Motion to Dismiss Counts I and II is denied. Defendants' Motion to Dismiss Count III for failure to state a claim pursuant to 735 ILCS 5/2-615 is granted, without prejudice. Plaintiff and Defendants concede dismissal of Count IV. Plaintiff is granted 28 days to file an amended complaint in conformity with this order. Defendants shall have 28 days thereafter to answer or otherwise plead to the amended complaint.

ENTER: _____ Mitchell L. Hoffman _____

Judge Mitchell L. Hoffman

Dated this _____, 2021, at Waukegan, Illinois.

25