**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION** | **MDL NO. 3026** |
| | **Master Docket No. 22 C 00071** |
| **This Document Relates to:** | **Hon. Rebecca R. Pallmeyer** |
| ***Inman v. Mead Johnson & Company, LLC*** | |
| **Case No. 22 C 3737** | |

## MEMORANDUM OPINION AND ORDER

This case, part of a multidistrict litigation of similar cases, concerns allegations that an infant formula manufactured by Defendant Mead Johnson & Company caused necrotizing enterocolitis ("NEC") in a preterm infant. To prove a link between formula and NEC, Plaintiffs in this MDL have retained Dr. Logan Spector as an expert witness on general causation. Months ago, the court provisionally found that Dr. Spector's testimony meets the standard established by FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and declined Defendant's motion to exclude him from this MDL. Mead Johnson now moves again [53] to exclude the testimony of Dr. Spector in this bellwether trial, arguing that his opinions do not "fit" the facts of this particular case. As explained below, this motion is denied.

## BACKGROUND

The court assumes the parties' familiarity with the factual and procedural background of this MDL, and the facts of this bellwether.[1] To briefly summarize: on May 12, 2020, Plaintiff Alexis Inman delivered her son Daniel at 29 weeks gestation. Weighing less than two pounds at

---

[1] See General Causation Order, No. 22 C 00071, 2025 WL 1283927 (N.D. Ill. May 2, 2025); Omnibus Daubert Order, No. 22 C 00071, 2025 WL 2381699 (N.D. Ill. Aug. 15, 2025); *see also Mar v. Abbott Lab'ys, Inc.*, No. 22 C 00232, 2025 WL 1282749 (N.D. Ill. May 2, 2025); *Diggs v. Abbott Lab'ys, Inc.*, No. 22 C 05356, 2025 WL 2377686 (N.D. Ill. Aug. 14, 2025); *Brown v. Abbott Lab'ys, Inc.*, No. 22 C 2001, 2025 WL 2987083 (N.D. Ill. Oct. 23, 2025); *Inman v. Mead Johnson & Co., LLC*, No. 22 C 3737, 2026 WL 1266148 (N.D. Ill. May 8, 2026).

birth, Daniel was classified as "very premature" and kept in the neonatal intensive care unit ("NICU"). *Inman*, 2026 WL 1266148, at *1. Initially, Daniel was fed his mother's breast milk, but due to concerns that Daniel had a genetic disorder impacting his tolerance of certain sugars present in human milk, doctors switched him to two different cow's-milk-based hydrolyzed, hypoallergenic formulas: Nutramigen and Pregestimil. *Id.* at *2. After they ruled out this genetic disorder, his doctors resumed feeding Daniel his mother's own milk. Later, about thirty days after Daniel was born, doctors switched Daniel's feeds to consist exclusively of Enfamil Premature Formula, a product manufactured by Defendant Mead Johnson & Company ("Mead Johnson" or "Mead"). Daniel developed necrotizing enterocolitis ("NEC") and died shortly thereafter. *Id.* at *3. Ms. Inman sued Mead Johnson, arguing that the formula caused Daniel to develop NEC. The parties selected this case as the fourth in an initial wave of "bellwether" trials, designed to provide helpful information to the entire class of cases in this MDL.

To prove that formula created from cow's-milk formula causes NEC, MDL Plaintiffs have retained Dr. Logan Spector as an expert witness. Dr. Spector is a Professor and Director of the Division of Epidemiology and Clinical Research in the Department of Pediatrics at the University of Minnesota Medical School. (Spector Am. Rep. [53-6] at 3.) He earned his Ph.D. in Epidemiology from Emory University in 2002 and then joined the University of Minnesota's faculty as a postdoctoral fellow. (*Id.*) He has published some 200 articles in peer-reviewed journals, focusing his research on the causes and outcomes of childhood cancers—specifically, hepatoblastoma, a liver cancer that disproportionately affects babies of very low birth weights. In the course of this work, Spector has "bec[o]me very familiar with NEC and other NICU issues." (Hearing Tr. [124] at 5:20–6:6.) While Dr. Spector has not conducted research on NEC specifically prior to this litigation, he is a generalist in pediatric epidemiology and has experience in epidemiological study design and analysis. (Spector Am. Rep. [53-6] at 4.)

