# Exhibit 1

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fasx: (702) 382-1169

Proposed Attorneys for Debtor

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>MEDOLAC LABORATORIES, A PUBLIC BENEFIT CORPORATION,<br><br>Debtor. | Case No. 21-11271-abl<br>Chapter 11 |

**OMNIBUS DECLARATION OF ELENA M. MEDO IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION, INITIAL EMERGENCY MOTIONS, AND RELATED RELIEF**

I, Elena M. Medo, hereby declare as follows:

1. I am over the age of 18 and am mentally competent. I make this Declaration in support of the initial emergency motions requesting various types of immediate relief (collectively, the "Initial Motions") filed by Medolac Laboratories, a Delaware public benefit corporation, as debtor and debtor in possession (the "Debtor" or "Medolac"), in its chapter 11 bankruptcy case (the "Chapter 11 Case"), as well as such other relief as may be requested.

2. I am the Debtor's President, Treasurer, and Chief Executive Officer ("CEO") and have worked in that capacity since I founded it in February 2009, and have also served as Chair of its Board of Directors for that same period of time as well. Prior to founding Medolac in 2009, I was the founder and CEO of Prolacta Bioscience, Inc. ("Prolacta") from 1999 to 2006 and continued to work at Prolacta until 2008. Prior to working for Prolacta, I was founder and CEO

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

of White River Concepts, a breast pump company, from 1986 to 1999. I received my Master of Business Administration from the University of California, Irvine in 2006, and a Bachelor of Arts in Humanities in 1999 from the Union Institute.

3. Based upon my experience with Medolac, I am readily familiar with its operational and financial affairs. All facts set forth in this Declaration are based upon my own personal knowledge of Medolac's operations and finances, or information learned from my review of relevant documents maintained in the ordinary course of its business and which are business records. If called upon to testify as to the contents of this Declaration, I could and would do so as set forth herein.

4. This Declaration provides the Court with certain background information regarding Medolac, as well as the context for various relief requested. Accordingly, the Declaration is organized into two parts: first, an overview of Medolac, its operations, and the events leading to its Chapter 11 Case; and second, an explanation of the relief sought in the Debtor's Initial Motions.[1] The relief sought in the Initial Motions is critical to the Debtor's operations, will allow for a smooth transition into chapter 11, and will help to ensure that the Debtor is provided the opportunity to reorganize successfully.

## I. BACKGROUND

### A. Business Overview and Management.

5. Medolac is a Delaware public benefit corporation ("PBC") with a principal place of business located at 1031 Boulder City Parkway, Boulder City, Nevada 89005. Medolac processes human milk products utilizing proven food-processing methods to produce the first sterile human milk-based nutrition that is shelf-stable at room temperature. Medolac was the first milk bank legally classified as a PBC.

6. A PBC is a for-profit corporation "that is intended to produce a public benefit or public benefits and to operate in a socially responsible and sustainable manner. To that end, a public benefit corporation shall be managed in a manner that balances the stockholders' pecuniary

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Initial Motions, all of which are being filed contemporaneously herewith.

interests, the best interests of those materially affected by the corporation's conduct, and the public benefit or public benefits identified in its certificate of incorporation." Del. Tit. 8 § 362(a). The term "public benefit" means "a positive effect (or reduction of negative effects) on 1 or more categories of persons, entities, communities or interests (other than stockholders in their capacities as stockholders) including, but not limited to, effects of an artistic, charitable, cultural, economic, educational, environmental, literary, medical, religious, scientific or technological nature." Del. Tit. 8 § 362(b). Operating in a "responsible and sustainable manner" means that management should consider the company's impact on the environment, its workforce and the communities in which it operates to minimize negative externalities. Medolac's stated mission is to increase access to processed human milk, especially for preterm and critically ill infants. A PBC generally must identify itself as such in its certificate of incorporation and with the words "public benefit corporation," or the abbreviation "P.B.C.," or the designation "PBC" in its name. Del. Tit. 7 §§ 362(a) and (c).

7. Aside from myself, Medolac's other officer is Doug Hawkins who serves as its Secretary. Aside from myself, Medolac's Board of Directors includes the following additional persons: Thomas Kalchik, previously regional director for the U.S. Department of Agriculture's ("USDA") Cooperative Business Centers and serves on the Board as part of the Medolac's Management, Supply and Facilitation Agreement with the Mother's Milk Cooperative, a supplier of mother's milk; Paul Feldstein, PhD, who is a noted health care economist; Doug Hawkins, who has 25 years of experience working for a large multinational infant nutrition company; and Ethel Hoffman, who spent much of her career working in an administrative role for a large hospital system.

**B. My Experience and Founding of Prolacta.**

8. I have been an active member of the neonatal and human milk industries since 1986 when I started a company designing, manufacturing, and selling breast pumps for hospital and home use. During this time, neonatologists were beginning to see better outcomes in very preterm infants who received mother's milk instead of infant formula, and there were a few very early studies indicating how valuable human milk was in their treatment. Although new mothers work

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

hard to provide enough milk for their preterm infants, they often fall short of the need. At the time, the only source of donor milk was through a small network of non-profit milk banks. Most physicians and hospitals had concerns with the safety and quality of milk from the small community milk banks. To make matters more challenging, preemies require more protein, vitamins and minerals for brain development than mother's milk contains, making it necessary to add a concentrated protein, called human milk fortifier made from cow's milk. At the time, all fortifiers were made from cow's milk.

9. By the early 1990's, neonatologists started to notice that babies receiving the cow's milk fortifier often suffered from a lethal intestinal infection called necrotizing enterocolitis ("NEC"). NEC has a case fatality rate of nearly 50% and if the child manages to survive the infection, they are often left with just 20% of their intestines after undergoing surgery to remove infected tissue. If they survive the surgery, some infants leave the hospital and live for a few years, in pain and often on a strict liquid diet. Some die in their primary years as a result of NEC and because of the extreme cost of their care.

10. After being a part of the neonatal community for 25 years, and marketing and selling my own line of breast pumps, I hypothesized that if preterm infants were to be fed exclusively human milk, outcomes would improve, NEC would be scarce, and the cost of care would decrease. The eradication of NEC became my personal and professional mission.

11. It was with this mission in mind that I started Prolacta in 1999, where I developed what was then the first and only 100% human milk-based fortifier for human milk. Through my work, I had an industry-changing impact for neonatal intensive care units ("NICUs") around the country and across the world by decreasing the risk of infection and other complications associated with the use of cow-milk based fortifiers and formulas.

12. It proved particularly difficult, however, to raise money for Prolacta. Investors stated that they were not convinced Prolacta could compete with the large multinational infant formula industry. Yet, at the same time, many physicians were frustrated with seeing otherwise perfectly healthy preterm babies die of NEC after receiving nutritional feedings containing cow's milk protein. Small amounts of seed money provided capital to augment my own financial

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

contribution to Prolacta. Finally, in 2001, I had lined up the investors needed to build a pilot plant. A week later, the terrorist attacks of September 11 happened and most of the funding fell through. My husband and I continued funding the company through additional development stages. Then, in 2002, I was able to secure the first round of investment from a venture capitalist and I began building the pilot plant. Subsequent investment thereafter was raised, the plant was built, and the products were produced and offered for sale in 2004-2005. I leveraged my previous relationships with hospitals to establish Prolacta's first accounts, including Johns Hopkins Hospital. The long-awaited human milk protein fortifier performed well in the hospital and data began to emerge to show a marked decrease in NEC.

13. I raised subsequent rounds of venture capital money, totaling $24 million and in 2006, the Board announced that they wanted to hire a CEO to replace me but asked me to stay on and help with specific duties. I agreed to continue assisting, and thereafter a new CEO, Scott Elster ("Mr. Elster") was named for Prolacta.

**C. Differences Arise, Leading to My Eventual Departure from Prolacta.**

14. Despite my sincere efforts to support Mr. Elster, I had significant differences of opinion and philosophy with him, and was significantly mistreated by him. I witnessed widespread abuse of female employees, inappropriate behavior in the workplace and alienation of many of the key decisionmakers at the hospital accounts I had already established before Mr. Elster joined Prolacta.

15. At one point, I witnessed Mr. Elster announce to Prolacta's Board that he intended to refile all of the company's patents. When I asked him how that would be possible, he indicated that he was going to change the priority date on the numerous patents that I had been filed. When I questioned the legality of this action, he stated that the U.S. Patent and Trademark Office (the "USPTO") was "too stupid to notice." Since I was the lead inventor on all of Prolacta's patents, I was concerned about Mrs. Elster's intentions, especially considering that, as the lead inventor on all of Prolacta's patents, I could be permanently barred from filing patents if it was found that I took part in fraud. Prolacta's patents are currently at risk in another lawsuit for this very reason involving Ni-Q, LLC, another provider of nutrition to at-risk infants.