Plaintiffs in this MDL have retained Dr. Spector to offer a general causation opinion on the relationship between cow's-milk-based formula ("CMBF") and NEC. His opinion is based on a

2

statistical analysis that he conducted in a "systematic literature review" ("SLR") of randomized clinical trials ("RCTs") exploring the association between CMBF and NEC. The court described Dr. Spector's qualifications and methodology in greater detail in an earlier order, *see* 2025 WL 1283927, at *2–7, concluding there that Dr. Spector was qualified as an expert on this issue and had employed sound methodology under the criteria of FED. R. EVID. 702 and *Daubert*. The court rejected a *Daubert* challenge brought by formula manufacturers Abbott Laboratories and Mead Johnson, reasoning that, although Dr. Spector "could not opine as to the threshold dose at which CMBF increases the risk of NEC," his "broad analysis of studies exploring a range of different feeding mixtures applies across the diverse feeding methods in the MDL cases." *Id.* at *10–11 (citation omitted).

In a subsequent order in the *Diggs* bellwether, however, the court excluded Dr. Spector's opinion on the basis that his opinion failed the "fit" test. *Diggs*, 2025 WL 2377686, at *5. The infant in the *Diggs* litigation was born at 32 weeks' gestation and weighed more than 2,000 grams; the court observed that "almost every study Dr. Spector considered—and *all* studies that supported a finding of association between CMBF and NEC—would have excluded [the *Diggs* infant] based on his 2,000 gram birthweight, 32-week gestational age, or both." *Id.* This deviation was significant because prematurity and low birth weight are significant risk factors for NEC, and none of the studies Dr. Spector reviewed showed an association between CMBF and NEC in infants of that infant's maturity (i.e., his weight and gestational age). *Id.* Thus, the court determined that Dr. Spector's opinion would not be helpful to the jury in that case. *Id.* Mead Johnson raises a similar challenge to Dr. Spector's opinion here; in arguing that Dr. Spector's opinion is not relevant to this case, Mead Johnson points to the brief period when, due to a suspicion that Daniel suffered from a genetic disorder, he was fed an alternative formula. (Mot. [53] at 3.) For the reasons explained here, the court does not agree that these circumstances defeat the relevance of Dr. Spector's causation opinion.

**DISCUSSION**

## I.     Legal Standard

Under FED. R. EVID. 702, an expert witness must be qualified by specialized knowledge or skill, their testimony must be relevant and assist the trier of fact, and their methods must "demonstrate sufficient reliability" in both the underlying data and its application to the facts of the case.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citing FED. R. EVID. 702).  In *Daubert*, the Supreme Court held that the Federal Rules of Evidence require the trial judge to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  The court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.' "  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

Although the court must assess whether the expert's methodology is reliable, "this obligation "does not ordinarily extend to the reliability of the conclusions those methods produce— that is, whether the conclusions are unimpeachable."  *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025) (citations and quotations omitted).  So long as the expert's testimony is "based on a valid and properly applied methodology," it is admissible even if the expert reaches "a conclusion that is subject to doubt."  *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–66 (7th Cir. 2013).  "[T]he accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' "  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596).

**II.    Analysis**

In renewing their challenge to admission of Dr. Spector's testimony, Defendant contends that due to Daniel's brief ingestion of hydrolyzed, hypoallergenic formulas—Nutramigen and Pregestimil—Dr. Spector's opinion does not fit the facts of this case, and thus will not be helpful to the jury.  (Def.'s Mem. [53] at 4.)  The court disagrees.