Case: 2:21-cv-03237-ABC Document 175 Entered 03/09/26 14:59:05 Page 6 of 41 Page ID #1246

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

16. I also had concerns about safety of Prolacta's products under Mr. Elster's tenure, because his team and he wanted to eliminate key laboratory tests that would normally ensure optimum safety. On another occasion, I was shocked when I learned that Mr. Elster was planning to use coffee filters to remove sharp plastic shards from the milk that had resulted from a malfunction of the filling machine.

17. Mr. Elster was also racist and anti-gay and constantly made jokes in the workplace that were both offensive and in violation of labor laws. For example, Mr. Elster often told me to go home and play with her grandchildren and publicly speculated that I was going through menopause. Mr. Elster also would routinely take the male members of upper management to a strip club at lunch and when they came back, they would be loudly discussing what they saw there, describing the physical attributes of the strippers in graphic detail. Female employees at Prolacta were horrified and embarrassed by this. Many of these same allegations were made in a lawsuit filed recently by Prolacta's Vice President of Human Resources. In her lawsuit, which was recently settled with Prolacta, she describes a workplace where women were paid less, where racist, sexist and agist behavior was perpetrated and where labor laws were largely ignored. There are other lawsuits currently pending against Prolacta for similar offenses.

18. As a result of these same kind of concerns in addition to many others, I decided to quit my job at Prolacta in June 2008. I offered to stay on as a consultant during the transition and during that time, I produced several reports for the Board. But by early February 2009, I received an increasing number of phone calls from doctors at hospital accounts I had originally set up, begging for me to intervene with Mr. Elster on myriad subjects that were adversely affecting patient health. For example, when several individual doctors informed Prolacta that their patients receiving Prolacta fortifier were suffering the effects of a mineral deficiency, Mr. Elster and his management team falsely claimed that they had not had any other complaints. It was only when several neonatologists brought up the subject in a chat room for neonatologists that it was revealed they were all having trouble with the low mineral content and had all been told theirs was the only complaint. One particular phone call I received was about a premature baby who had been enrolled in the Prolacta multi-hospital clinical trial. The infant did well in the hospital and had gone home

when he was transitioned to infant formula. After two days on infant formula, the baby was readmitted to the intensive care unit in critical condition. The doctor contacted Mr. Elster, asking him to provide a small amount of fortifier at no cost to rescue the baby. Since the hospital had not yet approved the actual purchase of Prolacta products, it was not possible for the hospital to purchase it for the baby. Mr. Elster refused the request, telling the neonatologist that if he felt so strongly about providing it for the baby, he needed to reach for his personal gold card. Mr. Elster then reminded the doctor, "hey, we're the only game in town." The doctor was outraged and called me to ask for my intervention. When I tried to convince him to provide some fortifier to rescue the baby he still refused and told me never to bring these types of issues to him again or it would amount to insubordination.

19. While still at Prolacta, and with the permission of its Board, I worked on the development of a laboratory instrument to measure major nutrients like protein, carbohydrate, fat and total calories. I collaborated with a reputable instrument manufacturer to modify and refine a dairy milk analyzer so that it would function well to measure human milk nutrients. Prolacta's fortifier was designed to be mixed with mother's milk, but mother's milk nutrients vary widely, making precise fortification impossible. The intended use of the analyzer was to measure the true protein, total protein, fat, lactose and total calories in the mother's milk so that the hospital would know how much Prolacta fortifier should be added to the mother's milk. In light of the expense of Prolacta's product, I suggested that Prolacta should consider offering a program to place an analyzer into the hospital NICU under a fortifier supply contract. I presented the opportunity to Mr. Elster and Prolacta's Board, however, Mr. Elster ridiculed me in front of the Board and they had no interest in any involvement with the analyzer. I secured the Board's permission to start a company for the purposes of selling the analyzer to hospitals, with the Chairman John Bacich even suggesting that Prolacta and my new company could share leads and co-promote.

20. As a result, I started North American Instruments in 2008 and by the end of 2009, I had completed the development and started marketing the instruments to hospitals. At the time, I hoped that the revenue from selling the analyzer would provide income to augment my husband's social security payments, which was our only source of income after I had left Prolacta. After

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

selling the first few instruments to hospitals and funding some clinical research, however, I discovered that Prolacta was doing deals to give away a competitive analyzer for free to prevent hospitals from purchasing from my new company. The low volume of sales that resulted caused the equipment manufacturer to eventually mothball my project.

21. During the same period of time, Prolacta was nearing completion of a twelve hospital clinical research study to look at infant outcomes for babies receiving the Prolacta human milk protein fortifier. When the study ended, there was a large volume of fortifier left over. Mr. Elster informed the Board that the leftover fortifier would be discarded because it was within about 90 days of the "use by" date. I suggested that they could offer to donate the remaining fortifier to Oakland Children's Hospital and pointed out the goodwill that would result. That particular hospital had experienced a 25% NEC rate and during the study, the rate went down to less than 3%. But since the hospital serves a very low income population, it was clear they would not be able to afford the product. In the discussions with the Board, Mr. Elster stated that Children's Hospital Oakland would never be a customer because they could not afford it, so the issue of good will was not relevant and it would cost Prolacta to ship it. I offered to pay the freight myself or even to drive the product to Oakland. I also suggested that I could identify and meet with foundations and other charitable entities in the Bay Area to provide funding so that Oakland Children's could obtain the product on an ongoing basis. But when Mr. Elster ridiculed the idea, the Board refused to consider it and dumped the remaining product down the drain. At the time, I calculated that the amount of product that was dumped would have fed at least 30 preterm infants for their entire hospital stay. At that point, I realized that the company I had started with a mission to save baby's lives had a more pressing mission, focused primarily on profits at any cost. It was clear that Prolacta's lifesaving products were only going to be accessible to wealthy communities. Today, twelve years later, Prolacta is still the "only game in town" presently and its products are so expensive that they are rationed in NICUs.

22. As a result of these developments, I had no choice but to break my ties with Prolacta and terminate my consulting agreement five months early. I negotiated a mutual full release in exchange for giving proxy voting rights to Frank Foster. I held the majority of the common stock

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

in Prolacta at the time.

**D. <u>My Founding of Medolac.</u>**

23. With my full release in hand, there was no reason I could not compete in the industry. Due to the fact that hospitals in low income areas could not access Prolacta's product, I set out to create a product that would be safer, higher quality and affordable. I founded Medolac (established as Neolac, Inc.) in 2009. Over the next few years, I contracted with several research labs and spent over $1.5M to develop new processes that would achieve those goals and ultimately result in economies of scale and lower prices to hospitals. I wanted to serve the hospitals and babies who were not able to afford the expensive Prolacta product.

24. In late 2010, I attended and testified at a hearing before the U.S. Food & Drug Administration (the "<u>FDA</u>") on milk banking and I publicly disclosed my plans to redesign the milk banking model by improving how human milk was being processed and to develop concentrated human milk immune factors. At the time, the milk banking model was based on unpaid donation of breast milk by altruistic nursing mothers. Chronic shortages of donor milk made it difficult for hospitals to rely on the limited supply for routine feeding in NICUs. Prior to the FDA hearing, it was a long-held belief that it was illegal to compensate nursing mothers for their milk. At the hearing, it became clear that there was no law against it and that as long as all the food safety rules and tissue banking rules were followed, compensating donors was not prohibited. Prolacta representatives were also at the hearing and heard my remarks. Because of their presence there, they were aware in 2010 that I was working to innovate human milk banking, yet, as hereinafter described, they filed suit five (5) years later, clearly beyond the statute of limitations to file the lawsuit, and in an effort to try and get rid of a competitor.

25. At that point, after selling to NICUs for 25 years, I knew that the demand would be much bigger than what could be provided by Prolacta and a handful of non-profit community milk banks. New mothers were under a great deal of pressure to return to work soon after birth and I felt strongly that a paid donor program could potentially provide new mothers with a source of income during their maternity leave. I sought and received a Cooperative Development Grant from the USDA, which led to the establishment of the first human milk bank owned and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

democratically controlled by the donors who provide the milk, called the Mothers Milk Cooperative Program. As Co-Op members, they would be paid for the milk, subject to passing all blood and milk safety testing. The Cooperative was launched in 2012 and the response was dramatic. Within a few short months, hundreds of donors had been blood tested by the American Red Cross and Medolac was ready to build its pilot plant.

26. I remained a Prolacta shareholder until 2012 when I sold all of my Prolacta interests to Health Evolution Partners, Prolacta's Series E investors. In addition to making innovative changes to milk banking, I worked to develop high volume processing that would result in economies of scale while rendering the product safer due to commercial sterility. By contrast, Prolacta's products are frozen, not sterile, have a short shelf life and must be shipped overnight. Because of the lack of sterility, hospitals are required to dispose of their product 24 hours after thawing, thus leading to tremendous waste. The combination of high prices, overnight freight cost and excessive waste made it cost-prohibitive for many hospitals to use Prolacta's product.

27. Medolac applied for and was awarded a Federal Discovery Grant and began contracting with labs to develop new processes to render human breast milk sterile and concentrate the proteins. These efforts resulted in a radically different processing method than what Prolacta and the non-profit milk banks used. The new process, used by infant formula companies to make preterm infant formula, rendered the milk commercially sterile so the risk of infection was virtually eliminated. Medolac's products have always been homogenized because so many preterm infants must be tube fed, the fat clings to the tubing unless the milk is homogenized. When this happens, as much as 30% of the fat can be lost and the infant is deprived of precious nutrients to help them gain weight.