As the court explained in its omnibus ruling, Dr. Spector is qualified, his methodology is sound, and his opinion will be helpful to the jury in the cases within this MDL.  Dr. Spector's testimony fits this specific case, as well, because he opines as to a link between CMBF and necrotizing enterocolitis among infants born roughly at Daniel's prematurity, an opinion that is at least arguably supported by the medical literature; that Daniel was occasionally fed hydrolyzed formulas does not render Dr. Spector's opinion irrelevant to this case.  There is no requirement that expert testimony consider epidemiological studies that mirror the idiosyncratic circumstances of each individual infant in order to "fit" the case.  Such a requirement is unrealistic, particularly in a context where conducting a randomly controlled study at all is challenging.  There is no requirement that a general causation witness consider the individual circumstances of each infant; a plaintiff can establish a causation theory through more than one witness, and Plaintiff's apparent plan to rely on the general causation opinion of Dr. Spector together with the specific causation opinion of Dr. DeZure appears reasonable. *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2023 WL 7183216, at *4 (N.D. Ill. Nov. 1, 2023) (Kennelly, J.) ("Experts' general causation reports can hardly be expected to discuss the precise circumstances of each potential plaintiff's injury.  That would effectively erase the distinction between general and specific causation.").

In arguing that feedings of hydrolyzed formulas render Dr. Spector's causation opinion irrelevant, Mead Johnson appears to suggest that hydrolyzed formulas might be an intervening cause for Daniel's developing NEC.  If this is the thrust of Mead Johnson's argument, it is in effect an intervening causation argument dressed up as a *Daubert* "fit" argument.  Intervening causes

5

are typically the domain of specific causation witnesses, so, again, the court does not fault Dr. Spector for not considering individual causes that might have been present in Daniel's case. *See Hardeman v. Monsanto Co.*, 997 F.3d 941, 966 (9th Cir. 2021). In any event, causation is typically a jury question. If Mead Johnson has evidence that Daniel's intermittent feedings of Nutramigen and Pregestimil feedings increased Daniel's risk of NEC, it is free to cross-examine Dr. DeZure on this issue and present such arguments to the jury at trial.

Defendant is correct that the court previously excluded Dr. Spector's opinion in the prior *Diggs* bellwether, but that case differs. Based on his weight and gestation, the *Diggs* infant would have been excluded from almost all of the studies relied upon by Dr. Spector. Dr. Spector explicitly acknowledged that his opinion was limited to infants of a certain weight and age group because prematurity leads to greater NEC risk, and that "extrapolation" was required to extend his opinion to more mature infants. (Spector Dep. [616-3] in Case No. 22-cv-00071 at 395:2–11; Daubert Tr. [124] at 44:18–25.) The *Inman* infant, in contrast, was firmly within the weight and age of infants considered by the studies relied upon by Dr. Spector.

Moreover, contrary to Defendant's assertion otherwise, it is not clear that Daniel would have been excluded from the studies in Dr. Spector's SLR based on his ingestion of hypoallergenic formula during the course of his treatment in the NICU. As Dr. Spector explained in his *Daubert* hearing testimony, RCTs of the kind he analyzed employ the doctrine of "intention to treat," meaning that "when you conduct a randomized trial, you need to analyze everybody who is randomized to an arm in that arm, regardless of what happens after the randomization." (Daubert Tr. [124] at 15:9–15.) This principle is demonstrated by reference to the Colaizy 2024 study, where several infants that were randomized into each arm of the study were switched from the study diet to an "open label diet" either temporarily or permanently. (Colaizy Study [53-5] at 4.) Despite this change in their diets, the "intent to treat" principle required that these infants' outcomes were not excluded from the researcher's final assessment. (Daubert Tr. [124] at 20:8–21.) Similarly, there is no basis for the assumption that Daniel, who would have met the inclusion

6

criteria of many, if not most, of the studies included in Dr. Spector's SLR based on his birth-weight and gestational age, would have been excluded from the researchers' final assessments based on his temporary switch to hydrolyzed formulas.

The court concludes that Dr. Spector's testimony is relevant, fits the facts of this case, and will be helpful to the jury. He may testify at trial.

## CONCLUSION

The motion to exclude [53] the testimony of Dr. Spector is denied.

ENTER:

Dated: May 12, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

7