28. When the development work was complete, I began raising money for Medolac, resulting in a $3.2M funding round raised from accredited investors, many of them doctors who wanted a safer, more affordable product for their preterm patients. Prolacta's high prices had resulted in severe rationing in NICUs and prevented doctors from being able to make the products available to all extremely preterm infants. There was growing resentment among doctors as a result. The value of an exclusive human milk diet was being confirmed by repeated studies and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

the realization that human milk is lifesaving led one neonatologist to say that every time he had to disconnect life support to a preterm infant who did not "qualify" for Prolacta under the strict rationing rules for, he became outraged. The same situation persists today. Medolac's original business plan predicted that it would have a competitive fortifier to market by 2016, however, as hereinafter discussed, the Prolacta Litigation (as hereinafter defined) derailed those plans.

29. Medolac spent its early years being operated out of my house. When it was time to build a pilot plant, we chose Oregon because California was in a major drought and Oregon had plenty of water. Medolac found a co-processor that could take the raw milk that had been tested and pooled by Medolac, and perform the final fill-and finish steps using their thermal processing equipment. This allowed Medolac to get into production without having to raise millions to purchase the equipment. Medolac's startup team included my daughter, Adrianne Weir ("Mrs. Weir"), her husband Shawn, my son, Aaron Medo, who was an electrical contractor and his wife, Jennifer, who had spent some time working to sell analyzers for North American Instruments. The family all moved to Oregon from Southern California in September of 2013 to begin work on the pilot plant.

30. A year later when the pilot plant was finished, Medolac started selling its first product, Co-Op Donor Milk. Less than 3 months later, in January 2015, Prolacta filed its lawsuit against me, and eventually Medolac and Mrs. Weir, claiming that we had stolen its trade secrets, and related claims, and in a readily transparent effort to try and remove Medolac as a competitor from the market.

**E. An Abbreviated Procedural History of the Prolacta Litigation.**

31. On January 20, 2015, as first amended on April 13, 2015, Prolacta, as plaintiff, filed its original complaint against me personally, as defendant, in the Superior Court, Orange County, California (the "California State Court"), Case No. 30-2015-00767116-CU-NP-CJC (the "Prolacta Litigation"). Over the ensuing years, Prolacta amended its complaint three (3) more times (for a total of four (4) times), and now includes as defendants Medolac and Mrs. Weir in addition to me (collectively, the "Defendants").

32. On November 14, 2017, Prolacta filed its *Fourth Amended Complaint* (the

"Complaint"), which is its current operative complaint in the Prolacta Litigation, which asserts the following claims:

(a) Conversion against the Defendants of Prolacta's alleged non-trade secret confidential material and proprietary information, including electronic and physical files and documents related to Prolacta's operations, corporate structure, management, marketing and promotional materials and presentations, product information and price lists;

(b) Intentional interference with prospective economic advantage against the Defendants for allegedly providing Prolacta's proprietary and confidential information and trade secrets, disparaging Prolacta to customers, potential customers and Prolacta employees with the intent to steal business and employees from Prolacta and/or with the intent to damage Prolacta's reputation and business, and with Medolac being vicariously liable for the alleged harm caused;

(c) Unfair competition pursuant to California Business & Professionals Code § 17200, *et seq.*, against the Defendants by: (1) acts that were alleged to be unlawful, unfair, and/or deceptive other than misappropriation of trade secret information from Medolac by allegedly providing non-trade secret, confidential material and proprietary information and documents to me and/or Medolac; (2) by allegedly breaching their contractual obligations to Prolacta, including nondisclosure agreements and/or contractual confidentiality provisions; (3) by allegedly deceptively and falsely disparaged Prolacta to Prolacta's customers, potential customers and employees with the intent to steal business and employees away from Prolacta and/or with the intent to damage Prolacta's reputation and business and in breach of my Termination Agreement, and with Medolac being vicariously liable for the alleged harm caused.

(d) Breach of alleged fiduciary duty against CCC and me because I was an officer and director of Prolacta and, as such, owed a fiduciary and undivided duty of loyalty and confidentiality to it, and against CCC because it was a contractor that entered into a Services Agreement and a Non-Disclosure and Non-Circumvention Agreement with

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

Prolacta.

(e) Breach of contract against CCC, Ms. Weir and I for alleged breaches of a Non-Disclosure Agreements ("NDAs") by allegedly disclosing confidential and trade secret information, proprietary data, documents and property belonging to Prolacta after termination of their employment, and allegedly utilizing Prolacta's trade secret information to benefit and provide an unfair advantage to Medolac as a competitor;

(f) Breach of contract against me for alleged breach of my Termination Agreement with Prolacta for allegedly: (1) failing and refusing to return all materials belonging to Prolacta to Prolacta; (2) utilizing confidential proprietary information which I allegedly stole from Prolacta; and (3) disparaging Prolacta to customers, potential customers and Prolacta employees.

(g) Violation of the Uniform Trade Secrets Act, Cal. Civil Code § 3426 *et seq.*, against the Defendants for allegedly taking, acquiring, using and/or disclosing Prolacta's trade secrets, including customer lists, sales contact databases, medical databases, product pricing formulae, cost information and profit margin calculations, research and development documentation and results, documents and records related to Prolacta's clinical trials and product research and other proprietary information.

(g) Civil conspiracy against all Defendants;

(h) Vicarious liability pursuant to Cal. Civil Code § 2338 against CCC and Medolac, with CCC vicariously liable for Mr. Fannon's alleged misdeeds, and Medolac vicariously liable for Ms. Weir's and my alleged misdeeds. Mr. Fannon filed for personal bankruptcy as a result of the Prolacta lawsuit against him.

33. Since its inception, the Prolacta Litigation has been handled by three (3) different judges, and three (3) different discovery referees. In total, Prolacta took the deposition of thirty-three (33) different individuals all across the United States, and deposed me in particular for more than a week.

34. In January 2018, Medolac filed suit against Prolacta in Delaware for breach of contract related to my full release and for publicly disparaging Medolac and its products, as well

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

as me personally. In the full release, Prolacta had the opportunity to list any and all information that they deemed trade secrets but failed to do so within the time period designated in the Agreement. Prolacta routinely disparages me personally as well as Medolac's products to hospitals in an effort to discourage them from purchasing our products. Prolacta was able to convince the court in Delaware to stay the case until the Prolacta Litigation against Medolac in California was finished. Since that has not happened, the case in Delaware also continues to remain stayed.

35. The written discovery in the Prolacta Litigation has been incredibly overbroad and overreaching and clearly designed to garner competitive information not related to the lawsuit. Overall, Prolacta had served hundreds of discovery requests, and served subpoenas for records on various third parties, including Salesforce.com, Inc., the California Department of Public Health, and the University of California, Irvine. Immediately after filing the lawsuit, Mr. Elster testified that Prolacta had no proof to support their accusations of trade secret theft. Prolacta took the depositions of 29 individuals, and the Defendants took the depositions of 14 individuals, 6 of whom Prolacta designated as its own corporate persons most qualified to testify on its behalf, and another 6 of whom Prolacta designated as its testifying experts. Medolac produced over 55,000 documents as part of the discovery process.

36. On September 3, 2019, the California State Court entered an order approving a stipulation among the parties providing that the fact discovery deadline was 30 days before trial and would close on September 27, 2019 (when trial was then set to proceed on October 28, 2019).

37. Trial in the Prolacta Litigation thereafter was continued multiple times at Prolacta's request, and eventually was scheduled to commence on February 24, 2020, with an estimated trial time of 28 days. As a result, all discovery in the Prolacta Litigation had fully closed as of early 2020 within a month of the February 2020 trial date.

38. In late January 2020, the parties each lodged their respective trial briefs with the California State Court. In its trial brief, Prolacta argued that it had discovered in late 2014 that I had allegedly taken and was utilizing through Medolac what Prolacta alleged was proprietary and confidential Prolacta data, including, but not limited to:

(a) Prolacta customer lists, and in particular, a spreadsheet containing a customer contacts from 2011;

(b) Prolacta medical databases, and in particular, a folder containing questions and answers between Prolacta's medical monitor and milk banks, including medical research performed for Prolacta to determine the effects of drugs and medical topics on the quality and safety of human breast milk, and the time required for the contamination of breast milk caused by the drugs to "washout" of a mother's system);

(c) Prolacta confidential pricing and profit information, and in particular, a Prolacta pricing and margin calculations spreadsheet and special pricing for two customers, which also included Prolacta's operating costs and pricing formula;

(d) Standard Operating Procedures, and in particular, regarding Prolacta's manufacturing process; and

(e) The Prolacta formula and manner to create its fortifier product. A fortifier is an enriched human-milk based product to nourish premature infants that is only sold through hospitals. Prolacta alleged that the Defendants had copied Prolacta's fortifier product, which fortifier Medolac currently has in clinical trials to sell as its own fortifier.

39. As to Prolacta's claim for interference with business relationships, Prolacta's trial brief alleged that Medolac was not only stealing away Prolacta's customers with Medolac's own competing fortifier product (that Prolacta alleges was stolen by me and used by Medolac), but also that Medolac had taken away certain of Prolacta's suppliers of donated raw breast milk as well.

40. As to Prolacta's claims for breach of contract and breach of the fiduciary duties of loyalty and confidentiality, its trial brief alleged that my various relationships gave rise to such duties. In particular, I was the founder and CEO of Prolacta until I transitioned to a consulting role on July 15, 2008. Thereafter, I continued to act as a consultant to Prolacta's Board of Directors until February 26, 2009, which was the date that I signed the Termination Agreement. Prolacta also alleges that due to the fact that I continued to be the majority common stockholder in Prolacta for three (3) years thereafter, I continued to owe fiduciary duties of loyalty and confidentiality until I sold my majority interest and divested myself of all my shares in Prolacta on or about August 31,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

2012. Specifically, Prolacta alleged in its trial brief that I breached my Confidentiality and Termination Agreement by fraudulent misrepresenting the facts with respect to that contract, and in particular, by failing to disclose to Prolacta that I had already began telling people in the industry that I was working on a new business to develop improved methods for formulated breast milk.

41. Finally, Prolacta's trial brief summarized its expert damages reports, which asserted that Medolac's unjust enrichment and Prolacta's actual "damages" resulted in approximately $19,000,000 in compensatory damages, as well as punitive damages. Prolacta's damage "calculation" appears to have been formulated by Mr. Elster, whose "methodology" for such a calculation appears to be a compilation all of the costs Prolacta claims to have expended in developing its fortifier product, which was actually developed and marketed prior to Mr. Elster's tenure with Prolacta.

42. Trial in the Prolacta Litigation was expected to be lengthy. For example, the parties filed a list of 60 expected witnesses and estimated their testimony lasting more than 245 hours (and thus more than 30 days at 8 hours a day), and an exhibit list that contained 2,180 potential exhibits.

43. On February 24, 2020, trial in the Prolacta Litigation began before a jury, and Prolacta began putting on its case-in-chief, however, trial was stopped after several weeks on March 10, 2020, due to order of the Governor of California and Presiding Judge closing the courts due to the COVID-19 pandemic.

44. On March 12, 2020, the Defendants filed a supplemental brief regarding trade secret matters. Within the Prolacta Litigation, Prolacta has pursued a trade secret claim against the Defendants based on its contention that they allegedly misappropriated Prolacta's patented process for making its fortifier product. Specifically, on August 30, 2006, Prolacta's Provisional Application for the Patent was filed with the U.S. Patent and Trademark Office. Thereafter, Prolacta filed a full non-provisional PCT (Patent Cooperation Treaty) application on August 30, 2007. The PCT patent examiner then conducted an initial evaluation of the PCT application, which included publication of the entire pending application on March 6, 2008, whereupon the application had been disclosed to the world. As more particular set forth in a brief submitted by

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

Medolac, the foregoing public disclosure bars Prolacta's trade secret claim because public disclosure extinguishes any trade secret protection as a matter of law.

45. On May 26, 2020, Prolacta filed a motion seeking a mistrial due to the delay in the proceedings, which the California State Court later granted by minute order entered on September 14, 2020, and the Court thereafter discharged the jury.

46. On January 12, 2021, the California State Court held a Status Conference and ordered that trial in the Prolacta Litigation would re-commence anew from the beginning starting on January 10, 2022. The retrial, just like the original trial, is expected to take a month or more of trial time, and involve the same extensive number of exhibits and witnesses. The California State Court has not entered any order regarding reopening discovery in the Prolacta Litigation.

**F. <u>The Differences Between Medolac's New Fortifier and Prolacta's Old One.</u>**

47. Mother's milk, although ideal for full-term babies, lacks the protein and caloric density required by preterm infants to complete the growth and development that would naturally occur in the womb. An exclusively human milk diet has been shown to decrease death and illness in the preterm infant population. Because of the expense of the Prolacta fortifier, many hospitals still use the cow's milk protein fortifier made by infant formula companies, even though there is a higher documented risk of NEC.

48. There are numerous critical differences between Medolac's new and improved fortifier, and Prolacta's fortifier, including without limitation the following:

(a) Prolacta's fortifier is frozen and has a short shelf-life, whereas Medolac's is stored at room temperature and has a shelf life of over a year and thus Medolac's fortifier provides an unquestionably significant improvement.

(b) Prolacta's fortifier is not commercially sterile, whereas Medolac's is. Prolacta uses standard daily pasteurization – pasteurization does not kill all potentially harmful bacteria and spores. Medolac's new and different fortifier uses a process of destroying all bacteria and spores making it less risky for pre-term infants.

(c) Medolac's new fortifier can be safely kept in the refrigerator seven (7) days after opening, whereas Prolacta's fortifier must be discarded 24-48 hours after thawing.

(d) Medolac's product is homogenized, whereas Prolacta's is not. Homogenization prevents the fat from adhering to feeding tubes, which is a very important improvement because it helps preterm infants gain weight.

(e) Medolac's product has vitamins and minerals added, whereas Prolact's lacks added vitamins required for premature babies.

(f) Medolac's fortifier is ready to use and saves time for the nursing staff at the hospital because it does not have to be thawed before feeding.

(g) Medolac's product can be shipped by ground and does not have to be kept frozen during shipping, whereas Prolacta's fortifier must be shipped on dry ice overnight.

(h) The percentages and quantities of ingredients between Prolacta's and Medolac's fortifiers are entirely different, which one can readily see by comparing the labels containing the required governmental listing of the percentage and contents of vitamins and minerals. Medolac's formulation reflects the latest international recommendations for neonatal nutrition which have changed substantially since the Prolacta fortifier was developed.

(i) Medolac provided its novel fortifier to a major university medical center for clinical research on preterm infants. The study concluded several months ago and the principal investigator is preparing a manuscript for publication. The new Medolac fortifier performed exceptionally well in the study which centered on metrics measuring growth and tolerance. A clinical research study is nearly complete at another hospital where outcomes are being compared with the Prolacta fortifier. Prolacta has attempted to interfere with the study by claiming that the patient data from using their product is proprietary to Prolacta and should be considered a trade secret.

(j) Medolac's submitted its filing to the FDA Committee responsible for infant nutritional products last October. When questions are sent by this committee, the application is "paused" until the questions are answered. The submission is currently paused, awaiting additional information from the University researchers. It is unknown as to when Medolac's fortifier will be approved.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

(k) Prolacta's fortifier costs approximately $180.00 per ounce. The average volume required by a preterm infant is 200 ounces, which is the main reason its use is restricted to only the smallest preterm infants for a very short period of time. By contrast, I designed Medolac to have the ability to reduce its cost with increased scale, and as such Medolac hopes to deliver our fortifier for substantially less than Prolacta, making it possible for hospitals to provide the human milk fortifier to critically ill preemies for a longer period of time and expand the use to more preemies.

49. The foregoing critical differences belie Prolacta's claims that Medolac stole its fortifier and/or somehow is attempting to profit off of Prolacta's trade secrets as the two companies' fortifiers are substantially different products. Human milk banking has proliferated internationally and the processes for testing the donor, testing the milk, and processing the milk is widely published. Although Prolacta is the only currently approved source of human milk-based fortifier, they use basic dairy processing methods to make the fortifier, the same methods used by infant formula companies for over 40 years to make their cow's milk-based fortifier. Moreover, my team and I devoted years of research and $1.5M to develop Medolac's new fortifier.

50. Prolacta's Litigation is thus clearly motivated to avoid competition from Medolac. Prolacta simply does not want competition as it is able to charge extraordinarily high prices for its fortifier product, which sells to hospitals for $180/ounce, whereas Medolac's product will be substantially less expensive for hospitals to purchase and with the reduced waste, many more infants will be provided with safe, high quality human milk nutrition at a substantial savings when compared to Prolacta. Prolacta has also abused the discovery process in the Prolacta Litigation to pry into Medolac's business, find out who its customers are, and has actively attempted to dissuade hospitals from utilizing Medolac products. For example, Prolacta has repeatedly told hospitals that Medolac does not test the milk at all and that "it's a wonder that Medolac hasn't killed infants with its untested products." The six long years that Medolac has endured the Prolacta Litigation has drained the company of cash and made it difficult to raise sufficient funds, especially since millions of dollars of investment money has had to pay lawyers to defend Medolac against the baseless lawsuit. Prolacta is clearly using the expense and delays associated with the Prolacta

litigation to try to put Medolac out of business and in order to maintain its monopoly position as the only company to offer a human milk fortifier made from human milk worldwide. Prolacta's product is so expensive, labor intensive and in short supply that it is only used in the most extreme of situations, when in fact, a more economical and improved product like Medolac's will result in greater implementation and reduced mortality and morbidity among preterm infants.

**G. The Impact of the Prolacta Litigation on Medolac.**

51. The Prolacta Litigation has been extremely expensive and time consuming for Medolac, which is obviously Prolacta's intention. Medolac incurred attorney's fees and costs to its counsel of not less than $5 million over the course of the entire case, of which approximately $765,000 presently remains unpaid to its current law firm, Rutan & Tucker, LLP ("Rutan & Tucker"). Moreover, in just the trial preparation and trial, Medolac incurred approximately $500,000 in attorney's fees and costs, and thus the re-trial will likely cost it at least that much, if not more, plus the cost of any post-verdict and post-judgment proceedings and appeals, which will undoubtedly only increase the costs hundreds of thousands of dollars more.

52. As a result, in spite of the fact that Prolacta's claims in the Prolacta Litigation have always been and remain heavily disputed and clearly unliquidated, and in spite of Medolac's extremely promising business prospects, when faced with the prospects of another expensive and time consuming trial in the Prolacta Litigation next year, which proceedings Medolac and I simply cannot afford and against a well-financed plaintiff like Prolacta, and after consultation with our legal and financial advisors, Medolac made the difficult choice to file its voluntary petition for bankruptcy relief. Medolac's bankruptcy is thus filed to bring about an economical and expedient resolution to its business and financial affairs and to ensure that Medolac will be able to fulfill its public benefit mission of making human milk feeding available for all intensive care infants.

53. Another complicating factor is that Medolac's insurance carrier has refused to cover any further legal fees and costs in the Prolacta Litigation. Accordingly, Medolac has been left to shoulder the burden of the litigation costs, and also has a duty to indemnify various of the other personal defendants, including Mrs. Weir and me, which is cannot afford to do as well.

54. Additionally, in late January 2021, Rutan & Tucker gave notice to the Defendants

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

that it could no longer continue representing them in the Prolacta Litigation going forward without Medolac demonstrating an ability to bring its large outstanding invoice current, and that failing that, the law firm would seek to withdraw from representing the Defendants in the Prolacta Litigation.

55. The financial cost and time consumed by the Prolacta Litigation -- which is undoubtedly by design as Prolacta is a developed and well-funded company with an estimated $300M in annual revenue -- and intended to hamstring a startup competitor like Medolac, which has a superior and more affordable product, has weighed heavily on Medolac's financial prospects because it is an early stage company with promising products. As the original founder of Prolacta, I am well known and well respected in the neonatal medical community, making me the target of Prolacta's disparagement and attempted character assassination.

**H. <u>The Liquid Gold Litigation.</u>**

56. During the entire Prolacta Litigation, Medolac was continuously presenting the company to investors and most would turn it down specifically because of the risk of the ongoing Prolacta Litigation. Nonetheless, Medolac went through due diligence with dozens of potential investors, including the State of Nevada Battle Born Fund, however, all of them ultimately turned Medolac down, citing the risk of the litigation. That is why Medolac was surprised and excited when we met the Whiteheads, who had a business incubator for women called The Pink Ceiling. Medolac told them it was looking for investment and, with little or no due diligence, it invested $1.9M in a 2-year convertible note through an LLC they formed called Liquid Gold. They assured Medolac that they had other investors lined up for subsequent and full funding and that they were aware of the Prolacta lawsuit and simply made provisions in their investment documents for a larger conversion discount in the event that Prolacta prevailed in court.

57. On or about July 12, 2017, Liquid Gold, as investor, and Medolac, entered into a Note Purchase Agreement for a total of $2,000,000 (inclusive of a $100,000 investment from another party), which agreement, just like Medolac's other noteholder agreements, allowed Liquid Gold to convert its debt into preferred equity in Medolac.

58. In the first 6 months after Liquid Gold made its investment, it started pressing for

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

information about Medolac's key vendors, the product's cost of goods, step-by-step details on how Medolac made the products, and many things that investors normally do not ask. Liquid Gold representatives kept saying that they were going to line up more funding for Medolac and that was why they needed to know the details. After stating that they could help Medolac obtain the investment the company needed, they asked for a draft of Medolac Series B1 investment offering the company was preparing but had not yet launched. I provided it through a secure data room that required a confidentiality agreement to access. Not long after that, the same document was presented at my deposition in the Prolacta Litigation. It was not submitted as evidence, but it was clearly evident that Prolacta obtained it from the Whiteheads. A few months later, the Whiteheads tendered an offer to buy a majority stake in the company and step in as controlling managers. The tender offer was presented to the Medolac Board and they unanimously declined.

59. It was only after Liquid Gold notified Medolac in May 2018 that it would not be converting the note and wanted to be paid back that Medolac found disturbingly close connections between the Whiteheads and members of the Draper family, who are large investors in Prolacta. Various magazine articles quoted Cindy Whitehead and Jesse Draper as saying that they had invested in each other's venture capital offerings and "spoke daily about the businesses they funded." Liquid Gold, the entity that the Whiteheads put together to invest in Medolac, and the identity of the other members of the LLC were a closely kept secret by the Whiteheads. Medolac tried to negotiate, offering Liquid Gold more favorable terms as an incentive to convert its debt, which at that time was due less than a month later. Liquid Gold representatives asked Medolac to schedule a one hour briefing of what the company had accomplished in the past year but declined to identify the 7-8 people who were on the call for the presentation. I gave the presentation but was told shortly after, that they had decided not to convert their note to equity and would expect repayment immediately.

60. On August 14, 2019, Liquid Gold, as plaintiff, filed a *Complaint* against Medolac, as defendant, in the Superior Court for the State of Delaware (the "Delaware Superior Court"), Case No. N19C-08-115 MJ CCLD (the "Liquid Gold Litigation"), thereby asserting claims for breach of contract, for failure to pay the note when due, and unjust enrichment.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

61. On February 17, 2021, the Delaware Superior Court entered a final judgment in favor of Liquid Gold in the Liquid Gold Litigation in the amount of approximately $2,400,000.00 (the "<u>Liquid Gold Judgment</u>"), inclusive of principal, interest, attorney's fees and costs. Additionally, Liquid Gold began the initial steps of preparing to domesticate its judgment in Nevada and thus Medolac believed that enforcement of the Liquid Gold Judgment in Nevada was imminent. The threat of enforcement of the Liquid Gold Judgment and the potential disruption and dislocation that would have on Medolac's operations was an additional reason the company considered in deciding to file for bankruptcy protection.

**I. <u>The *Evolve-Abbott* Litigation and the Third-Party Subpoena on Medolac.</u>**

62. Evolve Biosystems, Inc. ("<u>Evolve</u>") is the maker of the EVIVO® probiotic product for infants. In 2019, Evolve sued Abbott Laboratories ("<u>Abbott</u>") in the U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 19-cv-5859 (the "<u>Evolve Litigation</u>"). Medolac is not a party to the Evolve Litigation. In the Evolve Litigation, Evolve asserts numerous patent infringement claims against related to its allegedly infringing Similac® Probiotic Tri-Blend product. Specifically, Evolve alleges that the combination of Abbott's Similac® Probiotic Tri-Blend product with human milk products violates patents pertaining to human milk oligosaccharides ("<u>HMOs</u>").[2]

63. In or about September 2020, Evolve issued a third-party subpoena to Medolac (the "<u>Evolve Subpoena</u>") within the Evolve Litigation, which requested the very lifeblood of Medolac's business: samples of its Benefit line of Products, as well as step-by-step instructions on how it formulates and processes those products. Worse still, upon obtaining the Benefit Products, Evolve stated that it intended to subject those products to a detailed laboratory analysis.

64. To avoid motion practice though, Medolac engaged in months of cooperative negotiations with Evolve to modify the scope of the Evolve Subpoena. Those negotiations ultimately revealed that Evolve, a potential competitor to Medolac, is more interested in using its

---

[2] "Human milk oligosaccharides" or "HMOs" is a phrase used to describe human milk sugars found in breast milk. HMOs, which are essentially prebiotics, naturally occur in all mother's milk in various quantities and sizes. The specific HMO profile in mother's milk varies from woman to woman. In addition, the HMO profile may even vary from batch to batch for the same woman depending on factors such as the season, nutrition, stress, hormones, etc.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

subpoena power to capture Medolac's trade secrets than it is in prosecuting its claims against Abbott. Medolac sells its Benefit Products exclusively to hospital NICUs and, at the request of a physician, to caregivers of premature infants, meaning that Medolac products are not available to the public. This very narrow distribution channel helps protect against competitors accessing said products. If a competitor, or potential competitor like Evolve, gained possession of Medolac's Benefit Products, that competitor could attempt to reverse engineer the Benefit Products with the aid of professional de-formulation laboratory analysts.[4]

65. When negotiations to limit the Evolve Subpoena were unsuccessful, and to protect against the theft of Medolac's long-guarded secret and confidential research, development, and commercial information, on February 10, 2021, Medolac filed a *Motion to Quash or, in the Alternative, to Modify Subpoena Duces Tecum* (the "Motion to Quash") with the U.S. District Court for the District of Nevada, Las Vegas (the "Nevada Federal Court"), thereby commencing Case No. 2:21-cv-00224-APG-DJA.

66. The Motion to Quash asserts that a subpoenaing party like Evolve cannot obtain a non-party's trade secret or confidential information unless and until it satisfies its burden of establishing a substantial need for the requested information. Further, Medolac asserted that Evolve has no need, let alone a substantial need, to obtain and analyze Medolac's Benefit Products for purposes of the Evolve Litigation. In fact, and in a critical admission to Medolac's counsel, Evolve has no evidence to show that Abbott's Similac® Probiotic Tri-Blend product has ever been used in combination with Medolac's Benefit Products.[3]

67. In another telling admission, Evolve also has no evidence as to which hospitals Medolac distributes its Benefit Products, let alone which hospitals may (if at all) use the Benefit Products in conjunction with Abbott's Similac® Probiotic Tri-Blend 28 product. Indeed, when counsel for the parties reached an informal agreement for Medolac to provide, in lieu of its Benefits Products, a sample of the "pooled" raw mother's milk (a "Raw Sample") it uses to produce its packaged products, Evolve pivoted. In response Evolve demanded that Medolac affirm that the

[3] Another admission is that Evolve has no evidence as to which hospitals Medolac distributes its Benefit Products, let alone which hospitals may (if at all) use the Benefit Products in conjunction with Abbott's Similac® Probiotic Tri-Blend 28 product.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

HMO profile in the Raw Sample was representative of the HMO profile in all of Medolac's Benefit Products and, further, demanded to depose a Medolac representative regarding the company's specific formulas and processing methods used to produce its Benefit Products. With every pivot, Evolve's goal became more apparent: to obtain Medolac's confidential information by any means necessary.

68. Not only did Evolve's counsel's demands far exceed the bounds of what it originally requested in the Evolve Subpoena, even worse, they called for Medolac to provide false testimony and to reveal its trade secrets.[4] Medolac painstakingly explained that its Benefit Products do not have a "representative" HMO profile because they are separately made, batch after batch, by pooling together human donor milk from different donors, which can vary widely in the type and concentration of HMOs. When Evolve refused to withdraw its unreasonable and impossible demands, the parties reached an impasse, necessitating the Motion to Quash.

69. Additionally, once again, there is a connection to Prolacta. Both Prolacta and Evolve were funded millions of dollars by Silicon Valley based Alta Partners and their managing partner, Dan Janney, has served on both Evolve's and Prolacta's board for many years. Medolac simply cannot hand over this material, especially knowing the inter-relationships between Evolve and Prolacta. Evolve also may be trying to get evidence to file a nuisance patent lawsuit against Medolac, although Medolac does not do anything with prebiotics in its processing. Medolac has incurred over $20,000 in legal fees and costs for its litigation attorneys seeking to reach a reasonable compromise with litigation counsel. The Motion to Quash the Evolve Subpoena was in the middle of being briefed with the Nevada Federal Court as of the Petition Date, and thus remains unresolved.

## J. Medolac's Decision to File for Reorganization Under Subchapter V of Chapter 11.

70. Medolac has fed over 10,000 babies to date. Medolac had planned to have its fortifier to market by 2016-2018 but lacked the funds to support clinical trials, and due to the continual drain of legal expenses. Instead, Medolac provided its fortifier to a well-respected

[4] As Medolac explained *repeatedly*, the HMO profile in any given batch of pooled donor milk used to produce its products varies based on the women who donated to each batch, such that it is impossible for Medolac to affirm that a global or uniform HMO profile exists across all of its products.)

academic center and agreed to an investigator led study, which it did not have to pay for. It took over a year to complete the study. The fortifier is regulated as an exempt infant formula by the FDA and so Medolac filed its submission to the FDA in October 2020. The application is currently "paused" at the moment, waiting for additional data from the University. Medolac may receive FDA permission to market within the next 6-8 months but, in the meantime, it can no longer wait and had no other choice but to seek relief in bankruptcy court to restructuring its business and financial affairs in light of the ongoing Prolacta Litigation, the pending Liquid Gold Judgement, the Evolve-Abbott Third Party Subpoena, unpaid legal bills and a variety of vendor payables, all of which threaten to destroy Medolac.

71. Unable to raise the necessary operating capital, Medolac began falling behind with vendors and several lawsuits were filed to collect. While domiciled in Oregon, after Prolacta filed the lawsuit, Medolac could not make payroll and had to lay off several people, were sued for the wages and made payments to pay them off. Medolac negotiated settlements, kept to the payment plans and paid the vendors while I, as well as the members of my family, did not take paychecks for months on end. Meanwhile, Medolac could not afford a sales force, so it took a few members of our production team and had them start calling hospitals and sending out information.

72. As a result of all of the foregoing combination of issues, and after consultation with its legal and financial advisors, Medolac thus made the difficult choice to file for bankruptcy, and in order to bring a more expedient and economical end to the Prolacta Litigation, stay enforcement of the Liquid Gold Judgment, stay other pending collection litigation from other noteholders and vendors, and also to allow its business to continue and in order to attract potential new investment.

## II. INITIAL MOTIONS

### A. Introduction.

73. Medolac's transition into Chapter 11 must be effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from this Chapter 11 Case. Accordingly, it is critical that the Debtor maintains a strong relationship with the community, its customer, vendors, creditors, and such other parties that enable the Debtor to conduct its business. To maintain and foster these relationships, it is important



LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

to minimize the distractions to the Debtor's business operations that could result from the Debtor's petitioning for chapter 11 relief.

74. I have reviewed and am generally familiar with the contents of each of the Initial Motions. Based on that familiarity and information supplied to me by other members of Debtor's advisors, I believe that the relief sought in each of the Initial Motions is necessary to enable Debtor to operate in this Chapter 11 Case with minimal disruption and loss of value.

**B. DIP Financing/Cash Collateral.**

75. The Debtor has only a single secured creditor, the U.S. Small Business Administration (the "SBA") for an Economic Injury Disaster Loan (the "EIDL") in the principal amount of $150,000.00 made on May 23, 2020, which is secured in all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. Further, the SBA was granted a security interest in all accessions, attachments, accessories, parts, supplies and replacements for the collateral, all products, proceeds and collections thereof and all records and data relating thereto (collectively, the "SBA Collateral").

76. On June 2, 2020, the SBA filed a financing statement with the Nevada Secretary of State perfecting its security interest in and to the SBA Collateral. The SBA did not take possession or control of Medolac's deposit funds or cash, and did not have a deposit account control agreement for any of its bank accounts, and thus is not secured and/or properly perfected in such specific personal property.

77. Additionally, several other creditors have also filed financing statements against the Debtor in Nevada, including the following: (a) Crestmark Vendor Finance for a retort machine with a total claim of approximately $114,668.53 pursuant to an equipment lease agreement dated as of September 20, 2018, and with a financing statement filed as to just that property only on

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

September 24, 2018; and (b) Targeted Lease Capital, LLC for a microplate reader, injector and centrifuge with a total claim of approximately $36,616.53 pursuant to an equipment lease agreement dated as of January 7, 2019, and with a financing statement filed as to just that small collection of property only on January 8, 2019. The Debtor believes these are "protective" financing statement filings in the event these parties' leases are (re)charaterized as secured/financed purchases.

78. As of the Petition Date, the Debtor has approximately $193,000 in cash held in its bank accounts, however, as set forth in the Budget, the Debtor requires approximately $330,000 to $360,000 per month in order to fund its operations. Accordingly, the Debtor lacks sufficient available cash on hand or access to credit to fund its operations, and thus was left with no other choice but to file its Chapter 11 Case in order to arrange for additional financing to fund ongoing operations and to allow for an orderly reorganization of its financial affairs.

79. The Debtor's ability to finance its operations post-petition is essential to its ability to maximize the value of its estate and successfully reorganize. The Debtor does not have sufficient liquid assets in its estate available to finance its operations post-petition through to confirmation of a plan of reorganization. As such, in the absence of the Debtor's obtaining credit pursuant to section 364 of the Bankruptcy Code, the Debtor's estate will suffer immediate and irreparable harm. The preservation, maintenance, and enhancement of the value of the Debtor is of the utmost significance and importance to a successful restructuring.

80. The terms and conditions of the DIP Loan Documents, and the proposed Interim Order, and the related relief requested herein are fair, reasonable, and in the best interests of the Debtor, its creditors, and its estate. The Debtor could not obtain financing from any other lender on terms equally or more favorable than the DIP Loan offered by the DIP Lender, and certainly not before all of the Debtor's limited cash resources were depleted by the search. The Debtor exercised its best business judgment in negotiating the DIP Loan Documents and the Interim Order that is presently before the Court.

81. The DIP Lender's offer to provide the DIP Loan as an administrative claim and a superpriority priming lien loan pursuant to section 364(d) of the Bankruptcy Code, in an amount

necessary to meet the Debtor's working capital needs on the terms, and within the time frame provided, simply cannot, in the Debtor's judgment, be matched by any third-party lender. The DIP Lender has already performed all the due diligence necessary in connection with the DIP Loan and, thus, is well positioned to provide post-petition financing to the Debtor.

82. The DIP Lender, Doug Hughes, is an existing Medolac shareholder who participated in a Series B preferred equity offering in March 2021. In particular, Mr. Hughes invested $3,394,460.42 in exchange for receiving 2,108,361 shares in Medolac, which is equal to approximately 12.7% of the issued and outstanding shares of Medolac.

83. The Debtor has been unsuccessful in its efforts to obtain additional funding prior to negotiating the proposed DIP financing facility.

84. Here, the Debtor has exercised the utmost level of care in selecting and entering into the DIP Facility. The Debtor's management engaged in extensive deliberations regarding the company's liquidity and financing options, in consultation with experienced legal and financial advisors. Moreover, the Debtor carried out a meaningful search for financing, and eventually selected the option offering the best terms following rounds of negotiations. Accordingly, the decision to enter into the DIP Facility is the product of the Debtor's sound business judgment.

85. The Debtor engaged in a competitive process to obtain the most favorable postpetition financing available. The Debtor's process, and the negotiations of the terms of the DIP Facility, were carried out in good faith and at arm's length through experienced legal and financial advisors. Based on an evaluation of all reasonably available options, the DIP Facility represent the best financing available to the Debtor.

86. Further, given the Debtor's financial circumstances and credit profile, financing was not available except for secured indebtedness or alternative forms of capital that would have been unduly expensive or dilutive.

87. Finally, as described more fully above, the Debtor was unable to obtain financing without agreeing to provide the DIP Lender with certain terms enumerated herein. The Debtor submits that approving such terms is appropriate under the circumstances because (a) the DIP Lender was unwilling to extend credit without such terms; and (b) the terms of the DIP Facility

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

are otherwise favorable to the Debtor and its estate.

88. The DIP Facility was negotiated at arm's length and in good faith, that its terms are fair, reasonable and adequate, and that the DIP Facility represents the best financing available to the Debtor under the circumstances.

89. The DIP Facility is necessary for the continued operation of the Debtor's business and the preservation of its bankruptcy estate. In particular, the DIP Facility was sized based upon the Debtor's projected cash flow and liquidity needs for the anticipated duration of the Chapter 11 Case. Additionally, without access to this financing, the Debtor would lack sufficient liquidity to continue operating, putting at risk its assets and jeopardizing any recovery for creditors. Accordingly, the DIP Facility preserves the Debtor's operations and is in the best interests of its estate and its creditors.

90. Absent authorization from the Court to access the DIP Loan on an interim basis pending a Final Hearing, the Debtor and its creditors will be immediately and irreparably harmed. As set forth above, the Debtor's ability to access the DIP Facility on the terms described herein is critical to their ability to operate their business. Accordingly, the Interim Order should be granted.

91. The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtor to access $150,000.00 on an interim basis under the DIP Facility, is not granted promptly after the Petition Date. The Debtor has an immediate need for access to financing to continue the operation of their business, meet payroll, procure other goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtor's value for the benefit of all parties in interest.

92. Access to the DIP Facility during the Interim Period would provide the Debtor sufficient liquidity to stabilize its operations and fund the administration of this Chapter 11 Case. Specifically, the DIP Facility will allow the Debtor to: (a) acquire supplies that are essential to the Debtor's ability to provide uninterrupted services to its customers; (b) provide the liquidity necessary to stabilize the Debtor's operations; (c) fund payroll obligations coming due in the Chapter 11 Case; (d) fund other essential payments made under first day orders; and (e) fund the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

administrative costs of this Chapter 11 Case. Given the nature of the Debtor's business, any interruption of the Debtor's ability to pay vendors and operate its business could have devastating consequences on its reorganization.

93. The DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms pursuant to which the Debtor could obtain postpetition financing. All negotiations regarding the DIP Facility were conducted in good faith and on an arm's length basis. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with a Budget. Further, no consideration is being provided to any party to the DIP Facility other than as described herein or set forth in the DIP Loan Agreement. Accordingly, at the Final Hearing, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

94. Accordingly, the Court should grant emergency, interim approval of the Debtor's Motion for Approval of DIP Financing and use of Cash Collateral or Alleged Cash Collateral, and also schedule a Final Hearing for consideration of final approval of the Motion.

**C. Employee Wages.**

95. As of the Petition Date, the Debtor employs approximately 23 employees (collectively, the "Employees"), 20 of which are full-time, and 3 of which is part-time, in the ordinary course of its business whose continued service is vital to Debtor's ongoing operations and reorganization efforts. As of the Petition Date, the Employees were owed or had accrued in their favor, various sums for wages and salaries incurred in the ordinary course of the Debtor's business and operations, including prepetition compensation (collectively, the "Wage Obligations"). The total estimated amount of Wage Obligations that will have accrued but remain unpaid as of the Petition Date is approximately $14,000.00, which represents two (2) days of the pay period. The Debtor pays its Employees twice a month, on the 5th and the 20th of the month, and one (1) week in arrears. For example, Medolac's specific payroll period for which it seeks authorization and approval to pay in this Motion is from March 16, 2021 through March 31, 2021,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

and thus encompasses two (2) days pre-petition, including the Petition Date. The Debtor seeks authorization to continue to pay these Wage Obligations in the ordinary course of business.

96. The Debtor is required by law to withhold from the Employees' wages amounts related to federal and state income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities. To the extent that the Debtor has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, the Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business. In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. For the pay period in question, these sums total approximately $1,100.00. The Debtor seeks authorization to continue to pay or turn over these funds to the applicable authorities in the ordinary course of business.

97. The Debtor also provides its Employees with three forms of regular paid time off ("PTO") consisting of holidays, vacation and sick leave time (collectively, the "PTO Policy"). Many Employees have not used their proportionate amount of PTO as of the Petition Date. The Debtor has accrued approximately $49,020.40 in PTO obligations year-to-date as of the Petition Date. The Debtor requests authority to honor its PTO Policy and accruals, and continue to implement the PTO Policy on a post-petition basis and in the ordinary course of the Debtor's business.

98. In the ordinary course of processing payroll checks for its Employees, the Debtor also withholds certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not been forwarded yet to the respective counterparties who are tasked with collecting the funds. As of the Petition Date, the Debtor estimates the total Garnishments withheld are less than approximately $500.00. The Debtor requests permission to pay over any such

Garnishments in the ordinary course of business.

99. In the ordinary course of its business, the Debtor also accrues amounts for contributions to health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, the "Employee Benefit Plans"). These benefits include health plans (i.e. medical, dental, vision, and life insurance), various welfare plans (i.e. life insurance, disability insurances, accidental death and dismemberment insurance), and other employee assistance programs. These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions that will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be $2,175.87. The Debtor seeks authorization to continue to pay such Employee Benefit Contributions in the ordinary course of business.

100. In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor (the "Reimbursable Business Expenses"). The Chapter 11 Case was filed during the Debtor's normal payroll periods for hourly and salaried Employees and during their normal reimbursement cycle for Reimbursable Business Expenses. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed. The Debtor cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, estimates that amount does not exceed $3,000.00. The Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business provided that they do not exceed, in the aggregate, the foregoing estimate.

101. The Wage Obligations, PTO Policy, and Employee Benefit Contributions to be paid to or for the benefit of each of the Employees will not exceed $12,850.00 per employee, consistent with the cap provided in section 507(a)(4) of the Bankruptcy Code.

102. Finally, under the laws of the State of Nevada, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

from or related to their employment with the Debtor. The Debtor currently maintains an annual workers' compensation policy (the "Workers' Comp Policy") pursuant to which it provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability. The current term of the Workers' Comp Policy runs through December 30, 2021, and costs approximately $8,900.00 on an annual basis, with $838.00 payable monthly. As of the Petition Date, the Debtor owes approximately $6,704.00 for its Workers' Comp Policy. The Debtor hereby seeks authority to maintain its Workers' Comp Policy in accordance with applicable law post-petition and to pay all premium installments as they come due in the ordinary course of business.

103. If Debtor is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date, there is a significant risk that essential Employees will resign and that those Employees that remain will be discontented and demoralized. As such, continued payment of Wage Obligations, Employee Benefit Contributions, PTO Policy, Garnishments, Reimbursable Business Expenses, Worker's Comp Policy and other matters set forth herein is essential to maintain positive relations between Debtor and its Employees, as well as to comply with applicable State law. If the relief requested herein is not granted, the success of Debtor's ongoing operations and reorganization will be placed in substantial jeopardy, and the Debtor will likely be in violation of various State laws. Thus, the relief request herein in the best interests of the of Debtor, its estate, its creditors, and all other parties in interest.

104. If the outstanding employee obligations are not satisfied or honored as set forth herein, Debtor will experience immediate and irreparable harm. Accordingly, the Court should grant the Debtor's Employee Wage Motion.

**D. Cash Management.**

105. To manage its business efficiently and seamlessly, the Debtor utilizes a cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business. The Cash Management System facilitates Debtor's cash monitoring, forecasting, and reporting. In

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

connection with the Cash Management System, the Debtor proposes to maintain control over the administration of its bank accounts and at the banks indicated herein.

106. The Debtor requests (i) authority to continue to operate the Cash Management System, including to fund the operations of Debtor in the ordinary course of business, consistent with its prepetition practices, as modified herein, (ii) authority to honor certain prepetition obligations related to the use of the Cash Management System, and (iii) authority to maintain existing business forms.

107. In the ordinary course of business prior to the Petition Date, the Debtor used the Cash Management System, which is similar to those utilized by other large companies, to collect, transfer, and distribute funds generated by Debtor's business operations efficiently. In the ordinary course of business, the Debtor accurately recorded such collections, transfers, and disbursements as they were made. Currently, the Debtor has numerous bank accounts with various institutions as follows: five (5) accounts with Boulder Dam Credit Union, including one (1) checking account and four (4) savings accounts; one (1) account with Greater Nevada Credit Union; one (1) account with KeyBank for its operating account, and one (1) account with Wells Fargo Bank (collectively, as applicable the "Banks" and the "Bank Accounts").

108. Some of the Debtor's customers use credit cards to make payments. Thus, the Debtor also has a merchant account through which payments made through credit card companies are processed. The Debtor has been advised that it would take a substantial amount of time to obtain a new merchant account. Hence, if the Debtor is not permitted to continue to use the merchant account as debtor-in-possession, it could not offer its customers the service of allowing them to pay its bills by credit card for whatever period of time it would take for Debtor to obtain new a merchant account. The absence of credit card services even for a short period of time would materially and adversely affect Debtor's business. As of the Petition Date, customer drafts relating to such credit cards were in various stages of collection. To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of the estates to be authorized to continue to its ordinary course credit card transactions, rather than to close this account and then open a new account.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

109. Given the complexity of the existing Cash Management System and the confusion and inefficiency that would be caused by trying to change it, the Debtor has determined to continue its prepetition cash management practices in the post-petition period to a large extent. Debtor's Cash Management System constitutes ordinary course, essential business practices providing significant benefits to Debtor including, *inter alia*, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon Debtor's value.

110. The Debtor will maintain its books and records relating to the Cash Management System to the same extent the books and records were maintained before the Petition Date. In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained. As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate, and all creditors and parties in interest. Therefore, the Debtor seeks authority to maintain and use its Cash Management System during its Chapter 11 Case.

111. In connection with its use of the Cash Management System, Debtor incurs periodic service charges and other fees to the Banks for the maintenance of the Cash Management System (the "Service Charges"). Debtor is unaware of any unpaid prepetition Service Charges as of the Petition Date. However, out of abundance of caution, Debtor hereby requests authority to pay the prepetition Service Charges, if any, that remain unpaid as of the Petition Date. Payment of the prepetition Services Charges is in the best interests of Debtor, its estate and all parties in interest as it will prevent any disruption to the Cash Management System. Because the Banks have setoff rights with respect to the Service Charges, payment of any prepetition Service Charges would not affect unsecured creditors and the issue of paying any prepetition Service Charges would just be a matter of timing. Accordingly, the Debtor seek authority, at Debtor's sole discretion, the prepetition Service Charges, if any.

112. As part of the Cash Management System, the Debtor maintains numerous Bank Accounts. Debtor routinely deposits and withdraw funds from the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers. Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Petition Date, the closure of Debtor's prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. The Debtor believes, however, that its transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of its case with the same account numbers; *provided*, *however*, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

113. Unless otherwise ordered by this Court, no Banks shall honor or pay any check issued on account of a prepetition claim. Any bank may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored. Furthermore, notwithstanding anything to the contrary in any other emergency and interim order or other order of this Court, the Debtor requests that the Banks be authorized to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Debtor further requests that the Banks should not be liable to any party for following the Debtor's instructions or representations regarding which checks should be honored.

114. By preserving business continuity and avoiding disruption and delay to Debtor's disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that would otherwise result, absent the relief requested herein, would ill-serve Debtor's rehabilitative efforts.

115. Accordingly, the Debtor requests authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

116. In addition, to minimize expenses, Debtor further requests that it be authorized to continue to use its correspondence and business forms, including, but not limited to, purchase orders, checks, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to its status as debtor in possession. Because all of the Debtor's payments were made out of its bank accounts at the Banks, to the extent they use those bank accounts for payroll and vendor payments, it is requesting to continue to use such check stock; *provided, however*, that the Debtor shall commence marking "Debtor in Possession" and the chapter 11 case number on its own existing check stock and wire transfer instructions instead of having new stock printed with such marking.

117. If the Debtor is not permitted to maintain and utilize its current Bank Accounts and its existing Business Forms, including check stock, the resultant prejudice will include significant (i) disruption to the Debtor's ordinary financial affairs and business operations, (ii) delay in the administration of Debtor's estate, and (iii) cost to the estate to set up new systems, open new accounts, print new business forms, and print new checks.

118. Accordingly, the Debtor's Cash Management Motion is necessary and appropriate, and should be approved.

**E. Utilities.**

119. In the ordinary course of operating the Debtor's business, the Debtor incurs utility expenses for water and sewer, electricity, natural gas, and waste management. In particular, the Debtor has an approximately 47,000 square foot facility that includes multiple large walk-in refrigerators and other large equipment used in the storage and processing of its raw materials and products. These utility services are provided by the utilities (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers"), and inclusive of water/sewer, electric, natural gas, internet, telephone, and waste removal. On average, the Debtor expends approximately $9,000.00, in the aggregate, each month on utility costs. As of the Petition Date, the Debtor is current on nearly all of its utility obligations owed to its current utility providers, and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

except for accrued amounts with other utility providers that have not been billed as of yet. Additionally, the Debtor already has an $800.00 balance on deposit with Southwest Gas, and a $845.00 balance on deposit with The City of Boulder City (for electric and water/sewer). Accordingly, the Debtor has some existing deposits on hand that provide certain utility vendors with adequate protection.

120. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to continue maintaining its stores, thereby negatively affecting customer relationships, revenues and profits. Such a result could jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during the Chapter 11 Case.

121. The Debtor intends to pay its post-petition utility obligations owed to the Utility Providers in a timely manner and keep them current on a go forward basis from and after the Petition Date. The Debtor expects that it will have access to such funds from operations, as well as access to debtor in possession financing to pay post-petition obligations to the Utility Providers. Given the monthly obligations to Utility Providers, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers that did not hold deposits from the Debtor on the Petition Date.

122. Given the long account history, and the monthly obligations to the Utility Providers, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers who did not hold deposits from the Debtor on the Petition Date.

123. Notwithstanding the Proposed Adequate Assurance for the Utility Providers, if the Utility Providers are not satisfied that they have received adequate assurance of future payment, the Debtor proposes the following procedures (the "Procedures") under which such dissatisfied Utility Provider may make additional requests for adequate assurance, which is detailed in the Debtor's Utilities Motion.

124. The Debtor believes it will have sufficient resources to pay, and intends to pay, all valid post-petition utility obligations for utility services in a timely manner. In addition, the Debtor

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170 Fax: (702) 382-1169

has a powerful incentive to stay current on its utility obligations because of the Debtor's reliance on utility services for the operation of its cleaning and sanitizing equipment. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payment is required in this Chapter 11 Case (the "Proposed Adequate Assurance"). In light of the foregoing, the Debtor respectfully submits that the Proposed Adequate Assurance for the Utility Providers are more than sufficient to assure the Utility Providers of future payment.

125. Moreover, if a Utility Provider disagrees with the Debtor's analysis, the Procedures will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations. If a Utility Provider fails to timely file a Request in accordance with the Procedures, however, such Utility Provider shall be deemed to consent to the Procedures and shall be bound by any order approving the Utilities Motion.

126. The proposed Procedures are necessary for the Debtor to carry out its reorganization efforts. If such Procedures are not approved, the Debtor could be forced to address a volume of requests by its Utility Providers during the critical first weeks of its reorganization. Moreover, the Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the 30th day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service would force operations to cease, and such disruption of operations could place the Debtor's reorganization efforts in jeopardy.

**F. <u>Designation of Responsible Person.</u>**

127. As previously noted, I am the Debtor's CEO and President, and have worked in those capacities since the company was founded in February 2009, and have also served as Chairwoman of its Board of Directors that entire time as well. Additionally, pursuant to the Debtor's corporate resolution authorizing it to file bankruptcy as attached to its Voluntary Petition [ECF No. 1] filed in this Chapter 11 Case, the Debtor's Board specifically authorized and approved me to serve as a designated responsible person for the Debtor in its Chapter 11 Case. Accordingly, I have the necessary background and knowledge and thus am suitable for serving as a designated

responsible person on behalf of Debtor in this Chapter 11 Case, and thus the Debtor's Motion to designate me as such should be approved.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED: March 19, 2021.

/s/ Elena M. Medo
ELENA M. MEDO

**LARSON & ZIRZOW, LLC**
**850 E. Bonneville Ave.**
**Las Vegas, Nevada 89101**
**Tel: (702) 382-1170 Fax: (702) 382-1169**